Andrew Gould (No. 013234)
Dallin B. Holt (No. 037419)
Brennan A.R. Bowen (No. 036639)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2575 East Camelback Road, Suite 860
Phoenix, Arizona 85016
(602) 388-1262
agould@holtzmanvogel.com
dholt@holtzmanvogel.com
bbowen@holtzmanvogel.com
minuteentries@holtzmanvogel.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SCOT MUSSI, GINA SWOBODA, in her capacity as Chair of the Republican Party of Arizona, and STEVEN GAYNOR<br><br>Plaintiffs,<br><br>v.<br><br>ADRIAN FONTES, in his official capacity as Arizona Secretary of State,<br><br>Defendant. | Case No.:<br><br>**COMPLAINT** |

Plaintiffs bring this Complaint against Defendant Adrian Fontes in his official capacity as the Arizona Secretary of State (the "Secretary"), and allege as follows:

**INTRODUCTION**

1. Section 8 of the National Voter Registration Act (the "NVRA"), 52 U.S.C. § 20507, requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . (A) the death of the registrant; or (B) a change in the residence of the registrant" to maintain accurate and updated voter-registration records in a uniform manner across the state. 52 U.S.C. § 20507(a)(4)(A)–(B).

2. Arizona has failed to comply with this requirement because Arizona voter registration data and statistics indicate the lack of an NVRA-compliant list maintenance program in the state.

3. Instead of establishing an efficient and uniform voter file maintenance program across Arizona, the Secretary—when providing information regarding its list maintenance programs to the state legislature—has responded that its program "is in development," meaning that the general maintenance program required of states by the NVRA does not currently exist in Arizona.

4. All counties in Arizona have registration rates that far exceed the national and statewide voter-registration rates in recent years.

5. Up to four Arizona counties—Apache, La Paz, Navajo, and Santa Cruz—have more registered voters than citizens over the age of 18 (*i.e.*, more registered voters than citizens eligible to register to vote).

6. Similarly, the remaining counties—apart from Greenlee (registration rate of approximately 76.5%)—have voter registration rates of between 80 and 99 percent, with the majority being over 90 percent.

7. These rates are implausibly high. By comparison, when reviewing latest Current Population Survey ("CPS") data from the U.S. Census Bureau and comparing estimates of registered voters who are actually eligible to be registered, the *national* voter registration rate as a percentage of potential voters is 69.1% (*i.e.*, average registration rate across the country) and for *Arizona* it is 69.9%.[1] The data made public by the Secretary show that Arizona counties have *actual* registration rates that exceed the *expected* registration rates provided by the U.S. Census Bureau and evidence a high rate of likely ineligible voter names on the official lists of eligible voters.

8. Based on even the most conservative data sources, Arizona has at least 500,000 registered voters on the voter rolls who should have otherwise been removed. In

---

[1] All the data discussed herein is supported by the expert report of Thomas M. Bryan, attached hereto as "Exhibit 1," and incorporated herein by reference.

other words, at least 500,000 registered voters currently listed on the Secretary's voter rolls for Arizona are deceased or no longer reside in Arizona.

9. And a review of other reliable data sources shows that Arizona has between 1,060,000 and 1,270,000 unaccounted-for voters on the state voter rolls.

10. Either way, at a minimum, reliable data shows that Arizona's voter rolls contain at least 500,000 voters that should not be currently registered.

11. Removing registered voters who have died is one of the ways voter rolls must, under Section 8, be maintained.

12. In looking at Arizona deaths compared to voter file removals, from December 2020 to the end of November 2022 (the "Study Period"), there were approximately 20,000 to 35,000 registered voters who died and were not removed from Arizona's voter rolls. This amounts to a removal shortage for deceased voters of 20%–35%. Meaning that, of the approximately 143,278 Arizona citizens of voting age who died during the study period, only 108,103 were removed from the voter rolls.

13. Additionally, for Maricopa County during the Study Period, the Election Administration and Voting Survey ("EAVS") conducted by the U.S. Election Assistance Commission ("EAC") shows that 752,387 voter registration confirmation notices were sent to voters listed on the registration rolls in Maricopa County to determine if they still lived at the location where they were registered to vote. And while the data shows that 131,682 voters were removed for various reasons from the notice batch, there are no reported voter responses or removals by the Secretary accounting for the status of the remaining 620,000 notice letters.

14. Unlike Maricopa County, in the remaining Arizona counties, nearly every notice letter that went out was accounted for in EAVS.

15. The data shows that even when unremoved deceased voters are excluded from the approximate 500,000 unaccounted-for registered voters on Arizona's voter rolls, there remains a significant difference between Arizona's Citizen Voting Age Population ("CVAP") and registered voters.

16. In other words, this data shows that the 500,000 unaccounted-for registered voters remaining on Arizona's voter rolls is primarily attributable to voters moving out of Arizona or voters who failed to respond to confirmation notices—both of which are established methods of maintaining clean and updated voter rolls.

17. The Secretary has admitted to the Arizona Legislature that he has not implemented an NVRA-compliant program to remove the names of ineligible voters from the official registration lists. Indeed, in every quarterly report since January 2023 provided to the Senate President and Speaker of the House—where the Secretary is required to account for voter roll list maintenance—the Secretary avers that the "process is in development" rather than outlining his voter list maintenance procedures.[2]

18. Based on this and other evidence, the Secretary is failing to make a reasonable effort to conduct appropriate list maintenance, despite the NVRA's requirement that he maintain updated and accurate voter rolls.

## JURISDICTION AND VENUE

19. The Court has subject-matter jurisdiction because this case alleges violations of the NVRA. 28 U.S.C. § 1331.

20. Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred in this County and because the Secretary "resides" here. 28 U.S.C. § 1391.

## PARTIES

21. Plaintiff Scot Mussi is a duly registered Arizona voter who lives in Maricopa County. Mussi regularly votes in Arizona's primary and general elections, and is currently President of the Arizona Free Enterprise Club. Mussi has spent nearly 20 years working on conservative issues and causes in Arizona, and he plans to vote in Arizona's upcoming federal and state elections.

22. As a result, Mussi has a clear interest in supporting the enforcement of laws such as the NVRA that promote fair and orderly elections.

---

[2] The Secretary's last four report letters are attached hereto as "Exhibit 2," and are incorporated herein by reference.

23. Plaintiff Gina Swoboda is Chair of the Republican Party of Arizona ("AZ GOP").

24. AZ GOP is a political party committee organized and operated pursuant to Title 16, Chapter 5 of the Arizona Revised Statutes.

25. As Chair of AZ GOP, Swoboda works in Arizona to advance conservative policies and to help elect Republican candidates. AZ GOP relies upon accurate voter registration rolls to engage in electoral activity, contact voters, get out the vote, monitor the integrity of elections, protect the efficacy of AZ GOP adherents' votes, and decide how to allocate limited resources.

26. Thus, Swoboda, in her capacity as Chair of the AZ GOP, has a clear interest in supporting the enforcement of laws such as the NVRA that promote fair and orderly elections.

27. Plaintiff Steven Gaynor is a duly registered Arizona voter who lives in Maricopa County. Gaynor regularly votes in Arizona's primary and general elections. He plans to vote in Arizona's upcoming federal and state elections.

28. Therefore, Gaynor has a clear interest in supporting the enforcement of laws such as the NVRA that promote fair and orderly elections.

29. Because the Secretary does not maintain accurate voter rolls, ineligible voters have an opportunity to vote in Arizona elections, risking the dilution of Plaintiffs' legitimate votes.

30. Further, Arizona's inaccurate rolls undermine Plaintiffs' confidence in the integrity of Arizona elections, which also burdens their right to vote.

31. In sum, based on Arizona's inaccurate voter rolls, Plaintiffs' votes risk being diluted, and their confidence in elections is undermined, regardless of their political party or the political party of the candidate they vote for in an election.

32. Additionally, because the Secretary does not maintain accurate voter rolls, Plaintiffs must spend more time and resources monitoring Arizona's elections for fraud

and abuse, mobilizing voters to counteract it, educating the public about election-integrity issues, and persuading elected officials to improve list maintenance.

33. Plaintiffs also must spend more of their time and resources on get-out-the-vote efforts for like-minded individuals—eligible voters who, because the Secretary does not maintain accurate voter rolls, lack confidence in the accuracy and integrity of Arizona's elections. The time and resources that Plaintiffs divert to these activities would otherwise be spent on other projects and activities that would advance their goals.

34. Defendant, Adrian Fontes, is the Arizona Secretary of State. He is the State's chief election officer and is responsible for the statewide list maintenance required by the NVRA, 52 U.S.C. § 20509. Adrian Fontes is sued in his official capacity.

## BACKGROUND

### I. Statutory Background

35. Congress enacted the NVRA "to protect the integrity of the electoral process." 52 U.S.C. § 20501(b)(3). Specifically, Section 8 was enacted "to ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b)(4).

36. Retaining voter rolls bloated with ineligible voters harms the electoral process, heightens the risk of electoral fraud, and undermines public confidence in elections.

37. Section 8 obligates States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4).

38. Each State's program for maintaining voter-registration lists must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act." 52 U.S.C. § 20507(b)(1).

39. Specifically, Section 8 requires States to remove individuals from the voter rolls who have become ineligible due to "death" or due to "a change in . . . residence" outside their current voting jurisdiction. 52 U.S.C. § 20507(a)(4)(A)–(B).

40. The Help America Vote Act (HAVA) also requires States to adopt computerized statewide voter registration lists and maintain them "on a regular basis" in accordance with the NVRA. 52 U.S.C. § 21083(a)(2)(A).

41. States must "ensure that voter registration records in the State are accurate and are updated regularly"—an obligation that includes a "reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." 52 U.S.C. § 21083(a)(4)(A).

42. HAVA's list-maintenance requirements include coordination with "State agency records on death" and "State agency records on felony status" to facilitate the removal of individuals who are deceased or rendered ineligible under state law due to a felony conviction. 52 U.S.C. § 21083(a)(2)(A)(ii)(I)-(II).

43. According to the bipartisan Carter-Baker Commission, "registration lists lie at the root of most problems encountered in U.S. elections."[3] Inaccurate voter rolls that contain "ineligible, duplicate, fictional, or deceased voters are an invitation to fraud." *Id.* "While election fraud is difficult to measure" (because many cases go undetected, uninvestigated, or unprosecuted), "it occurs." *Id.* at 45. "In close or disputed elections, and there are many, a small amount of fraud could make the margin of difference." *Id.* at 18. And "the perception of possible fraud contributes to low confidence in the system." *Id.*

44. Arizona, too, has experienced known cases of voter fraud.

45. But the known cases are a small percentage of the overall cases because Arizona is not well equipped to detect fraud. For example, Arizona has no system in place to detect when people vote in multiple States. While the Electronic Registration Information Center can reveal whether voters have moved out of state, 50% of States do not participate in that voluntary program.

46. Recognizing these concerns, the NVRA includes a private right of action. It empowers any "person who is aggrieved by a violation" to "provide written notice of the

---

[3] Comm'n on Fed. Election Reform, *Building Confidence in U.S. Elections*, at 10 (Sept. 2005), available at: https://www.eac.gov/sites/default/files/eac_assets/1/6/Exhibit%20M.PDF.

violation to the chief election official of the State involved." 52 U.S.C. § 20510(b)(1). "If the violation is not corrected within 90 days after receipt of a notice, … the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief." *Id.* § 20510(b)(2).

**II.  The Secretary's Statutory Duty**

47.  The Arizona Secretary of State is primarily responsible for voter list maintenance in Arizona.

48.  The NVRA requires each State to "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under" the law. 52 U.S.C. § 20509.

49.  Arizona law designates the Secretary of State as that individual. *See* A.R.S. § 41-121(A)(9) & (13).

50.  Ultimate responsibility for coordinating and overseeing all list-maintenance activities rests with the Secretary of State under both state and federal law. Therefore, the Secretary of State is the appropriate defendant in this case. A chief election official "may not delegate the responsibility to conduct a general program to a local official and thereby avoid responsibility if such a program is not reasonably conducted." *United States v. Missouri*, 535 F.3d 844, 850 (8th Cir. 2008).

51.  Indeed, "the NVRA's centralization of responsibility counsels against . . . buck passing." *Scott v. Schedler*, 771 F.3d 831, 839 (5th Cir. 2014). Courts have rejected the view that, "once the state designates" a local entity to assist with complying with federal law, "her responsibility ends." *Harkless v. Brunner*, 545 F.3d 445, 452 (6th Cir. 2008). "[I]f every state passed legislation delegating NVRA responsibilities to local authorities, the fifty states would be completely insulated from any enforcement burdens, even if NVRA violations occurred throughout the state." *Id.*

52.  Accordingly, because the Secretary has the legal duty to ensure that all voter registration records in Arizona, regardless of the county, are maintained in an accurate and

uniform manner across Arizona. He cannot abdicate this duty and place responsibility on the county recorders across Arizona to perform his duties under Section 8.

### III. Plaintiffs' Statutory Notice

53. Under the NVRA, a plaintiff has standing to bring suit only if they first "provide written notice of the violation to the chief election official of the state involved," and then 90 days elapse without correction of the violation. 52 U.S.C. § 20510(b)(1)–(2).

54. In a lawsuit involving multiple plaintiffs, so long as one of the plaintiffs provided actual 90-day notice, it is not necessary that all plaintiffs provide separate 90-day notices. *See Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997) (holding that where one plaintiff had already provided notice and the state had ignored it, additional notices from other plaintiffs would be futile and unnecessary).

55. On August 8, 2023, Plaintiff Mussi mailed a statutory notice letter ("90-Day Notice Letter") to the Secretary, notifying him that 14 Arizona counties were in violation of Section 8 of the NVRA and formally requested that he correct the violations within 90 days.[4]

56. Following the 90-Day Notice Letter, Plaintiffs received updated comparisons based on data that was released after the Letter, revealing that all 15 Arizona counties are in violation of Section 8. *See generally* Exhibit 1. Those numbers are reflected above.

57. The 90-Day Notice Letter stated that Mussi "hope[d] to avoid litigation and would welcome immediate efforts by [the Secretary] to bring Arizona into compliance with Section 8." Exhibit 3, at p. 3.

58. The 90-Day Notice Letter asked the Secretary to "modify [his] current list maintenance program to ensure that it is comprehensive, nondiscriminatory, and in compliance with federal law" and to "identify and remove [several] categories of individuals from the official lists of eligible voters." *Id.* at pp. 3–4.

---

[4] All related correspondence with the Secretary is attached hereto as "Exhibit 3," and are incorporated herein by reference.

59. The 90-Day Notice Letter also asked the Secretary to "respond in writing within 45 days of the date of this letter," "fully describ[ing] the efforts, policies, and programs [the Secretary is] taking, or plan[ning] to undertake prior to the 2024 general election to bring Arizona into compliance with Section 8," and "not[ing] when [the Secretary] plan[ned] to begin and complete each specified measure and the results of any programs or activities you have already undertaken." *Id.* at p. 4.

60. Additionally, the 90-Day Notice Letter requested that the Secretary advise Mussi "what policies are presently in place, or will be put in place, to ensure effective and routine coordination of list maintenance activities with the federal, state, and local entities" and to provide him with "a description of the specific steps [he] intend[ed] to take to ensure routine and effective list maintenance on a continuing basis beyond the 2024 election." *Id.* The 90-Day Notice Letter also requested that the Secretary take steps to preserve documents as required by Section 8(i) of the NVRA, 52 U.S.C. § 20507(i)(1)-(2), and other federal law. *Id.* at pp. 4–5.

61. Finally, the 90-Day Notice Letter stated that a lawsuit would be filed under 52 U.S.C. § 20510(b)(2) if the identified violations were not corrected. *Id.* at p. 5.

62. The Secretary responded to the 90-Day Notice Letter on August 15, 2023. In his response, the Secretary mischaracterized Plaintiffs' statistics and denied that inflated voter rolls were evidence of an NVRA violation. *See generally id.* at pp. 6–10.

63. For example, the Secretary stated that "[a]s of 2022, there were more than 5 million total citizens of voting age in Arizona, only 3.5 million of which, or 62.1%, were registered to vote according to U.S. Census estimates." *Id.* at p. 7.

64. The Secretary is correct that there were roughly 5 million citizens, and that roughly 3.5 million registered—but clearly erred in his citation of the resulting registration rate being 62.1%.

65. Using the exact 2022 registered voter estimates provided by the Secretary—of 3,560,000 registered and 5,093,000 CVAP—the percent registered among *CVAP* is 69.9%. The 62.1% statistic misleadingly used by the Secretary in his response is the percent

of registered voters of the total *Voting Age Population* ("VAP") of 5,731,000 in Arizona—thus failing to only consider *citizens* of voting age population.

66. Another example of the Secretary's efforts to excuse his complacency with misleading data is when he stated in response that "in 2020, Arizona Secretary of State records indicate a total of 4,143,929 active registered voters, while the U.S. Census data indicates only estimated 3,878,000 registered voters." *Id.*

67. The Secretary's response is correct in one regard but wrong in another (more important) sense. Specifically, although the U.S. Census Bureau data does indicate there were 3,878,000 registered voters for 2020, the response errs in reporting the Secretary's own recorded number of active registered voters. Defendant's own website (https://azsos.gov/elections/results-data/voter-registration-statistics, (last visited Apr. 4, 2024)) shows 4,281,308 active registered voters for 2020, while the 4,143,929 active registered voters mentioned in the August 15, 2023, response are from *2022*. In short, the Secretary's response mismatches the relevant years being compared.

68. The Secretary, in referencing the 90-Day Notice Letter, states that "the comparators used are estimates that undercount the number of actual registered voters in the state." Exhibit 3, at p. 7. However, in reality, it is the Secretary's use of the incorrect 2020 registered voter estimate (4.1MM, from 2022) instead of the actual (4.3MM, from 2020) against the official US Census Bureau's 2020 estimate (3.9MM) that creates an underestimate of the magnitude of difference between the two sources for 2020. The difference between the Secretary's 4.1MM *active registered* voters in the most recent period (2022) and the US Census Bureau's *registered* voter estimate for 2022 (3.6MM) is even larger.

69. A reply letter was sent to the Secretary on September 12, 2023, apprising the Secretary of his reliance on inaccurate data, and stating that "if Arizona fails to take the necessary curative steps to resolve the issues identified in [the correspondence], [we are] prepared to file a lawsuit seeking declaratory and injunctive relief." *See generally id.*, pp. 11–13.

70. No further communication was received from the Secretary, and, no necessary curative steps were taken by the Secretary to resolve the issues identified in the 90-Day Notice Letter.

### IV. The Secretary Has Failed to Perform His Mandatory List Maintenance Duty Under the NVRA.

71. The Secretary is failing to perform his mandatory list-maintenance duty under the NVRA. In fact, the Secretary has essentially admitted as much to the Arizona Legislature. *See generally* Exhibit 2 (repeatedly admitting that various components of the NVRA-complaint list maintenance program are "in development").

72. To determine if the Secretary is accurately maintaining the voter file, one must first compare the total number of eligible voters in Arizona (U.S. Citizens over 18 years of age) against the number that are actually registered.

73. The number of *potentially* eligible Arizona voters is determined by the U.S. Census Bureau and the total number of *actually* registered voters is calculated by state data, as well as multiple national surveys.

74. If there are more registered voters than eligible voters—or if the percentage of registered voters exceeds agreed-upon levels of registration—it is reasonable to infer that the voter rolls contain voter records that should otherwise have been removed by the Secretary.[5]

75. When determining voter registration percentages, best practices require use of Vote Eligible Population ("VEP") or CVAP—meaning those who are legally about to cast a ballot—as opposed to using VAP, which simply looks at age.

---

[5] Providing voter registration percentages using inaccurate data points may appear to show NVRA-compliant list maintenance, when in fact this is not the case. For example, instead of including the CVAP in the calculation, an election official might include only VAP (this number would include non-citizens, who are not eligible to vote). Or, as opposed to including total registered voters, an election official might include only "active" registered voters—thus removing from the calculation the universe of inactive voters who are still on the jurisdiction's voter rolls. By comparing VAP (as opposed to CVAP) against active registrants (as opposed to total registrants), one can see what the percentage of registered *should be* (by removing likely-moved inactive voters and non-citizens), not what the percentage of total registered voters *actually is*. In fact, this is exactly what the Secretary already attempted to do. *See supra* § III (discussing the letters attached as "Exhibit 3" where the Secretary responded to Plaintiff's 90-day notice letter by citing misleading statistics).

76.     Arizona's CVAP is determined by the U.S. Census Bureau's American Community Survey ("ACS"). This information is gathered and released on a rolling basis. As of filing of this Complaint, three ACS data sets are probative in determining the number of individuals in Arizona who are both citizens and of voting age: (1) 2017 – 2021 ACS; (2) 2018 – 2022 ACS; and (3) 2022 ACS (limited to state-wide data and data for counties with populations exceeding 50,000).

77.     According to the U.S. Census Bureau, Arizona state-wide CVAP is as follows: (1) 2017 – 2021 ACS: 5,000,102; (2) 2018 – 2022 ACS: 5,118,553; and (3) 2022 ACS: 5,322,581.

78.     The number of registered voters in Arizona can be ascertained through multiple sources: (1) Data reported by the State; (2) the U.S. Census Bureau's Current Population Survey ("CPS"); and (3) the Cooperative Election Study ("CES") (both pre- and post-election surveys).

79.     The data reported by the State purports to be *actual* registration numbers, as opposed to the CPS and CES survey *estimates*. The CPS and CES data sets are both reputable and highly regarded national surveys that have long determined the number of registered voters in a particular jurisdiction. The CPS and CES almost universally show lower numbers of registered voters than numbers reported by states—leading to the inference that actual numbers reported by states are inflated with voters who should otherwise not be in the state voter file. This is the case in Arizona.

80.     The number of registered voters in Arizona is as follows: (1) State Data: 4,833,160[6]; (2) 2022 CPS: 3,560,000; (3) 2022 CES Pre-Election: 3,773,000; and (4) 2022 CES Post-Election: 4,333,000.

---

[6] As discussed *supra* § III, this number refers to the *total* number of registered voters, not the number of active registered voters. In most instances, when the Secretary reports voter registration numbers, it only includes *active*, not *total*, registered voters. Compare data reported on the Secretary's website, https://azsos.gov/elections/results-data/voter-registration-statistics, with EAVS data at https://www.eac.gov/sites/default/files/2023-06/2022_EAVS_for_Public_Release_V1.xlsx.

81. Comparing the number of Arizona registered voters against the various CVAP metrics, the voter registration rates in Arizona are as follows:

| Arizona ACS and Sec. of State | CPS and CES National Surveys |
|---|---|
| 2017-2021 ACS & 2022 AZ Sec. of State<br>4,833,160 registrants<br>CVAP 5,000,102<br>**96.7% Registration** | 2022 CPS<br>3,560,000 registrants<br>5.093MM CVAP (reported)<br>**69.9% +/- 3.3% Registration** |
| 2018-2022 ACS & 2022 AZ Sec. of State<br>4,833,160 registrants<br>CVAP 5,118,553<br>**94.4% Registration** | 2022 CES Pre-Election<br>3,773,000 estimated* registrants<br>ACS 2022: 5,322,581 CVAP<br>**70.9% Registration** |
| 2022 ACS & 2022 AZ Sec. of State<br>4,833,160 registrants<br>ACS 2022: 5,322,581 CVAP<br>**90.8% Registration** | 2022 CES Post-Election<br>4,333,000 estimated* registrants<br>ACS 2022: 5,322,581 CVAP<br>**81.4% Registration** |

82. Historically, one of the primary criticisms of the CPS is that it *overreports* its numbers, including voter registration. Said differently—the CPS's voter registration percentages are typically *higher* than the official reported numbers. In fact, in describing the CPS's numbers the U.S. Census Bureau said, "[i]n general, sample surveys like the CPS tend to yield higher voting rates than official results."[7] This further casts doubt on the State's reported registration rates of 90.8%, 94.4%, and 96.7%—depending on which ACS metric the registration numbers are compared against. The 2022 CPS shows a 69.9% voter registration rate in Arizona.

83. From CPS, the *national* percent of registered voters of CVAP in 2022 is 69.1%.

---

[7] https://www.census.gov/content/dam/Census/library/publications/2022/demo/p20-585.pdf

84. Stated differently, the best available data indicates that the number of people on the official voter registration rolls in Arizona is 20 or more percentage points higher than the number actually eligible and registered in Arizona.

85. Regardless of the metrics used to determine voter registration percentages, except for Greenlee County, all Arizona counties have exceptionally high rates of registered voters when compared to CVAP.

86. In fact, multiple counties (Apache, La Paz, Navajo, and Santa Cruz) show an impossible number of registered voters—more registered voters than people who are eligible to be registered.

87. The remaining Arizona counties all have voter registration rates that significantly exceed national averages, and reputable survey averages, for Arizona—with many of the registration rates being in the mid-to-high 90% range.

88. When looking at the various ACS CVAP metrics, compared against the total number of registered voters as reported by the State via the ACS, the county-by-county breakdown is as follows:

**Table III.B.1 ACS CVAP by Vintage: 2017-2021, 2018-2022 and 2022 and Total Registered Voters[8]**

| Geography | 2017-2021 5-year CVAP | 2018-2022 5-year CVAP | 2022 1-Year CVAP | A1a Total Registered "TREG" | %TREG of 17-21 CVAP | %TREG of 18-22 CVAP | %TREG of FY 2022 CVAP |
|---|---|---|---|---|---|---|---|
| Apache | 48,002 | 48,085 | 48,096 | 56,461 | **117.6%** | **117.4%** | 117.4% |
| Cochise | 93,080 | 94,116 | 94,779 | 87,376 | 93.9% | 92.8% | 92.2% |
| Coconino | 111,746 | 111,990 | 112,684 | 105,278 | 94.2% | 94.0% | 93.4% |
| Gila | 41,905 | 42,340 | NA | 38,087 | 90.9% | 90.0% | NA |
| Graham | 27,616 | 27,942 | NA | 22,469 | 81.4% | 80.4% | NA |
| Greenlee | 6,782 | 6,746 | NA | 5,164 | 76.1% | 76.5% | NA |
| La Paz | 13,014 | 12,681 | NA | 13,141 | **101.0%** | **103.6%** | NA |
| Maricopa | 2,998,592 | 3,079,626 | 3,218,330 | 2,939,138 | 98.0% | 95.4% | 91.3% |
| Mohave | 169,576 | 172,944 | 181,825 | 161,847 | 95.4% | 93.6% | 89.0% |
| Navajo | 77,149 | 78,419 | 80,594 | 77,286 | **100.2%** | 98.6% | 95.9% |
| Pima | 763,822 | 775,517 | 798,113 | 705,072 | 92.3% | 90.9% | 88.3% |
| Pinal | 305,976 | 317,927 | 338,587 | 282,575 | 92.4% | 88.9% | 83.5% |
| Santa Cruz | 28,562 | 28,834 | NA | 32,244 | **112.9%** | **111.8%** | NA |
| Yavapai | 188,873 | 192,907 | 201,459 | 187,587 | 99.3% | 97.2% | 93.1% |
| Yuma | 125,407 | 128,479 | 130,763 | 119,435 | 95.2% | 93.0% | 91.3% |
| **TOTAL AZ** | **5,000,102** | **5,118,553** | **5,322,581** | **4,833,160** | **96.7%** | **94.4%** | **90.8%** |

Source: https://data.census.gov/all?q=b05003

89. There is no evidence that these counties experienced above-average voter participation compared to the rest of the country or state. The only likely explanation for these discrepancies is substandard voter list maintenance by the Secretary.

90. There is also evidence that the Secretary has failed in his duty to remove deceased voters from the rolls under the NVRA.

91. During the Study Period, there were approximately 20,000 to 35,000 registered voters who died and were not removed from Arizona's voter rolls. This amounts to a removal shortage for deceased voters of 20%-35%.

92. Unlike the change-of-address procedure outlined in Section 8 of the NVRA, States are not required to wait to remove the names of deceased voters until a specified number of federal general elections has passed. *See* 52 U.S.C. 20507(c), (a)(4) (specifying a multistep process for change-of-address removals but not for deceased removals).

---

[8] Red and black represent higher values and green represents lower values. The colors do not convey that an estimate is acceptable or unacceptable, or one that complies with the NVRA.

Deceased voters may lawfully be removed from the voter rolls as soon as the Secretary receives confirmation of the voter's death.

93. The significant discrepancy between the estimated total number of registered voter deaths and the reported number of removals because of death demonstrates that the Secretary has not taken reasonable efforts to develop a consistent program to remove deceased voters from the rolls.

94. Additionally, when it comes to voter registration confirmation notices sent out to confirm voter registration files, nearly all Arizona counties account for every notice letter sent out in EAVS (*i.e.*, returned as undeliverable, responded that moved, responded that still at address, etc.). Meaning that if a county sent out 10,000 notices, they have documented nearly 10,000 responses or actions taken from those notices. However, the lone outlier is Arizona's most populous county—Maricopa.

95. During the Study Period, Maricopa County EAVS data shows that 752,387 voter registration confirmation notices were sent to voters in Maricopa County to determine if they still lived at the location where they were registered to vote. The data shows that 131,682 voters were removed for various reasons from the notice batch, thus leaving at least 620,000 of the notice letters unaccounted-for in EAVS—the clear outlier of all Arizona counties.

96. Given that a minimum of 500,000 unaccounted-for voters remain on Arizona voter rolls (possibly as many as 1,270,000, depending on the data source)—and given that unremoved deaths only account for 22,000–35,000 voters, by excluding other likely causes—this data shows that the 500,000 unaccounted-for registered voters on Arizona's voter rolls is primarily attributable to voters moving out of Arizona or voters who failed to respond to confirmation notices. Said differently, no other category of possible removals has 500,000 possible removals to make-up the difference.

97. Quarterly, the Secretary is required to provide a report to the Senate President and Speaker of the House accounting for voter roll list maintenance in Arizona. In the reports submitted in the last four quarters—January 25, 2024; November 1, 2023; August

1, 2023; and May 8, 2023—in lieu of providing clear and concise data outlining voter list maintenance procedures, the Secretary admitted the absence of a program, stating instead that the "process is in development" and providing no substantive information. *See generally* Exhibit 2.

98. The Secretary is also required to submit information regarding his voter list maintenance program to the EAC every two years in response to the EAVS. As described above, the information submitted for Maricopa County shows no voter responses or removals for over 620,000 voters who received notices attempting to confirm their continued eligibility. This omission is further evidence that the Secretary has not implemented a program to remove ineligible voters.

99. The NVRA requires that the Secretary adopt a "uniform" program for voter list maintenance in Arizona. *See* 52 U.S.C. § 20507(b)(1). The diverging voter registration and removal rates from county to county, along with the fact that Maricopa failed to account for 620,000 verification notices sent to registered voters in Arizona—as compared to other counties which did account for these notices—shows the Secretary has failed to implement a "uniform" list maintenance program as required by the NVRA.

100. The Secretary's failure to maintain accurate voter rolls and adopt a "uniform" program for voter list maintenance in Arizona violates federal law and jeopardizes the integrity of Arizona's upcoming elections.

## CLAIM

### Violation of Section 8(a)(4), 52 U.S.C. § 20507(a)(4)

101. Plaintiffs repeat and reallege each of their prior allegations.

102. Section 8(a)(4) of the NVRA requires that "each State shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of (A) the death of the registrant; or (B) a change in the residence of the registrant[.]" 52 U.S.C. § 20507(a)(4).

103. The Secretary has failed to make reasonable efforts to conduct voter list-maintenance as required by Section 8(a)(4) of the NVRA by failing to remove the names

of deceased voters and the names of those voters who have moved to other jurisdictions.

104. Plaintiffs have suffered irreparable injuries as a direct result of the Secretary's failure to maintain accurate voter rolls that properly reflect the names of eligible voters because Plaintiffs' legitimate votes risk dilution any time an ineligible voter casts a ballot and inaccurate voter registration rolls undermine Plaintiffs' confidence in Arizona's electoral system.

105. Plaintiffs are also harmed as they are required to divert their resources to address issues caused by the Secretary's failure to maintain Arizona voter rolls in compliance with federal law.

106. Plaintiffs will continue to be injured by the Secretary's violations of Section 8(a)(4) of the NVRA until the Secretary is enjoined from violating the law and required to identify and remove the names of ineligible voters from the rolls.

107. Plaintiffs have no adequate remedy at law beyond the judicial relief sought here pursuant to the NVRA.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against the Secretary and provide the following relief:

A. A declaratory judgment that the Secretary is in violation of Section 8 of the NVRA;

B. An injunction requiring the Secretary to fully comply with any existing procedures that Arizona has in place to ensure ineligible voters are identified and removed from the rolls;

C. An injunction requiring the Secretary to develop and implement additional reasonable and effective registration list-maintenance programs to cure their failure to comply with Section 8 of the NVRA and to ensure that ineligible registrants are not on the voter rolls;

D. Plaintiffs' reasonable costs and expenses of this action, including attorneys' fees; and

E. All other further relief that Plaintiffs may be entitled to.

Respectfully submitted this 31st day of May, 2024.

> HOLTZMAN VOGEL BARAN
> TORCHINSKY & JOSEFIAK PLLC
>
> By: */s/ Andrew Gould*
>     Andrew Gould
>     Dallin B. Holt
>     Brennan A.R. Bowen
>     2575 E. Camelback Road, Suite 860
>     Phoenix, AZ 85016
>
> *Attorneys for Plaintiffs*