D. Andrew Gaona (028414)
Austin C. Yost (034602)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
T: (602) 381-5486
agaona@cblawyers.com
ayost@cblawyers.com

Lalitha D. Madduri*
Melinda Johnson*
Tyler L. Bishop*
Renata O'Donnell*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
T: (202) 968-4330
lmadduri@elias.law
mjohnson@elias.law
tbishop@elias.law
rodonnell@elias.law

*Attorneys for Proposed Intervenor-Defendants*
*Arizona Alliance for Retired Americans and Voto Latino*

*\*Pro Hac Vice Application Forthcoming*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Scot Mussi, Gina Swoboda, in her capacity as Chair of the Republican Party of Arizona, and Steven Gaynor, <br><br> Plaintiffs, <br><br> v. <br><br> Adrian Fontes, in his official capacity as Arizona Secretary of State, <br><br> Defendant. | No. CV-24-01310-PHX-DWL <br><br> **ARIZONA ALLIANCE FOR RETIRED AMERICANS' AND VOTO LATINO'S MOTION TO INTERVENE AS DEFENDANTS** <br><br> Oral Argument Requested |

Pursuant to Federal Rule of Civil Procedure 24, the Arizona Alliance for Retired Americans ("Alliance") and Voto Latino (collectively, "Proposed Intervenors") move to intervene as defendants in this lawsuit. The Court should grant this motion because Proposed Intervenors satisfy all the requirements for intervention as of right under Rule 24(a) and, alternatively, permissive intervention under Rule 24(b).

Counsel for Proposed Intervenors has conferred with the parties. Plaintiffs oppose intervention. Defendant does not object.

## **INTRODUCTION**

The National Voter Registration Act ("NVRA") was enacted to make it *easier* for qualified voters to register and stay registered to vote, but in recent months some litigants have attempted to weaponize that federal law to pressure states to remove more voters from rolls. This lawsuit follows on the heels of several similar lawsuits brought recently in other states and creates a serious risk of erroneous removals of lawful, qualified voters from Arizona's voter rolls just before major elections are set to take place.[1] Arizona's federal primary election is just weeks away, and the November general election is less than five months away. Yet Plaintiffs—the Chair of the Republican Party of Arizona, the President of the Arizona Free Enterprise Club, and another Arizona voter—seek to force the Secretary of State to implement an entirely new voter roll maintenance system immediately because, in Plaintiffs' opinion, too many voters are registered in Arizona. Far from being required by the NVRA, the relief Plaintiffs seek would likely violate that federal law by compelling hasty purges of voter rolls just before upcoming federal elections and risking disenfranchisement of lawful voters who are improperly removed.

The Alliance and Voto Latino seek to intervene as Defendants to protect the

---

[1] Similar—and in some cases, nearly identical—claims have been filed in at least Illinois, Michigan, South Carolina, Nevada, and California in just the last three months. *See Judicial Watch, Inc. et al. v. Ill. St. Bd. of Elections*, No. 1:24-cv-01867 (N.D. Ill. filed March 5, 2024); *Repub. Nat'l Comm. et al. v. Benson*, No. 1:24-cv-00262 (W.D. Mich. filed March 13, 2024); *Public Interest Legal Foundation, Inc. v. Knapp*, No. 3:24-cv-01276 (D.S.C. filed March 14, 2024); *Repub. Nat'l Comm. et al. v. Aguilar*, No. 2-24-cv-00518 (D. Nev. filed March 18, 2024); *Judicial Watch, Inc. et al. v. Weber*, No. 2:24-cv-3750 (C.D. Cal. filed May 6, 2024).

significant—indeed, fundamental—voting rights of their members and constituents, who are among those most at risk from Plaintiffs' requested purges, as well as Proposed Intervenors' own organizational interests, which would be impeded if Plaintiffs succeed in forcing aggressive removals of voters from the rolls. They are entitled to intervene as of right under Federal Rule of Civil Procedure 24(a) because this suit threatens to impair those interests as a practical matter. Proposed Intervenors are organizations whose core missions include supporting their members' and constituents' ability to exercise their right to vote, and who invest significant resources in Arizona conducting programs that advance this mission. With more than 50,000 members and tens of thousands more constituents across all 15 of Arizona's counties, it is a statistical certainty that at least one of Proposed Intervenors' members or constituents will find themselves on the wrong end of Plaintiffs' purge efforts. Should Plaintiffs succeed, Proposed Intervenors would also be forced to divert scarce resources in the middle of a critical election cycle to educate voters about the risk to their voting rights and to attempt to combat the reality that their members, constituents, and other Arizonans could be improperly purged from the rolls and barred from voting.

Proposed Intervenors cannot rely on the Secretary to adequately represent their interests. As various courts have recognized, public-officer defendants like the Secretary have objectives that are necessarily distinct and at times contradictory to those of private parties seeking to intervene on the same side. Indeed, in voter purge cases in particular, state actors have often entered into consent decrees rather than litigate all the relevant issues.

Finally, because Proposed Intervenors seek to participate at the very outset of the litigation and intend to abide by any schedule the Court sets, their participation poses no risk of prejudice or delay. The Court should thus grant the motion to intervene.

## **BACKGROUND**

### I.     **Arizona's Obligations Under the NVRA**

The NVRA is federal remedial legislation that requires states to provide simplified, voter-friendly systems for registering to vote. In enacting the NVRA, Congress sought to

expand access to the franchise by establishing "procedures that will increase the number of eligible citizens who register to vote" and by making it "possible for Federal, State, and local governments to implement [the NVRA] in a manner that enhances the participation of eligible citizens as voters." 52 U.S.C. § 20501(b)(1)–(2). Congress also made a finding that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation . . . and disproportionately harm voter participation by various groups, including racial minorities." *Id.* § 20501(a)(3).

To further those pro-voter purposes, the NVRA imposes strict restrictions on whether, when, and how a state may remove a voter from its registration rolls. *See* 52 U.S.C. § 20507(a)(3)–(4), (b)–(d). A state may immediately remove a voter from the rolls in only rare circumstances, such as when a voter requests to be deregistered or is convicted of a disenfranchising felony. *See id.* § 20507(a)(3)(A)–(B). Otherwise, a state may not remove voters from the rolls without first complying with prescribed procedural minimums that Congress mandated to minimize risks of erroneous deregistration. *See id.* § 20507(a)(3)(C), (c), (d). For instance, a registrant may be removed from the rolls because of a change in residence only, in most cases, after failing to respond to a notice and failing to appear to vote for two general elections after that notice. *Id.* § 20507(d)(1).

The NVRA also prohibits systematic voters purges within 90 days of any federal election. States must complete "any program the purpose of which is to systematically remove the names of ineligible voters" from rolls "not later than 90 days prior to the date of a primary or general election for Federal office." *Id.* § 20507(c)(2)(A). And any removal program must also be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." *Id.* § 20507(b)(1).

Considering these safeguards, courts have recognized that the NVRA "does not require states to immediately remove every voter who may have become ineligible." *Pub. Int. Legal Found. v. Benson*, No. 1:21-CV-929, 2024 WL 1128565, at *11 (W.D. Mich. Mar. 1, 2024) ("*PILF*"). Rather, Congress has made the policy determination that some delay in the removal of voters is worthwhile because it helps to minimize the risk that

1    qualified voters will be wrongly deregistered. *See, e.g.*, *Bellitto v. Snipes*, 935 F.3d 1192,

2    1198–99 (11th Cir. 2019) (discussing the "balance" that Congress "crafted" in enacting the

3    NVRA's list maintenance provisions). For the same reason, a single "snapshot" of a

4    county's voter rolls at a particular moment in time simply cannot be reasonably understood

5    as a "definitive picture of what a county's registration rate is." *Id.* at 1208.

6           Plaintiffs' lawsuit ignores the NVRA's spirit and safeguards against

7    disenfranchisement and instead seeks to misuse it to micromanage states' affirmative list-

8    maintenance obligation. But the NVRA requires only that each state make "a reasonable

9    effort to remove the names of ineligible voters from the official lists of eligible voters by

10   reason of [] the death of the registrant; or [] a change in the residence of the registrant." 52

11   U.S.C. § 20507(a)(4)(A), (B). In other words, "Congress did not establish a specific

12   program for states to follow for removing ineligible voters," *PILF*, 2024 WL 1128565 at

13   *10, it required "reasonable" measures—and only with respect to voters who move or die.

14   The NVRA also includes an optional safe-harbor procedure that Arizona counties may avail

15   themselves to under state law: they may meet their list maintenance obligation if they use

16   U.S. Postal Service data to identify voters who may have moved and then follow a specified

17   notice procedure to confirm the change of residence and eventually remove the voter. *See*

18   52 U.S.C. § 20507(c)(1); A.R.S. § 16-166(E).

19   **II.    Plaintiffs' Lawsuit**

20          Plaintiffs filed suit against the Secretary on June 3, 2024. *See* ECF No. 1 ("Compl.").

21   They bring a single claim alleging that the Secretary is violating his obligation to conduct

22   "reasonable" voter roll maintenance under Section 8 of the NVRA. *See id.* ¶¶ 101–07 (citing

23   52 U.S.C. §20507(a)(4)). Plaintiffs' primary evidence in support of their claim is an

24   allegedly high number of voters on the rolls when compared to various federal estimates of

25   the number of purportedly eligible voters. *See id.* ¶¶ 71–107. Although Plaintiffs identify

26   no specific deficiency in the state's current list-maintenance protocols, they seek a

27   declaration that the Secretary is violating Section 8, as well as an injunction compelling him

28

to "develop and implement additional reasonable and effective registration list-maintenance programs" to remove unspecified "ineligible registrants." *Id.* at 19 (Prayer for Relief).

The gravamen of Plaintiffs' claim is that the Secretary must be violating the NVRA and must be compelled to remove more names from voter rolls because Plaintiffs believe that some Arizona counties have high registration rates. *See id.* ¶¶ 1–18, 71–107. But nowhere do Plaintiffs identify any specific deficiency with the state's current practices, nor do they identify any presently registered voters whose presence on the rolls violates the NVRA. *See generally id.* They instead allege that selectively chosen snapshots of voter registration data do not match federal county-population "estimates," which they proclaim—in "because we said so" fashion—is "evidence" of "substandard voter list maintenance by the Secretary" and a failure "to implement a 'uniform' list maintenance program as required by the NVRA." *Id.* ¶¶ 71–100.

Other federal courts have warned against reliance on Plaintiffs' approach precisely because it is detached from the reality that the NVRA—by design—requires states to delay the removal of voters who may have become ineligible for years to avoid the risk of unwarranted removals. *Bellitto*, 935 F.3d at 1208. In other words, data "snapshots" are not a reliable way to determine "whether list maintenance is going on," or whether the maintenance is "reasonable." *Id.* at 1208 (affirming trial court's ruling that Florida's procedures were "reasonable" under the NVRA). Nonetheless, Plaintiffs offer little more than such "snapshots" to demand an overhaul of Arizona's list maintenance procedures.

### III.    Proposed Intervenor-Defendants

Proposed Intervenors are organizations that operate in Arizona, whose missions include ensuring their members' and constituents' ability to vote, and who invest significant resources conducting activities to advance that mission.

***The Alliance for Retired Americans.*** The Alliance is a nonpartisan 501(c)(4) membership organization with over 4.4 million members nationwide. *See* **Ex. B**, Decl. of Dora Vasquez ("Vasquez Decl.") ¶ 3. In Arizona, the Alliance's membership includes nearly 51,000 retirees from public- and private-sector unions, community organizations,

and individual activists in every county in the state. *Id.* The Alliance's mission is to ensure social and economic justice and protect the civil rights of retirees after a lifetime of work, including by ensuring that its members have access to the franchise and can meaningfully participate in Arizona's elections. *Id.* ¶ 4. In support of that mission, the Alliance invests resources in conducting voter education programs throughout the state, including by distributing materials that educate voters on registering to vote, obtaining ballots, and navigating the state's election procedures. *Id.* ¶ 5. The Alliance also provides direct assistance to individuals who have questions about how to vote or concerns about ensuring that their vote is counted. *Id.* ¶¶ 5, 9.

To protect the right to vote and its other organizational interests, the Alliance has been involved in litigation implicating a range of voting-rights issues—including voter roll maintenance under the NVRA. Last election cycle the Alliance successfully challenged (among other things) a newly enacted provision of Arizona law that conflicts with the NVRA's list maintenance procedures by authorizing county recorders to cancel certain registrations without notice or authorization. *Ariz. All. for Retired Ams. v. Hobbs*, 630 F. Supp. 3d 1180, 1192–94 (D. Ariz. 2022) (granting motion for preliminary injunction against provisions of SB 1260).[2] As the Court there recognized, the Alliance has a significant interest in preventing unlawful purges that put voters at risk of removal. *See id.* & n.7. The Alliance has also successfully intervened as a defendant in multiple other challenges to election procedures in Arizona elections this election cycle.[3]

***Voto Latino.*** Voto Latino is a nonprofit 501(c)(4) corporation dedicated to growing political engagement in historically underrepresented communities, specifically young and Latinx voters. *See* **Ex. C**, Decl. of Ameer Patel ("Patel Decl.") ¶¶ 2, 3. Voto Latino has

---

[2] The Attorney General's appeal of the district court's preliminary injunction in favor of the Alliance remains pending before the Ninth Circuit.

[3] *See* Minute Order, *Repub. Nat'l Comm. et al. v. Fontes*, CV2024-050553 (Maricopa Cnty. Super. Ct. May 10, 2024) (noting the Alliance's and Voto Latino's intervention and granting motion to dismiss); Ruling and Order, *Ariz. Free Enter. Club v. Fontes*, No. S1300CV202300872 (Yavapai Cnty. Super. Ct. April 25, 2024) (same); *Ariz. Free Enter. Club v. Fontes*, No. S1300CV202300202 (Yavapai Cnty. Super. Ct. April 25, 2024) (noting the Alliance's and Voto Latino's intervention and granting motion for summary judgment).

made, and will continue to make, expenditures to educate, mobilize, and turn out voters in Arizona. *Id.* ¶ 4. Voto Latino employees and volunteers engage in voter registration drives and conduct email and social media campaigns to remind voters—particularly Voto Latino's core constituency, young and Latinx voters—to vote and to keep their voter registrations up to date. *Id.* ¶¶ 3–4. Voto Latino also conducts get-out-the-vote efforts, including text banking and other communications efforts, to inform their constituents about their voting options, such as early in-person voting and voting by mail. *Id.*

Like the Alliance, Voto Latino has been involved in litigation implicating a range of voting-rights issues, including voter roll maintenance issues. Voto Latino sued alongside the Alliance to enjoin provisions of SB 1260, *Ariz. All. for Retired Ams.*, 630 F. Supp. 3d at 1192–94, and have likewise been granted intervention to defend against lawsuits challenging Arizona's election procedures that would harm their constituents and organizational interests, *see supra* n.3.

## LEGAL STANDARDS

The standard for intervention is "broadly construed" because "a liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." *Arizonans for Fair Elections v. Hobbs*, 335 F.R.D. 261, 265 (D. Ariz. 2020) (quoting *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1177 (9th Cir. 2011)); *accord Arkaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003) ("Rule 24 traditionally receives liberal construction in favor of applicants for intervention.").

To determine whether an applicant has a right to intervene under Federal Rule of Civil Procedure 24(a)(2), the Ninth Circuit has established a "four-part test":

> (1) the motion must be timely; (2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action.

*United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1148 (9th Cir. 2010) (quoting *Cal. ex rel. Lockyer v. United States*, 450 F.3d 436, 440 (9th Cir. 2006)).

1  Rule 24(b) permits the Court to allow anyone to intervene "where the applicant for

2  intervention shows (1) independent grounds for jurisdiction; (2) the motion is timely; and

3  (3) the applicant's claim or defense, and the main action, have a question of law or a

4  question of fact in common." *Arizonans for Fair Elections*, 335 F.R.D. at 268 (quoting

5  *United States v. City of Los Angeles*, 288 F.3d 391, 403 (9th Cir. 2002)).[4]

6  Proposed Intervenors satisfy the standards for intervention as of right under Rule

7  24(a)(2), as well as permissive intervention under Rule 24(b).

## ARGUMENT

**I.    Proposed Intervenors have a right to intervene.**

10  The Court should grant Proposed Intervenors' motion to intervene as of right under

11  Rule 24(a)(2) because they have timely sought leave to participate, the disposition of this

12  case could impair their ability to protect significant interests—protecting members' and

13  constituents' right to vote and preserving mission-critical resources—and no existing party

14  adequately represents their interests.

**A.    The motion to intervene is timely and does not prejudice the parties.**

16  The instant motion is indisputably timely. It comes just days after Plaintiffs initiated

17  suit and before Defendant has appeared in the case or any substantive activity has occurred.

18  In determining whether a motion to intervene is "timely," courts in this Circuit

19  consider three factors: "(1) the stage of the proceeding at which an applicant seeks to

20  intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay."

21  *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997). All

22  three considerations support a finding of timeliness here.

23  Proposed Intervenors have moved to intervene at the earliest possible time, mere

24  days after the Complaint was filed—at the "outset of the litigation"—when timeliness is

---

[4] Rule 24(c) requires a motion to intervene to "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). In compliance with this Rule, Proposed Intervenors attach a proposed Answer to this motion. **Ex. A**. Proposed Intervenors, however, believe that the Complaint should be dismissed under Federal Rule of Civil Procedure 12(b) and intend to move for dismissal under that Rule by no later than Defendant's deadline to respond to the Complaint. Proposed Intervenors request that the Court treat that motion as filed before their proposed Answer.

plain. *See, e.g.*, *Arizonans for Fair Elections*, 335 F.R.D. at 265–66 (quoting *Sierra Club v. EPA*, 995 F.2d 1478, 1481 (9th Cir. 1993)). Indeed, Defendant has not filed anything, "let alone answered" the Complaint. *Id.* at 266. And because there was no delay in seeking leave to intervene, Proposed Intervenors "need not explain the reason for and length of the delay." *Id.*

Given the early stage of proceedings and because Proposed Intervenors will abide by all existing deadlines and any adopted by the Court, there is "no possible prejudice" to the other parties. *Id.*; *see also, e.g.*, *Portfolio FB-Idaho v. Fed. Deposit Ins. Corp.*, No. 1:10-CV-377, 2010 WL 5391442, at *4 (D. Idaho Dec. 17, 2010) (finding no risk of prejudice where "discovery has yet to commence, no original deadlines have expired, and [intervenor] represents that it can quickly file a responsive brief"); *W. States Trucking Ass'n v. Schoorl*, No. 2:18-CV-1989, 2018 WL 5920148, at *1 (E.D. Cal. Nov. 13, 2018) (finding no prejudice where party "sought to intervene [at] the very outset of litigation"). Proposed Intervenors accordingly satisfy Rule 24's timeliness requirement.

**B.    Proposed Intervenors have substantial interests that are threatened by the disposition of this case.**

Proposed Intervenors have significant protectable interests that stand to be impaired by Plaintiffs' suit, satisfying the intertwined second and third elements of Rule 24(a).

"[A] prospective intervenor 'has a sufficient interest for intervention purposes if it will suffer a practical impairment of its interests as a result of the pending litigation.'" *Wilderness Soc'y*, 630 F.3d at 1179 (quoting *Lockyer,* 450 F.3d at 441). Consistent with its liberal standard, "Rule 24(a)(2) does not require a specific legal or equitable interest," and "it is generally enough that the interest is protectable under some law, and that there is a relationship between the legally protected interest and the claims at issue." *Id.* (quoting *Sierra Club*, 995 F.2d at 1484). "[T]he 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Id.* (cleaned up). As such, applicants need not show that impairment is a "certainty," only that "disposition of the action 'may' practically impair a

party's ability to protect their interest in the subject matter of the litigation." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 900 (9th Cir. 2011) (quoting Fed. R. Civ. P. 24(a)(2)). Once an applicant has shown some protectible interest, courts generally "have little difficulty concluding that the disposition of [a] case may, as a practical matter, affect" an intervenor's interests. *Lockyer*, 450 F.3d at 442.[5]

Proposed Intervenors each have at least two significant, protectable interests that this action threatens to impair. *First*, Proposed Intervenors have an interest in ensuring that their members and constituents—many of whom are among those most likely to be affected by the kind of voter roll purges Plaintiffs seek—remain registered to vote and successfully participate in the upcoming elections. *Second*, any order compelling the purges sought by Plaintiffs would require Proposed Intervenors to divert time and resources away from other essential election-year activities and toward efforts to mitigate the impact of the purges— harming their organizations missions in the process.

> **1.    Plaintiffs' lawsuit risks unlawful purging and disenfranchisement of Proposed Intervenors' members and constituents.**

Proposed Intervenors each have an interest in ensuring that their members and constituents can access the franchise free from unnecessary obstacles—and in preventing purging of the voters they represent. Numerous courts have agreed that this is a sufficient basis to demonstrate a protectible interest for the purpose of intervening in a Section 8 case seeking to remove voters from the rolls. *See Bellitto v. Snipes*, No. 16-cv-61474, 2016 WL 5118568, at *2–3 (S.D. Fla. Sept. 21, 2016) (granting labor union intervention of right in Section 8 case); *see also, e.g.*, *PILF v. Winfrey*, 463 F. Supp. 3d 795, 799–800, 802 (E.D. Mich. 2020) (granting organization permissive intervention in Section 8 case); Order, *Daunt v. Benson*, 1:20-cv-522 (W.D. Mich. Sept. 28, 2020), ECF No. 30 (same); Order, *Voter Integrity Proj. NC, Inc. v. Wake Cnty. Bd. of Elections*, No. 5:16-cv-683 (E.D.N.C. Dec. 1,

---

[5] Rule 24(a)'s interest requirement is less stringent than Article III's standing requirements, so the threatened impairment of Proposed Intervenors' practical interests in this case need not necessarily rise to the level of an injury-in-fact. *See, e.g.*, *Yniguez v. Arizona*, 939 F.2d 727, 735 (9th Cir. 1991); *cf. Bechtel v. Rose*, 150 Ariz. 68, 72 (1986) (observing that standing poses higher bar than intervention because an intervenor "does not even have to be a person who would have been a proper party at the beginning of the suit" (cleaned up)).

2016), ECF No. 26 (granting voters permissive intervention in Section 8 case). In *Bellitto*, for example, the district court permitted a union with tens of thousands of members in Florida to intervene because "the interests of its members would be threatened by [any] court-ordered 'voter list maintenance' sought by Plaintiffs," a "potential harm" the court found "particularly great in light of the upcoming . . . General Election." 2016 WL 5118568, at *2. That is precisely what the Alliance seeks to do here on behalf of its tens of thousands of members in Arizona, most of whom are retired union workers, Vasquez Decl. ¶¶ 6–12, and what Voto Latino seeks to do on behalf the marginalized Latinx voters they serve, Patel Decl. ¶¶ 6–13; *cf. Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096–97 (9th Cir. 2021) (holding that organizations may sue on behalf of non-member constituents even under the more-demanding Article III test).

Courts have consistently held that an organization's interest in protecting its members voting rights satisfies even the "more stringent" requirement of Article III, which "compels the conclusion that they have an adequate interest" for purposes of Rule 24. *See Yniguez*, 939 F.2d at 735; *see also Mi Familia Vota v. Fontes*, No. CV-22-00509, 2024 WL 862406, at *29–32 (D. Ariz. Feb. 29, 2024) (finding organizations had standing to protect members' voting rights); *March for Our Lives Idaho v. McGrane*, No. 1:23-CV-00107, 2023 WL 6623631, at *7 (D. Idaho Oct. 11, 2023) (similar); *see also, e.g.*, *Common Cause/N.Y. v. Brehm*, 344 F. Supp. 3d 542, 558–59 (S.D.N.Y. 2018) (holding that plaintiff adequately alleged as-applied NVRA Section 8 claim challenging state's registration removal policy); *Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1156 (S.D. Ind. 2018) (similar).

Proposed Intervenors' interest in this case is particularly significant because they represent members and serve constituencies who face an acute risk from any systematic court-ordered voter roll purge using the notice procedures required by the NVRA. For example, because the Alliance's members are retired, it is common for members to be in the process of relocating to assisted living facilities, moving closer to family members, or transitioning to smaller homes for financial reasons. They are, as a result, at a particular risk

of missing purge notices that are meant to advise them that their voter registration is at risk. Vasquez Decl. ¶¶ 6–7. Many of their members also live in rural or remote locations and lack access to meaningful assistance—and are thus less likely to be able to successfully complete and return such notices. *See id.* ¶¶ 3, 7. Meanwhile, many of Voto Latino's constituents live on and around college campuses, change addresses frequently due to their age and financial circumstances, and rely on assistance to navigate the state's registration and re-registration procedures. Patel Decl. ¶¶ 7–8. As a result of these circumstances, students and others in Voto Latino's core constituency often do not receive removal notices, only to learn later that they have been purged from voter rolls. *Id.* Voto Latino's constituency is also made up of voters who regularly experience language barriers, making it substantially more likely that these voters will face difficulty in successfully returning a purge notice or reregistering. *Id.* ¶ 10. Proposed Intervenors indisputably have a protectable interest in preventing their voters from being unlawfully removed from the rolls.

> **2.    Plaintiffs' lawsuit also threatens Proposed Intervenors' limited organizational resources.**

Should Plaintiffs obtain the relief they seek, each Proposed Intervenor would be forced to divert time and resources away from other essential election-year activities to deal with the fallout from voter purges, harming their missions in the process.

The Alliance—whose mission is to ensure social and economic justice and protect the civil rights of retirees—would need to redirect time and resources away from other programs to educate its members on the new purges that Plaintiffs demand. This year, the Alliance is preparing and distributing voter education and assistance materials to voters across the state to inform them about ways to vote and candidates' positions on issues of importance to members, in addition to hosting town halls addressing similar issues. Vasquez Decl. ¶¶ 5, 10. If the purges that Plaintiffs seek are granted, the organization would divert resources away from those critical efforts to create new voter education materials, such as "fact sheets" for voters, and would further prepare additional programming to ensure voters are away of the risks. *Id.* ¶ 8. The Alliance would also need to divert time and resources

from other priorities to provide resources and support to members who seek assistance in response to purge notices to ensure that they are not disenfranchised. *Id.* ¶ 9. Similarly, Voto Latino, a grassroots organization focused on educating and empowering Latino voters, would be forced to redirect volunteer phone banking and door-knocking efforts aimed at increasing participation among students and others in its core constituency toward educating constituents about the purges and how to confirm their registration status. Patel Decl. ¶ 11–12.

Like their interest in protecting their members and constituents' right to vote, Proposed Intervenors' interest in protecting their own organizational missions and resources can suffice to meet even Article III's more demanding standard for standing. *See, e.g.*, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021) ("[A]n organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose."); *Mi Familia Vota v. Fontes*, No. CV-22-00509, 2023 WL 8183070, at *10 (D. Ariz. Feb. 16, 2023) (organizational plaintiffs had standing when voting laws would require them to divert resources from other activities to assist their supporters who might be disproportionately disenfranchised or discouraged from voting). Indeed, when the Alliance and Voto Latino challenged an Arizona law imposing additional voter roll maintenance requirements as violative of the NVRA, the court found they satisfied Article III's injury-in fact requirement based on a "diver[sion of] resources" toward efforts to "roll[] back the effects of the bill." *Ariz. All. for Retired Americans*, 630 F. Supp. 3d at 1194 n.7 (quoting *Common Cause Indiana v. Lawson*, 937 F.3d 944, 951 (7th Cir. 2019)). This second interest therefore supplies a more than sufficient and independent basis for granting intervention under Rule 24. *See Yniguez*, 939 F.2d at 735.

**C.    The parties do not adequately represent Proposed Intervenors' interests.**

Proposed Intervenors will not be assured adequate representation in this matter if they are denied intervention. "[T]he burden of making this showing is minimal" and is "satisfied if the applicant shows that representation of its interests *may* be inadequate."

1    *Hoopa Valley Tribe v. United States Bureau of Reclamation*, 648 F. Supp. 3d 1196, 1204

2    (E.D. Cal. 2022) (quoting *Sagebrush Rebellion Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir.

3    1983)) (emphasis added); *accord Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179,

4    196 (2022) (citing *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)).

5    Accordingly, courts are "liberal in finding" this requirement to be met because "there is

6    good reason in most cases to suppose that the applicant is the best judge of the representation

7    of the applicant's own interests." 7C Charles Alan Wright & Arthur R. Miller, *Federal*

8    *Practice & Procedure* § 1909 (3d ed. 2024).[6] Neither Plaintiffs nor Defendant adequately

9    represent Proposed Intervenors' interests here. Of course, Plaintiffs' and Proposed

10   Intervenors' interests are diametrically opposed as Proposed Intervenors strongly oppose

11   the purges Plaintiffs seek.

12        While the Secretary may oppose the relief Plaintiffs seek, it does not follow that he

13   will necessarily represent Proposed Intervenors adequately. Courts have "often concluded

14   that governmental entities do not adequately represent the interests of aspiring intervenors."

15   *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003); *accord Citizens for*

16   *Balanced Use*, 647 F.3d at 899 ("[T]he government's representation of the public interest

17   may not be 'identical to the individual parochial interest' of a particular group just because

18   'both entities occupy the same posture in the litigation.'" (quoting *WildEarth Guardians v.*

19   *U.S. Forest Serv.*, 573 F.3d 992, 996 (10th Cir. 2009))). This is because Arizona officials

20   "must represent the interests of all people" in their jurisdictions, such that they cannot give

21   Proposed Intervenors' interests "the kind of primacy" they would themselves provide.

22   *Planned Parenthood Ariz., Inc. v. Am. Ass'n of Pro-Life Obstetricians & Gynecologists*,

23   227 Ariz. 262, 279 (Ct. App. 2011); *see also, e.g.*, *Kleissler v. U.S. Forest Serv.*, 157 F.3d

24

25   [6] The Ninth Circuit has in the past applied a "presumption" of adequate representation where the parties share the same "ultimate" objective. *E.g.*, *Arakaki*, 324 F.3d at 1086. However,

26   that Court recently acknowledged that the Supreme Court's decision in *Berger* "calls into question" the practice and stated that such a presumption only applies if the parties share

27   "*identical* interests." *Callahan v. Brookdale Senior Living Comms.*, 42 F.4th 1013, 1021 n.5 (9th Cir. 2022) (emphasis in original). Because the Secretary and Proposed Intervenors do

28   not share identical interests, the burden to demonstrate inadequate representation remains "minimal." *Berger*, 597 U.S. at 196 (quoting *Trbovich*, 404 U.S. at 538 n.10).

964, 972 (3d Cir. 1998) (noting that government-official defendants' objectives are "necessarily colored by [their] view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it," and that the burden of establishing inadequacy of representation in such circumstances is "comparatively light"). In other words, Proposed Intervenors plainly "seek to give voice to a different perspective." *Berger*, 597 U.S. at 198.

This divergence of interests is particularly acute in the context of NVRA claims like this one. The Secretary is expressly charged with pursing the NVRA's "twin objectives—easing barriers to registration and voting, while at the same time protecting electoral integrity and the maintenance of accurate voter rolls." *Bellitto*, 935 F.3d at 1198. These competing goals "naturally create some tension." *Id.* In contrast, as another district court recognized in a similar context, groups like Proposed Intervenors have "[t]he mission and interest . . . explicitly to pursue the second of the expressly recognized interests that motivated Congress to enact [the NVRA]"—*i.e.*, eliminating barriers to registration and voting. *Winfrey*, 463 F. Supp. 3d at 801; *see also Bellitto*, 935 F.3d at 1198. As a result, it is entirely possible that the Secretary may take positions contrary to Proposed Intervenors' interests. In fact, recent history demonstrates that state officials sometimes try to resolve suits like this one through settlement. *See, e.g.*, Stipulation of Dismissal, *Daunt v. Benson*, No. 1:20-cv-522, ECF No. 58 (W.D. Mich. Feb. 16, 2021).

The potential for these kinds of conflicts among litigation objectives suffices to show that the Secretary will not adequately represent Proposed Intervenors' distinct interests. *See, e.g.*, *Trbovich*, 404 U.S. at 538 (union was not adequately represented by Secretary of Labor where its interests in litigation were "related, but not identical"); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 266 F.R.D. 369, 374 (D. Ariz. 2010) (granting intervention as of right to NRA, whose interest "focused on the hunting aspect and protecting its members' rights and all hunters' rights to hunt with lead ammunition," which was "not the objective of the current Defendants"); *Ariz. All. for Retired Ams. v. Hobbs*, No. CV-22-01374, 2022 WL 4448320, at *3 (D. Ariz. Sept. 23, 2022) (allowing Yuma County

Republican Committee to intervene alongside state and county election officials); *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-CV-1445, 2020 WL 5229116, at *1 (D. Nev. Aug. 21, 2020) (granting intervention as of right because Secretary of State did not adequately represent partisan organization's interests, despite both wishing to defend against suit); *Paher v. Cegavske*, No. 3:20-cv-00243, 2020 WL 2042365, at *1 (D. Nev. Apr. 28, 2020) (similar). The same result should follow here.

**II.    Proposed Intervenors should alternatively be granted permissive intervention.**

In the alternative, the Court should grant Proposed Intervenors permissive intervention because they have "'defense[s] that share[] with the main action a common question of law or fact'" and their intervention will not "'unduly delay or prejudice the adjudication of the original parties' rights.'" *Ariz. Democratic Party v. Hobbs*, No. CV-20-01143, 2020 WL 6559160, at *1 (D. Ariz. June 26, 2020) (quoting Fed. R. Civ. P. 24(b)). The motion is timely and risks no prejudice to the existing parties for the reasons already explained. *Supra* Part I-A. And Proposed Intervenors' defenses depend on resolution of many of the same questions of fact and law as Plaintiffs' claim—including but not limited to, whether the facts as alleged by Plaintiffs suffice to demonstrate a cognizable injury that can be redressed by this Court, whether the facts alleged by Plaintiffs state a plausible claim that the Secretary's list maintenance activities are not "reasonable," and whether Plaintiffs' requests for relief would themselves constitute violations of the NVRA.[7]

The Court also has good reason to exercise its discretion to grant Proposed Intervenors' motion because they will "significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *Ariz. All. for Retired Ams.*, 2022 WL 4448320, at *2. While Plaintiffs seek judicial intervention to compel the removal of large numbers of voters from the rolls and the Defendant must balance the State's dual obligations under the NVRA, there is no

---

[7] Courts often state that a proposed intervenor must also supply "independent grounds for jurisdiction," but the Ninth Circuit has "clarif[ied] that [this] requirement does not apply" where, as here, "proposed intervenors in federal-question cases [are] not raising new claims." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011).

party dedicated solely to the protection of the rights of the voters who are at risk of being purged. Thus, by granting intervention, the Court will benefit from hearing from voters who are among the most directly affected by the requested relief. On this point, the court's analysis in *Winfrey*, 463 F. Supp. 3d at 799–802, is instructive. There, the plaintiff sought an aggressive voter purge, and pro-voting organizations moved to intervene "for the purpose of challenging the plaintiff's claims with a view toward ensuring that no unreasonable measures are adopted that could pose an elevated risk of removal of legitimate registrations." *Id.* at 799. The court noted that the plaintiff's goal was to remove names from the rolls, and that the government defendants had an obligation to balance the NVRA's twin aims—but that no party was exclusively advocating to ensure that qualified voters are retained or restored on the rolls. *See id.* at 801. The voting rights groups' intervention motion was thus warranted to ensure "a fulsome consideration of both competing interests, vigorously advocated by appropriately interested parties concerned with each side of the balancing test," which would "unquestionably . . . be helpful to the Court when . . . called upon to strike the required balance and decide whether the defendants' program of list maintenance is 'reasonable' within the meaning of the statute." *Id.* This Court will similarly benefit from hearing from voters and pro-voting organizations who will be most directly affected by this case's resolution.

## <u>CONCLUSION</u>

For the foregoing reasons, Proposed Intervenors' motion to intervene as defendants should be granted.

1      RESPECTFULLY SUBMITTED this 12th day of June, 2024.

2                                    **COPPERSMITH BROCKELMAN PLC**

3                                    By: */s/ D. Andrew Gaona*

4                                         D. Andrew Gaona
                                          Austin C. Yost

5                                    **ELIAS LAW GROUP LLP**

6                                         Lalitha D. Madduri*
                                          Melinda Johnson*
7                                         Tyler L. Bishop*
                                          Renata O'Donnell*
8
                                     *Attorneys for Proposed Intervenor-Defendants*
9
                                     *\*Pro Hac Vice Application Forthcoming*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28