D. Andrew Gaona (028414)
Austin C. Yost (034602)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
T: (602) 381-5486
agaona@cblawyers.com
ayost@cblawyers.com

Lalitha D. Madduri*
Melinda Johnson*
Tyler L. Bishop*
Renata O'Donnell*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
T: (202) 968-4330
lmadduri@elias.law
mjohnson@elias.law
tbishop@elias.law
rodonnell@elias.law

*Attorneys for Proposed Intervenor-Defendants*
*Arizona Alliance for Retired Americans and Voto Latino*

*Admitted Pro Hac Vice

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Scot Mussi, Gina Swoboda, in her capacity as Chair of the Republican Party of Arizona, and Steven Gaynor, <br><br>          Plaintiffs, <br><br>    v. <br><br> Adrian Fontes, in his official capacity as Arizona Secretary of State, <br><br>          Defendant. | No. CV-24-01310-PHX-DWL <br><br> **PROPOSED INTERVENORS ARIZONA ALLIANCE FOR RETIRED AMERICANS AND VOTO LATINO'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT** <br><br> (Oral Argument Requested) |

Under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Proposed Intervenor-Defendants the Arizona Alliance for Retired Americans ("the Alliance") and Voto Latino ("Proposed Intervenors") file this proposed motion to dismiss the complaint filed by Plaintiffs Scot Mussi, Gina Swoboda, and Steven Gaynor (collectively, "Plaintiffs").

## INTRODUCTION

Congress enacted the National Voter Registration Act of 1993 ("NVRA") to make it *easier* for qualified voters to register and remain registered to vote. Plaintiffs improperly seek to weaponize the statute by demanding this Court order Arizona to undertake new and baseless purges of the voter rolls mere months before the 2024 General Election, all without plausibly alleging a deficiency in the state's reasonable efforts to conduct list maintenance. This case is part of troubling trend: In the past several months, activists have filed similar suits in states across the country as part of a nationwide effort to remove voters from the rolls ahead of the 2024 General Election.[1] Like those other cases, Plaintiffs' suit fails both for lack of jurisdiction and because it does not plausibly allege a violation of the NVRA.

To start, each Plaintiff lacks standing. Their purported injuries—worries about election integrity, the possibility of voter fraud and dilution of their votes, and the expenditure of resources to address those speculative and generalized grievances—fall short of what Article III requires. Plaintiffs also seek relief this Court cannot grant. Because of the NVRA's requirement that states may not conduct any systematic voter removal programs within 90 days of a federal primary or general election—a period that has already begun for the primary, which will take place on July 30, and which will then shortly be in place again for the closely following general election—Plaintiffs' requested relief cannot plausibly be obtained before that election. Additionally, the Eleventh Amendment prohibits the Court from ordering Defendant to comply with state law. *See Pennhurst State Sch. &*

---

[1] *See, e.g.*, Complaint, *Republican Nat'l Comm. v. Aguilar*, No. 2:24-cv-518(D. Nev. Mar. 18, 2024), ECF No. 1; Complaint, *Pub. Int. Legal Found. v. Knapp*, No. 3:24-cv-1276(D.S.C. Mar. 14, 2024), ECF No. 1; *Republican Nat'l Comm. v. Benson*, No. 1:24-cv-262 (E.D. Mich. Mar. 13, 2024), ECF No. 1; Complaint, *Jud. Watch, Inc. v. Ill. State Bd. of Elections, et al.*, Case No. 1:24-cv-1867 (N.D. Ill. Mar. 5, 2024). ECF No. 1.

ELIAS LAW GROUP LLP
ATTORNEYS AT LAW
WASHINGTON, DC

*Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

On the merits, Plaintiffs fare no better. To plausibly allege a violation of the NVRA, Plaintiffs must plead facts that suffice to show that Arizona is not making "reasonable efforts" at list maintenance. *See* 52 U.S.C. § 20507(a)(4). Yet Plaintiffs offer no clear allegation as to how Defendant's list-maintenance efforts fall short of the NVRA's "reasonable efforts" requirement. Instead, Plaintiffs focus exclusively on the results, contending that the numbers of registered voters in certain Arizona counties are too high or that too few voters have been removed. But Plaintiffs' statistical comparisons are misleading, and ignore that the NVRA does not require—but instead expressly *prohibits*— immediate removal of many voters, even if they may seem ineligible, to guard against wrongful disenfranchisement. *See, e.g.*, *id.* § 20507(d).

These and other limitations on the NVRA's list-maintenance requirements provide an "obvious alternative explanation" for Plaintiffs' allegations about registration and removal rates, requiring Plaintiffs to provide some factual allegation suggestive of lawless rather than lawful conduct. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 566–67 (2007). Plaintiffs' belief that Arizona counties have too many people on their voter rolls is not enough: The Rules require more than such a "naked assertion" to state a claim. *Id.* at 557.

## BACKGROUND

**I.   Arizona's obligations under the National Voter Registration Act**

The NVRA requires states to provide simplified, voter-friendly systems for registering to vote. Congress enacted the NVRA to *expand* access to the franchise by establishing "procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and by making it "possible for Federal, State, and local governments to implement [the NVRA] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(1)–(2).

To further those pro-voter purposes, the NVRA imposes strict restrictions on whether, when, and how a state may cancel a voter's registration. *See id*. § 20507(a)(3)–

(4), (b)–(d). Outside of limited and carefully delineated exceptions, a state may not remove a voter until that voter has (1) failed to respond to a notice, and (2) not appeared to vote for two general elections—or roughly four years—following delivery of the notice. *Id.* § 20507(d)(1).[2] Congress therefore purposefully "limited the authority of states to encumber voter participation by permitting states to only remove registrants" in a carefully prescribed manner. *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 182 (3d Cir. 2017).

At the same time, while Congress required that states maintain a "general program that makes a reasonable effort to remove the names" of voters who have died or moved "from the official lists of eligible voters," 52 U.S.C. § 20507(a)(4), Congress did not demand perfection. The "NVRA requires only a 'reasonable effort,' not a perfect effort, to remove registrants." *Pub. Int. Legal Found. v. Benson* ("*PILF*"), No. 1:21-CV-929, 2024 WL 1128565, at *11 (W.D. Mich. Mar. 1, 2024). And states need not "use duplicative tools or [] exhaust every conceivable mechanism" to comply with the "reasonable effort" requirement. *Bellitto v. Snipes*, 935 F.3d 1192, 1207 (11th Cir. 2019). This balanced approach reflects the twin policy objectives of the NVRA—to "enhance[] the participation of eligible citizens as voters" and "to protect the integrity of the electoral process." *See* 52 U.S.C. § 20501(b). It also reflects Congress's judgment that it is better to tolerate some ineligible voters remaining on the rolls past their point of ineligibility than to permit the erroneous removal—and potential disenfranchisement—of eligible voters. Because of this policy choice, voter rolls are *expected* to contain more names than those who are currently eligible. Consistent with that expectation, federal courts reject NVRA claims based on "snapshot[s]" of the number of registered voters at a given moment. *E.g.*, *Bellitto*, 935 F. 3d at 1208.

Arizona has enacted robust procedures to identify and remove registered voters who

---

[2] A state may immediately cancel a person's registration when a voter requests to be removed from the rolls, if a voter is convicted of a disenfranchising felony under state law, or upon verification of a voter's death. *Id.* § 20507(a)(3)(A)–(C), (a)(4).

- 3 -

ELIAS LAW GROUP LLP
ATTORNEYS AT LAW
WASHINGTON, DC

are no longer qualified to vote in their jurisdiction. *See* A.R.S. § 16-165(A)(2)–(5) (removal procedures for various categories of ineligible voters, including deceased Arizonans, individuals adjudicated incapacitated, and those convicted of a felony); *id*. § 16-165(D) (removal based on mental incapacitation); *id*. § 16-165(E) (removal based on department of health death records); *id*. § 16-165(F) (removal based on out-of-state license records); *id*. § 16-166(A) (inactive status based on U.S. Postal Service address verification); *id*. § 16-166(E) (inactive status based on change of address information); Ariz. Sec'y of State, State of Ariz. 2023 Elections Procedure Manual, 36–48 (Dec. 30, 2023) ("EPM").[3] And while the Secretary maintains the statewide database of voters, county election officials play a significant role in the state's list maintenance protocols. *See id.*

As to voters who may have moved, "[o]ne of the principal ways" the state "ensure[s] the accuracy of registration records is to update records based on a registrant's change of address." EPM 45. County recorders receive information about a voter's potential address change in various ways: from the Secretary (who periodically receives reports containing information from the Department of Transportation and information from other states), directly from the voter, from the U.S. Postal Service's National Change of Address ("NCOA") service, or through returned mail. *Id.* at 38–40, 45. Arizona is also part of the Electronic Registration Information Center ("ERIC"), which provides states with nationwide motor vehicle registration and Social Security Administration data, among other sources. *Id.* at 39, 45. When information from these sources suggests that a voter may have moved, Arizona follows the procedures "outlined in the NVRA." *Id.* at 46. County recorders may also cancel registrations based on information from "reliable sources." *Id.* at 38 (citing A.R.S. § 16-165(A)(2)).[4] For voters who have died, election officials receive

---

[3] The EPM has the force of law. *Ariz. Pub. Integrity All. v. Fontes*, 475 P.3d 303, 308 (2020). The 2023 EPM is available at: https://apps.azsos.gov/election/files/epm/2023/EPM_20231231_Final_Edits_to_Cal_1_11_2024.pdf.

[4] The NVRA includes a safe-harbor procedure: states may meet their obligation to conduct "reasonable" list maintenance by using NCOA data to identify voters who may have moved

- 4 -

data from the state department of health via the Secretary of State, verify the deaths, and remove voters from the rolls. A.R.S. § 16-165(E). In short, Arizona's several voter removal procedures constitute "a reasonable effort" as required by the NVRA.

## II.   Plaintiffs' Complaint

On June 3, three individual Arizona residents filed suit against the Secretary of State, alleging that the Secretary is violating his list-maintenance obligations under Section 8 of the NVRA Compl. ¶¶ 71, 102–03. The gravamen of Plaintiffs' complaint is that the Secretary *must* be violating the NVRA because Arizona counties have "implausibly high" rates of voter registration in Plaintiffs' opinion. *Id.* ¶ 7. Plaintiffs conclude so because they believe the state's total registration numbers exceed what should be "*expected*" according to a purported expert who derived estimates of registered voters from federal surveys and compared them to state-level data. *Id.* ¶¶ 7, 74 n.5.[5] Plaintiffs also point to correspondence from the Secretary to leaders of the Arizona Legislature stating that one category of state-level notice and cancellation procedures related to voters who may have moved are "in development," interpreting this to mean "that the general maintenance program required of states by the NVRA does not currently exist in Arizona." *Id.* ¶¶ 3, 17, 71. But nowhere does the complaint identify any instance of Arizona improperly keeping someone on the voter rolls whom the NVRA required be removed, or any procedure that Arizona fails to

---

and cancel such registrations according to the NVRA process. *See* 52 U.S.C. § 20507(c)(1). In Arizona, county recorders are authorized to use NCOA data for list maintenance purposes. *See* A.R.S. § 16-166(E); EPM 45–46.

[5] Plaintiffs purport to "incorporate[]" an "expert report" prepared for this litigation by Thomas M. Bryan to "support[]" "[a]ll the data discussed" in the Complaint. Compl. ¶ 7 n.1; *see* Compl. Ex. 1, ECF No. 1-1 ("Bryan Report"). But under Federal Rule of Civil Procedure 10(c) and Ninth Circuit precedent applying it, such "evidentiary" material is not properly part of the complaint and cannot be considered at the pleading stage. *See, e.g.*, *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1219–22 (S.D. Cal. 2001) (granting motion to strike expert affidavit attached as an exhibit to plaintiffs' complaint); *see also United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (citing *DeMarco*, 149 F. Supp. 2d at 1219–21, and holding that affidavits "prepared" for litigation were not properly considered part of a pleading). Should the Court grant their intervention motion, Proposed Intervenors intend to file a motion to strike the Bryan Report as well as all conclusory allegations and opinions in the Complaint that are derived from it under Federal Rule of Civil Procedure 12(f) and Local Rule 7.2(m).

use that the NVRA requires. Nor do Plaintiffs acknowledge Arizona's numerous statutory provisions that describe the state's "reasonable efforts" to comply with the NVRA. Plaintiffs simply assume that Arizona must be violating the NVRA because there are more voters on the rolls than Plaintiffs believe there should be.

The complaint likewise offers little to establish any injury to Plaintiffs because of Defendant's list-maintenance practices. Plaintiffs do little more than claim an interest in the Secretary following the law, while contending that the Secretary's voter roll practices "undermine [their] confidence in Arizona's electoral system" and "risk dilution" of their votes if "ineligible" voters were to cast ballots. *Id.* ¶ 104. Plaintiffs also allege they or organizations they lead that are not parties to the case will spend resources to address the Secretary's purported failure to comply with the NVRA. *Id.* ¶ 105.

As relief, Plaintiffs ask this Court to order an overhaul of Arizona's list-maintenance procedures: in addition to a declaratory judgment that the Secretary is violating Section 8 of the NVRA, Plaintiffs demand an injunction instructing the Secretary to develop and implement "reasonable and effective" registration list-maintenance programs and implement existing voter-removal procedures.

## LEGAL STANDARD

Standing is a "threshold matter central to [the court's] subject matter jurisdiction" under Rule 12(b)(1). *Bates v. United Parcel Serv., Inc.*, 511 F. 3d 974, 985 (9th Cir. 2007). To establish Article III standing, a plaintiff must sufficiently allege (1) a "concrete" and "particularized" injury-in-fact, actual or imminent, (2) that is fairly traceable to the defendant's conduct, and (3) is likely to be redressed by a favorable decision from the court. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39 (2016). Plaintiffs, as "[t]he party invoking federal jurisdiction[,] bear[] the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Koster v. Whitaker*, 427 F. Supp. 3d 1140, 1145 (D.

ELIAS LAW GROUP LLP
ATTORNEYS AT LAW
WASHINGTON, DC

Ariz. 2019) (quoting *Twombly*, 550 U.S. at 570), *aff'd*, 843 F. App'x 917 (9th Cir. 2021). Although a court must "take all of the factual allegations in the complaint as true," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555), "a plaintiff must allege facts sufficient to 'raise a right to relief above the speculative level.'" *Koster*, 427 F. Supp. 3d at 1145 (quoting *Twombly*, 550 U.S. at 555). Motions to dismiss should be granted "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)). Because Plaintiffs lack standing and their claim lacks merit, their complaint fails under both Rule 12(b)(1) and 12(b)(6), and it should be dismissed.

## ARGUMENT

### I.     Plaintiffs fail to plausibly allege standing.

Plaintiffs fail to plausibly allege any "actual or imminent" and "concrete and particularized" injuries-in-fact. *Lujan*, 504 U.S. at 560 (citation omitted). Each of their purported bases for standing—worries about election integrity, the specter of voter fraud and vote dilution, and vague allegations that they or non-party organizations will spend resources in response to Arizona list-maintenance procedures—fall far short of Article III's requirements.

#### A.     Plaintiffs' desire for the government to follow the law and worries about election integrity and vote dilution are not cognizable.

According to the complaint, each Plaintiff "has a clear interest in supporting the enforcement of laws such as the NVRA that promote fair and orderly elections," Compl. ¶¶ 22, 26, 28, and "inaccurate voter registration rolls undermine Plaintiffs' confidence in Arizona's electoral system," *id.* ¶ 104. Such subjective and unsubstantiated worries about Arizona's compliance with the NVRA—and their supposed effect on Plaintiffs' faith in the integrity of Arizona's elections—are not cognizable harms.

Plaintiffs' "concern [about] obedience to law" is an "abstract and indefinite" harm

ELIAS LAW GROUP LLP
ATTORNEYS AT LAW
WASHINGTON, DC

that fails to supply an injury-in-fact. *Novak v. United States*, 795 F.3d 1012, 1018 (9th Cir. 2015) (quoting *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 23 (1998)). It is no more than a "generally available grievance about government . . . [that] does not state an Article III case or controversy." *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 909 (9th Cir. 2011) (quoting *Lujan,* 504 U.S. at 573–74). The Supreme Court has held that mere concern about whether a federal election requirement "has not been followed" is "precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance." *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam) (dismissing case challenging Colorado law as violating Elections Clause for lack of standing); *see also FDA v. All. for Hippocratic Med.*, Nos. 23-235 & 23-236, 2024 WL 2964140, at *6 (U.S. June 13, 2024) ("[A] citizen does not have standing to challenge a government regulation simply because the plaintiff believes that the government is acting illegally"). Plaintiffs allege no more with respect to their concern about whether the Secretary is following the NVRA and their fear about the ensuing consequences. In "seeking relief that no more directly and tangibly benefits [Plaintiffs] than it does the public at large," the complaint "does not state an Article III case or controversy." *Lance*, 549 U.S. at 439 (quoting *Lujan*, 504 U.S. at 573−74).

The same is true of Plaintiffs' generalized concerns about election integrity. Those allegations fail to constitute a cognizable injury-in-fact for another reason as well—they are purely speculative. "Courts have universally concluded that an alleged injury related to a lack of confidence" in election administration "is 'too speculative to establish an injury in fact.'" *Thielman v. Fagan*, No. 3:22-CV-01516, 2023 WL 4267434, at *4 (D. Or. June 29, 2023) (quoting *Lake v. Hobbs*, 623 F. Supp. 3d 1015, 1028−29 (D. Ariz. 2022)), *aff'd sub nom*. *Thielman v. Griffin-Valade*, No. 23-35452, 2023 WL 8594389 (9th Cir. Dec. 12, 2023). The complaint states that "Arizona [] has experienced known cases of voter fraud," Compl. ¶ 44, but nowhere does it identify any instance of fraud, let alone suggest that any fraud has resulted from Arizona's list-maintenance efforts. While the complaint makes a

Elias Law Group LLP
Attorneys at Law
Washington, DC

passing reference to a two-decade old federal report on elections that contained a few lines about voter rolls and possible fraud, *id.* ¶ 43, it makes no connection between any fraud and Defendant's list-maintenance procedures. Merely invoking "the possibility and potential for voter fraud," based only on "hypotheticals, rather than actual events," does not suffice. *Donald J. Trump for President, Inc., v. Boockvar*, 493 F. Supp. 3d 331, 406 (W.D. Pa. 2020). Plaintiffs' "subjective fear" about the prospect of voter fraud thus "does not give rise to standing." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013).

Plaintiffs also allege that their "votes risk being diluted" because of Arizona's list-maintenance procedures. Compl. ¶ 31. This, too, is a textbook generalized grievance: "Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any [Arizona] voter." *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926 (D. Nev. 2020). "Such claimed injury therefore does not satisfy the requirement that Plaintiffs must state a concrete and particularized injury." *Id.*; *see also Bowyer v. Ducey*, 506 F. Supp. 3d 699, 712 (D. Ariz. 2020) (rejecting vote dilution claim because it raised only generalized grievances). Indeed, a "veritable tsunami" of courts across the country, including in this Circuit, have *uniformly* rejected such a vote-dilution theory of standing. *O'Rourke v. Dominion Voting Sys. Inc.*, No. 20-CV-03747-NRN, 2021 WL 1662742, at *9 (D. Colo. Apr. 28, 2021) (collecting cases), *aff'd,* No. 21-1161, 2022 WL 1699425 (10th Cir. May 27, 2022).[6]

---

[6] Plaintiffs' generalized vote-dilution theory is different in kind from a vote-dilution injury in the redistricting context, where a law *minimizes* a voter's or a group of voters' voting strength *as compared to other voters*. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 207–08 (1962). "As courts have routinely explained, vote dilution is a very specific claim that involves votes being weighed differently and cannot be used generally to allege voter fraud." *Bowyer*, 506 F. Supp. at 711; *see also Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) (explaining why vote dilution may be an injury "in the racial gerrymandering and malapportionment contexts" but not in the context raised here). No court has recognized Plaintiffs' theory of injury, where the alleged counting of "illegitimate" ballots would "dilute" the voting power of all Arizonans equally. *See, e.g.*, *Wood*, 981 F.3d at 1314–15 ("Vote dilution in this context is a paradigmatic generalized grievance that cannot support standing.") (citation omitted); *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1000 (D. Nev. 2020) (Plaintiffs' alleged injury of vote dilution is impermissibly "generalized" and "speculative"); *Wash. Election*

Moreover, Plaintiffs' theory of standing premised on the possibility of unidentified voters committing fraud raises serious traceability and redressability concerns, as there is no reason to think Plaintiffs' requested relief will resolve their baseless and speculative fears. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (explaining it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision"). That is particularly true here where Plaintiffs' allegations of injury "depend on 'the unfettered choices made by independent actors not before the courts.'" *Novak*, 795 F.3d at 1020 (quoting *ASARCO Inc. v. Kadish,* 490 U.S. 605, 615 (1989)); *cf. Levine v. Vilsack*, 587 F.3d 986, 997 (9th Cir. 2009) (explaining that a "pleading directed at the likely actions of third parties . . . would almost necessarily be conclusory and speculative"); *see* Compl. ¶ 29 (alleging only that "ineligible voters have an opportunity to vote"). Simply put, there is no reason to think Plaintiffs' votes will be diluted by fraudulent votes absent the relief they request.

In sum, neither Plaintiffs' concern that Arizona is not adhering to the NVRA nor their speculative worries about election integrity and vote dilution confer standing.

### B.   Plaintiffs fail to allege cognizable monetary or resource-based harm.

Nor have Plaintiffs sufficiently alleged any other injuries that could support their standing. Plaintiffs claim that they "must spend more time and resources monitoring Arizona's elections for fraud and abuse, mobilizing voters to counteract it, educating the public about election-integrity issues, and persuading elected officials to improve list maintenance" and that they must "spend more of their time and resources on get-out-the-

---

*Integrity Coal. United v. Wise*, No. 2:21-CV-01394, 2022 WL 4598508, at *4 (W.D. Wash. Sept. 30, 2022) (collecting cases and concluding that allegations of vote dilution do not confer standing); *Hall v. D.C. Bd. of Elections*, No. CV 23-1261, 2024 WL 1212953, at *4 (D.D.C. Mar. 20, 2024) ("At bottom, they are simply raising a generalized grievance which is insufficient to confer standing."); *Testerman v. N.H. Sec'y of State*, No. 23-CV, 2024 WL 1482751, at *4 (D.N.H. Jan. 9, 2024) ("[C]ourts that have considered voters' standing in circumstances similar to those here have uniformly rejected individual standing claims based on allegations of dilution resulting from allegedly illegal votes being cast.").

ELIAS LAW GROUP LLP
ATTORNEYS AT LAW
WASHINGTON, DC

vote efforts for like-minded individuals." Compl. ¶¶ 32−33. But their "bare and conclusory allegations are insufficient to show that [Arizona's list maintenance] has" required such actions. *See Our Watch With Tim Thompson v. Bonta*, 682 F. Supp. 3d 838, 848 (E.D. Cal. 2023). Indeed, despite Plaintiffs' awareness of the alleged list maintenance deficiencies for more than ten months, the complaint is devoid of any allegation of what "time and resources" have been spent, what Plaintiffs have done to "mobilize voters," how they have "educate[d] the public about election integrity issues" or "persuade[d] elected officials" to act, Compl. ¶¶ 32−33, or how and from what Plaintiffs have been "required to divert their resources," *id.* ¶ 105. The complaint is thus "devoid of any allegations" about how the Secretary's activities "specifically impact[]" Plaintiffs, and they have at most "pled facts suggesting that [their] values have been undermined." *Our Watch*, 682 F. Supp. 3d at 848. More is required.

Even if Plaintiffs had sufficiently pled an injury based on expenditure of resources, they cannot create standing by "divert[ing] resources to combat an impermissibly speculative injury." *Cegavske*, 488 F. Supp. 3d at 1003. Because Plaintiffs have failed to allege a non-speculative injury stemming from Arizona's list-maintenance practices, any resources spent in response are expended to address an illusory problem. Plaintiffs' alleged election-integrity injuries derive from "speculative fears" based on a "chain of contingencies," and are thus "self-inflicted" and "insufficient to establish a cognizable injury." *Doe v. Bonta*, 101 F.4th 633, 640 (9th Cir. 2024) (quoting *Clapper*, 568 U.S. at 410–11); *see also Clapper*, 568 U.S. at 416 (holding a plaintiff "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending"); *see supra* Section I.A. Put differently, Plaintiffs "cannot manufacture standing by first claiming a general interest in lawful conduct and then alleging that the costs incurred in identifying and litigating instances of unlawful conduct constitute injury in fact." *Project Sentinel v. Evergreen Ridge Apartments*, 40 F.

Supp. 2d 1136, 1139 (N.D. Cal. 1999).[7] This theory of standing too fails.

## II. Plaintiffs fail to plausibly allege any violation of the NVRA.

As Plaintiffs acknowledge, all the NVRA requires is that states "conduct a general program that makes a *reasonable effort* to remove the names of ineligible voters" from the rolls due to death or change of residence. Compl. ¶ 37 (emphasis added) (citing 52 U.S.C. § 20507(a)(4)). Plaintiffs' meager attempt to cast doubt on the state's reasonable efforts to remove ineligible voters relies on misleading and faulty data and ignores Arizona's robust list maintenance procedures. In short, nothing in the complaint creates a plausible inference that Arizona has failed to make "reasonable efforts" to maintain its voter rolls in violation of the NVRA.

The gist of Plaintiffs' complaint is that Arizona *must* not be complying with the NVRA because, in Plaintiffs' view, "all Arizona counties have exceptionally high rates of registered voters." *Id*. ¶ 85; *see also id*. ¶¶ 72−99.[8] But the numbers Plaintiffs point to are "equally consistent with lawful conduct" and thus, "under *Twombly*, plaintiffs have not pleaded facts that would move their allegations from merely possible to plausible." *In re*

---

[7] To the extent Plaintiffs intend to do so, they may not assert the rights of non-party organizations that are allegedly spending resources in response to the Secretary's list-maintenance activities or otherwise impacted by them. Bedrock standing principles require that parties "assert their own rights rather than rely on the rights or interests of third parties." *Hong Kong Supermarket v. Kizer*, 830 F.2d 1078, 1081 (9th Cir. 1987). Though Plaintiffs Mussi and Swoboda lead organizations not party to this litigation, Compl. ¶¶ 21, 23, they cannot claim the purported injuries to those absent organizations as their own to establish standing because organizational standing turns on "whether the organization *itself* has suffered an injury in fact." *We Are Am./Somo Am., Coalition of Ariz. v. Maricopa Cnty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1094 (D. Ariz. 2011) (emphasis added). And while limited exceptions to that fundamental principle exist—such as when (1) "the party asserting the right has a close relationship with the person who possesses the right" and (2) "there is a hindrance to the possessor's ability to protect his own interests," *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 764 (9th Cir. 2018) (quoting *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017), no such exceptions exist here, and the Complaint nowhere contains allegations otherwise. Accordingly, the Court should not consider any purported impact of the Secretary's list-maintenance activities on non-party organizations. *See, e.g.,* Compl. ¶ 25 (describing the Republican Party of Arizona's purported use of voter rolls).

[8] Throughout the complaint, Plaintiffs cite the total number of registered voters, including inactive voters, which leads to an artificially inflated number of registrants because multiple Arizona statutes require placing potentially ineligible voters on inactive status in various circumstances before removal. *See, e.g.*, A.R.S. §§ 16-165 (F), 16-166(A), (E).

*Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007)**.**

Plaintiffs nowhere account for the fact that Congress "designed [the NVRA] to protect voters from improper removal and only provide[d] very limited circumstances in which states may remove them" from the rolls. *Am. C.R. Union*, 872 F.3d at 182. The law purposefully "limits the methods which a state may use to remove individuals from its voting rolls and is meant to ensure that eligible voters are not disenfranchised by improper removal." *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 381 (6th Cir. 2008). Most notably, if a voter fails to respond to a notice about a possible change of address, the NVRA forbids removing the voter until that voter has failed to appear to vote in at least two federal general elections—a four-year lag period meant to protect against improper removals, which has been incorporated into Arizona law. 52 U.S.C. § 20507(d); *see* A.R.S. § 16-166(E). In other words, Congress elected to permit some ineligible voters to remain on the rolls for several years while the statutorily prescribed removal process occurs. Courts have thus recognized that states need not "immediately remove every voter who may have become ineligible," and that "the NVRA requires only a 'reasonable effort,' not a perfect effort." *PILF*, 2024 WL 1128565, at *11. "[T]he statue requires nothing more of the state." *Bellitto*, 935 F.3d at 1203.

Considering the NVRA's narrow requirements and strict limitations, Plaintiffs' allegation that there are too many voters on the rolls fails to suggest anything "more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. The numbers Plaintiffs point to are just as consistent with Arizona adhering to the removal processes established by Congress. While Plaintiffs claim registration rates are too high, they do not explain why they are inconsistent with "reasonable" list maintenance efforts. Instead, Plaintiffs allege only that they show more registrants than estimates of the number of individuals who are *qualified* to vote at any given time. *See* Compl. ¶¶ 7−15, 73−89. But that is not enough to plead a violation of the NVRA, which requires that potentially ineligible voters remain on the rolls for years before removal. Because "Plaintiffs must do more than allege facts that

ELIAS LAW GROUP LLP
ATTORNEYS AT LAW
WASHINGTON, DC

are merely consistent with both their explanation and defendants' competing explanation," *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1105 (9th Cir. 2013), it is not enough to point to the "sheer number of . . . registered voters . . . [as] a hallmark of an unreasonable list maintenance program." *Pub. Int. Legal Found. v. Boockvar*, 495 F. Supp. 3d 354, 359 (M.D. Pa. 2020) (cleaned up). Under the NVRA, there is nothing "unreasonable" about having what appears to be an excessive number of voters on the rolls at one moment in time.

Moreover, as several courts have found, there is good reason *not* to take Plaintiffs' numbers at face value, even at the pleading stage. Their data relies on the 2022 American Community Survey ("ACS") produced by the U.S. Census Bureau to estimate the current population of several Arizona counties. *E.g.*, Compl. ¶ 76. The Eleventh Circuit observed that such ACS data may "significantly underestimate[] the population" of a county for various reasons, including because it "asks who has resided in the household in the two-month period" preceding the survey, thereby "exclud[ing] many college students, military personnel" and others who may not reside in an area for the full year. *Bellitto*, 935 F.3d at 1208. The Census Bureau itself has cautioned that "[d]ue to the variance inherent in survey estimates," it "do[es] not recommend combining survey data from the [American Community Survey] with administrative record data, such as those produced as part of voter tallies."[9] Yet Plaintiffs do just that, despite the Census Bureau's warning that "the margin of error could be around 90 percent."[10]

For Arizona's allegedly high registration rate, Plaintiffs rely on the 2022 Election Administration and Voting Survey ("EAVS") produced by the U.S. Election Assistance Commission. *E.g.*, Compl. ¶¶ 94−95, 98. But courts have warned that an "EAVS snapshot" can "in no way be taken as a definitive picture of what a county's registration rate is, 'much

---

[9] Kurt Hildebrand, *Republican National Committee names Douglas in voter roll lawsuit*, TAHOE DAILY TRIB. (Mar. 31, 2024), https://www.tahoedailytribune.com/news/republican-national-committee-names-douglas-in-voter-roll-lawsuit (quoting statement of Census Bureau respresentative).
[10] *Id.*

- 14 -

ELIAS LAW GROUP LLP
ATTORNEYS AT LAW
WASHINGTON, DC

less any indication of whether list maintenance is going on and whether it's … reasonable.'" *Bellitto*, 935 F. 3d at 1208 (cleaned up). The EAVS itself, relied on by Plaintiffs in their complaint, warns that:

> [D]ata on registered and eligible voters as reported in the EAVS should be used with caution, as these totals can include registrants who are no longer eligible to vote in that state *but who have not been removed from the registration rolls because the removal process laid out by the NVRA can take up to two elections cycles to be completed.*

2022 EAVS at 140 (emphasis added)[11]; *see also Jud. Watch, Inc. v. North Carolina*, No. 3:20-CV-211-RJC-DCK, 2021 WL 7366792, at *10 (W.D.N.C. Aug. 20, 2021) (observing the same cautionary note in 2018 EAVS survey). The EAVS thus advises that "states should expect to see high voter registration rates," meaning that "such information, without more, does not" provide a meaningful inference of "non-compliance with the NVRA." *Jud. Watch*, 2021 WL 7366792, at *10. As a result, Plaintiffs' data sources are not fit for the purposes chosen by Plaintiffs, as both courts and the authors of such data have recognized.

Even taking Plaintiffs' data and faulty theories at face value, the numbers suggest nothing besides a "reasonable" voter roll-maintenance program. Arizona's registration data, cited by Plaintiffs elsewhere, combined with their ACS data shows a registration rate of 77.8% in 2022, lower than at least one of the survey comparisons Plaintiffs claim represent expected registration rates. Compl. ¶ 81 & Bryan Report ¶ 55 (alleging expert's calculations result in 81.4% registration based on 2022 CES Post-Election Survey); *id.* ¶ 80 n.6. The EAVS also shows that 432,498 voters were removed from the rolls in Arizona during the two-year period Plaintiffs claim no reasonable program was being conducted, confirming what the Secretary stated to Plaintiff Mussi last year: Arizona is actively removing voters from the rolls. Compl., Ex. 3 at 7, ECF No. 1-3.[12]

---

[11] U.S. Election Assistance Commission, Election Administration and Voting 2022 Comprehensive Report (June 2023), https://www.eac.gov/sites/default/files/2023-06/2022_EAVS_Report_508c.pdf.
[12] *See* U.S. Election Assistance Comm'n, 2022 EAVS Data Brief for Arizona (2022), https://www.eac.gov/sites/default/files/2023-10/2022_EAVS_Data_Brief_AZ_508c.pdf; *see also* Bryan Report, ¶ 60.

ELIAS LAW GROUP LLP
ATTORNEYS AT LAW
WASHINGTON, DC

Other isolated data points Plaintiffs offer do not indicate anything besides a "reasonable" effort. Plaintiffs repeatedly claim that about 30,000 deceased voters were wrongly left on the rolls. *See, e.g.*, Compl. ¶ 12. But Plaintiffs compare apples to oranges: they report the total number of deaths and then "assume[] 100%" of these individuals were registered and thus should have been removed. Bryan Report, ¶ 65. But while "the Arizona Department of Health Services provides the Secretary of State a record of the death of a resident of the state, [] not everyone who is included in that list is a registered voter." *See* Compl. Ex. 2 at 2, ECF No.1-2.[13] Applying a 69.9% registration rate, which Plaintiffs claim is reasonable, Compl. ¶ 7, to the total 143,278 deceased Arizonans means about 100,151 deceased Arizonans were likely registered voters who should have been removed from the rolls. Given Plaintiffs admit that 108,103 voters were removed using death records, *id*. ¶ 12, Plaintiffs fail to show any gap at all.

Plaintiffs point to little else to support any inference that Arizona is falling short of the NVRA's requirements. While Plaintiffs note that the Secretary has reported that some state-level list-maintenance procedures in Arizona are "in development," Plaintiffs nowhere acknowledge Arizona's existing comprehensive statutory removal procedures, *see* A.R.S. § 16-165(A)(2)−(5), (D), (E), (F); *id*. § 16-66(A), (E); EPM 36−48, never mind "allege that this program itself is deficient" or "point to a specific breakdown that makes the program 'unreasonable.'" *Boockvar*, 495 F. Supp. 3d at 359. "Without allegation, let alone proof," of such a breakdown, the Court cannot infer "that the many procedures currently in place are unreasonable." *Id.* Plaintiffs also observe that the EAVS lacks data on some of the removal notices sent in Maricopa County, Compl. ¶ 95, but again, they never allege that any of the voters who received those notices are ineligible or should have been removed from the rolls.

At bottom, the complaint offers no basis to infer that the Secretary, or any election

---

[13] While Plaintiffs' "expert" adjusted these figures for citizenship and voting age, he made no other adjustments and assumed that 100% of these voters were registered. Bryan Report ¶ 65.

official in Arizona, is not complying with the NVRA. The "naked assertion" that Arizona's voter rolls include too many voters—a fact entirely consistent with the purposeful design of NVRA—"stops short of the line between possibility and plausibility," *Twombly*, 550 U.S. at 557, and the complaint should be dismissed.

### III. Plaintiffs seek relief that is unavailable.

Any injunctive relief Plaintiffs seek for 2024 is unavailable because the NVRA prohibits systematic voter removals during the 90-day period before a federal election. 52 U.S.C. § 20507(c)(2)(A) (systemic list maintenance must be completed "not later than 90 days prior to the date of a primary or general election for Federal office."). Arizona's federal primary election is on July 30, 2024, and the removal blackout window began on May 1. The 2024 general election will be on November 5, and the blackout period before it begins on August 7. With only seven days available outside of the blackout period, the Court cannot order any systematic voter list maintenance before the 2024 general election without violating the NVRA's clear prohibition on purging voters within the months leading up to federal elections.

Plaintiffs also request that the Court enter "[a]n injunction requiring the Secretary to fully comply with any existing procedures that Arizona has in place" to remove ineligible voters from the rolls. Compl. at 19. The Supreme Court has made clear that a federal court cannot order state officials to comply with state law. *See Halderman*, 465 U.S. at 98–100. Thus, this Court also cannot provide this portion of the relief Plaintiffs seek. *See Lucas v. Ariz. Sup. Ct. Fiduciary Certification Program*, No. CV09-2599, 2010 WL 2573557, at *1−2 (D. Ariz. June 23, 2010) (finding court lacked authority under the Eleventh Amendment to compel Arizona state officers to comply with state law), *aff'd*, 457 F. App'x 689 (9th Cir. 2011).

### CONCLUSION

For all of these reasons, Plaintiffs' complaint should be dismissed.

ELIAS LAW GROUP LLP
ATTORNEYS AT LAW
WASHINGTON, DC

RESPECTFULLY SUBMITTED this 25th day of June, 2024.

By: */s/ D. Andrew Gaona*
D. Andrew Gaona
Austin C. Yost

**ELIAS LAW GROUP LLP**

Lalitha D. Madduri*
Melinda Johnson*
Tyler L. Bishop*
Renata O'Donnell*

*Attorneys for Proposed Intervenor-Defendants*

**Admitted Pro Hac Vice*

- 18 -

## CERTIFICATE OF CONFERRAL

Under Local Rule 12.1(c), the undersigned counsel for Proposed Intervenor-Defendants the Arizona Alliance for Retired Americans and Voto Latino ("Proposed Intervenors") certifies that, on June 21, 2024, Proposed Intervenors' counsel informed counsel for Plaintiffs and counsel for Defendant that Proposed Intervenors intended to lodge a proposed motion to dismiss on the same schedule as Defendant. Counsel for Proposed Intervenors requested to participate in a meet-and-confer to discuss with the parties the issues that would be raised in Proposed Intervenors' proposed motion to dismiss. Counsel for Defendant did not object to counsel for Proposed Intervenors participating in a meet-and-confer, but counsel for Plaintiffs objected and refused to confer.

/s/ D. Andrew Gaona