1 | KRISTIN K. MAYES
Attorney General
2 | Firm State Bar No. 14000

3
Kara Karlson, No. 029407
4 | Karen J. Hartman-Tellez, No. 021121
Senior Litigation Counsel
5 | Kyle Cummings, No. 032228
Assistant Attorney General
6 | 2005 North Central Avenue
7 | Phoenix, AZ  85004-1592
Telephone (602) 542-8323
8 | Facsimile (602) 542-4385
9 | Kara.Karlson@azag.gov
Karen.Hartman@azag.gov
10 | Kyle.Cummings@azag.gov
adminlaw@azag.gov
11 | *Attorneys for Defendant Arizona*
12 | *Secretary of State Adrian Fontes*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Scot Mussi; Gina Swoboda, the Chair of the Republican Party of Arizona; and Steven Gaynor, <br><br>          Plaintiffs, <br><br> v. <br><br> Adrian Fontes, in his official capacity as Arizona Secretary of State, <br><br>          Defendant. | No. CV-24-01310-PHX-ESW <br><br> **ARIZONA SECRETARY OF STATE'S MOTION TO DISMISS** <br><br> **(Oral Argument Requested)** |

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendant Arizona Secretary of State Adrian Fontes moves to dismiss the Complaint filed by Plaintiffs Scot Mussi, Gina Swoboda, and Steve Gaynor (collectively, "Plaintiffs"). Plaintiffs have failed to allege sufficient facts to provide federal jurisdiction, and Plaintiffs' general concern about alleged ineligible voters on the voter rolls is insufficient to state a claim for which relief can be granted. The Complaint should be dismissed.

## INTRODUCTION

The National Voter Registration Act of 1993 ("NVRA") was enacted to "increase the number of eligible citizens who register to vote in elections for Federal office" and "enhance[] the participation of eligible citizens as voters." 52 U.S.C. § 20501(b)(1)-(2). This lawsuit, however, seeks to force additional, unspecified measures to Arizona's existing list maintenance program that would result in the removal of hundreds of thousands of registrants based solely on misleading statistical analysis. Plaintiffs allege that "at least 500,000 registered voters" should be removed, but also that "other reliable data sources show[ ] that Arizona has between 1,060,000 and 1,270,000 unaccounted for voters on the state voter rolls." (Docket Entry ("DE") 1 ¶¶ 8-9). Plaintiffs' numbers are so disparate that it can mean only one thing: Plaintiffs are guessing. But speculative purging of voter rolls is precisely the type of "discriminatory and unfair registration laws and procedures" that NVRA is meant to prevent. 52 U.S.C. § 20501(a)(3).

The lawsuit should be dismissed for two reasons. First, Plaintiffs fail to meet the bar for Article III standing. Plaintiffs' sole allegation of harm boils down to a claim of a fear of possible vote dilution. But vote dilution is not a cognizable claim outside of redistricting cases, and the potential vote dilution that Plaintiffs fear requires a series of systematic failures that are speculative, at best. Moreover, members of groups who work to turn out voters are not harmed by continuing to work to turn out voters, despite believing that they have to work harder to achieve their electoral goals.

Second, even if Plaintiffs could satisfy the constitutional requirements to establish standing to bring this suit, they fail to state a claim upon which relief can be granted. Arizona performs list maintenance in compliance with NVRA.  Indeed, Arizona's active list maintenance programs exceed NVRA's requirements.  Because unassailable facts plainly belie Plaintiffs' claims, this Complaint should be dismissed.

## BACKGROUND

### A.  The National Voter Registration Act

Pursuant to federal law, states may only remove voters from registration rolls:  (1) at the voter's request; (2) if a voter becomes ineligible as a result of criminal conviction or an adjudication of mental incapacity; (3) if the voter has died; or (4) if the voter has moved out of the jurisdiction.  52 U.S.C. § 20507(a)(3)-(4).  States are required to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of [death and change of address]."  52 U.S.C. § 20507(a)(3)-(4).  There is some lag between when voters become ineligible by moving out of the jurisdiction and when NVRA permits their removal from the voter rolls.  *See* 52 U.S.C. § 20507(d) (providing a state "shall not remove the name of a registrant . . . on the ground that the registrant has changed residence unless the registrant" does not take certain required steps for two consecutive election cycles).

NVRA programs to remove voters who have changed residence prohibit immediate removal, and require states to the following steps before removal.  First, when a county recorder receives notice that a registrant has moved out of a jurisdiction, the county recorder must send a notice to the registrant.  52 U.S.C. § 20507(d)(1)(B), (d)(2). If the registrant does not respond to the NVRA notice, *and* does not appear to vote in the next two federal general elections, that voter may be removed from the rolls.  52 U.S.C. § 20507(d)(1)(B).  Thus, as a function of federal law, a person who moved out of Arizona in 2019 would generally still be included in certain voter registration statistics.

The federal government has been tracking voter registration and list maintenance through the Election Administration and Voting Survey ("EAVS") since 2004. Following each general election, the EAVS report compiles data from around the country in a readable, reliable, and uniform format to ensure compliance with NVRA. "The EAVS provides the most comprehensive source of state and local jurisdiction-level data about election administration in the United States." Ex. 1 at i. The EAVS plays a "vital role" in "identify[ing] trends," deciding where to "invest resources to improve election administration" and "secure U.S. election infrastructure." *Id.*

According to EAVS, total active registration per Citizen Voting Age Population ("CVAP") in the United States as a whole was 85.4%, and two-thirds of all states had higher active registration rates as a percentage of CVAP than Arizona. *Id.* at 135. The majority of states report active registration rates of over 80% of CVAP, but not Arizona. *Id.* at 142. Finally, "some states may report an active CVAP registration rate of 100% or more . . . because the 2021 CVAP was used to calculate the 2022 registration rate and because due to federal law, some ineligible voters may take up to two full election cycles to be removed from the registration rolls." *Id.* at 166. Arizona had a 100% response rate to EAVS in 2022. *Id.* at 243.

**B. Arizona's List Maintenance Program.**

Arizona conducts regular voter registration list maintenance, removing convicted felons, people who have died, and other ineligible registrants from the voting rolls. Arizona sent out nearly one million confirmation notices, and removed 432,498 voters from registration rolls[1] in 2022 alone. *Id.* at 182, 188. Arizona removed 8.9% registrants, as a percentage of the state's total number of active registered voters in 2022.

---

[1] Plaintiffs rely on EAVS in their Complaint, and it is therefore incorporated by reference. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999, 1001-02 (9th Cir. 2018) ("[I]ncorporation by reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself."). Moreover, because the EAVS is published by a federal agency and has indicia of trustworthiness, it is proper for this Court to take judicial notice of it pursuant to Fed. R. Evid. 201. Consideration of this information will not convert this motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6), to a motion for summary judgment.

1    This is a bit higher than, but generally consistent with, the national average removal rate

2    of approximately 8.5% of registrants.  *Id.* at 188-89.  In fact, Arizona's rate of removal in

3    2022 that was higher than twenty-eight other states.  (*Id.*).  The EAVS data demonstrate

4    that Arizona maintains an active program to remove voters who have moved out of the

5    jurisdiction (18.9%), died (25.0%), failed to return a confirmation notice (40.5%), at the

6    voter's request (11.6%), and upon felony conviction (3.5%).  *Id.* at 188, 190.  Arizona's

7    data indicates that the state's list maintenance program is at least as active, and in many

8    cases *more active*, in removing ineligible voters from the rolls than the rest of the

9    country, where voter removal rates were reported as 26.8% who moved, 25.6% have

10   died, 25.4% failed to return a confirmation notice, 4.5% at the voter's request, and 1.4%

11   upon felony conviction.  *Id.* at 190-91.  In short, Arizona removes ineligible voters from

12   its registered voter list in compliance with the law.

13          In addition to state and federal statutes, Arizona elections officials must follow

14   the Elections Procedures Manual ("EPM"), which carries with it the force of law.  A.R.S.

15   § 16-452(A), (D).  The EPM provides fifty-five pages of guidance on processing and

16   validating voter registration, including a thirteen-page subsection titled "Voter

17   Registration List Maintenance."  Ex. 2, EPM Ch. 1.  This directs how and when to verify

18   and cancel registrants who are deceased, felons, incapacitated, or moved.  *Id.*

19          For example, when a county recorder receives notification that a voter has moved,

20   through the United States Postal Service's ("USPS") National Change of Address

21   ("NCOA") service, returned mail, or through other mechanisms, the county recorder

22   must send non-forwardable official election mail to that registrant's address.  *Id.* at 46.

23   If that mail is returned undeliverable, the recorder must send a second notice (the "Final

24   Notice") to the new address, if the USPS provides one, or the address on record if no

25   forwarding address is available within twenty-one days of the mail being returned to the

26   county.  *Id.*  The Final Notice must notify the registrant that they have thirty-five days to

27   update their record or they will be put in "inactive" status.  *Id.*  If the registrant does not

28

update their voter registration record or appear to vote in the "four years from the date of the Final Notice or following the second general election after the Final Notice," the registrant's record will be canceled. *Id.* at 47. This procedure is set forth in detail in the EPM, and a violation of these provisions is a class 2 misdemeanor. A.R.S. § 16-452(D).

In the legislative session in 2022, a number of new laws related to voter registration and list maintenance were enacted. One bill, H.B. 2243, 2022 Ariz. Legis. Serv. Ch. 370 (H.B. 2243) (West), added new list maintenance requirements—not required by NVRA—and was scheduled to take effect beginning January 1, 2023. However, parts of that law have been enjoined by this Court. *Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 862406 (D. Ariz. Feb. 29, 2024).

### C. Arizona's Elections Are Secure.

Plaintiffs claim they fear that ineligible voters may have an opportunity to vote in Arizona elections, which undermines their confidence in Arizona's elections as a whole. (*See* DE 1 ¶ 104). This fear is ill-founded. Arizona requires registrants to demonstrate proof of citizenship to register to vote, A.R.S. § 16-166, and requires voters to present identification at the polls to cast a ballot. A.R.S. § 16-579(A). Ballots cast by mail undergo signature verification to ensure that the individual signing the ballot is the person registered, A.R.S. § 16-550.

The 2020 and 2022 election spawned many lawsuits attacking the veracity of the final results. All of these lawsuits failed. *See, e.g., Ward v. Jackson*, No. CV-20-0343-AP/EL, 2020 WL 8617817 (Ariz. 2020); *Lake v. Hobbs*, No. 2 CA-CV23-0144, 2024 WL 2949331 (Ariz. App, June 11, 2024). Even Plaintiffs admit that there "is no evidence that" the counties they argue have abnormally high registration rates "experienced above-average voter participation compared to the rest of the country or state." (DE 1 ¶ 89). In short, despite intense scrutiny of Arizona's elections since 2020, there is no evidence that Arizona elections are not secure and properly conducted in

accordance with the law, and even Plaintiffs agree that there is no evidence supporting their fear of ineligible voters casting ballots in Arizona.

### D. Plaintiffs' Correspondence and This Lawsuit.

Plaintiffs sent a letter to the Secretary on August 8, 2023, alleging that comparing data "from the U.S. Census Bureau's 2017-2021 American Community Survey [("ACS")] and the most up-to-date count of registered voters available from the Arizona Secretary of State," four Arizona counties "all have greater than 100% voter registration" and "nine others have suspiciously high rates of voter registration." (DE 1-3, 3). The letter threatened a lawsuit if the "violations we have identified are not corrected," and that "if litigation ensues, you risk bearing the financial burden of the full cost of the litigation." (*Id.* at 4-5). The only information provided in the letter to support Plaintiffs' claims was a comparison of "the most up-to-date count of registered voters," *i.e.,* from 2023, with ACS data from 2017-2021, which Plaintiffs claimed indicate "there are more registered voters than eligible voters." (*Id.* at 2-3). Plaintiffs also requested information on procedures and policies used by the Secretary to comply with NVRA.

The Secretary replied on August 15, 2023, explaining that after a review of the data and the State's policies and procedures that "Arizona already maintains its voter rolls in compliance with NVRA." (*Id.* at 7). The Secretary suggested Plaintiffs review the EPM, which meticulously outlines the procedures that Arizona election officials follow to comply with NVRA. Then, the Secretary took the additional step of reviewing voter registration statistics to determine whether Plaintiffs' concerns had merit. The Secretary concluded they did not, and provided data to support his allegations. (*Id.*). Plaintiffs replied to the Secretary's letter on September 12, 2023, demanding the Secretary comply with NVRA and accusing the Secretary of trying to mislead them by, *inter alia*, specifically stating that certain data that Plaintiffs appeared to rely on was

likely an undercount.  (DE 1-3, 8).  On June 3, 2024, Plaintiffs filed this lawsuit with a previously undisclosed report upon which their allegations rely.[2]  (DE1-1).

### ARGUMENT

### I.  Plaintiffs Do Not Have Standing to Bring This Action.

The United States Constitution limits federal court jurisdiction to actual cases and controversies.  U.S. Const. Art. III, § 2.  A statutory private right of action does not absolve the Plaintiffs of their burden to demonstrate that they satisfy the constitutional requirement of standing.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016).  "[L]ack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)."  *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).  The party invoking federal jurisdiction bears the burden of establishing each element of standing.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  "[A]t an 'irreducible constitutional minimum,'" a plaintiff must demonstrate (1) an injury in fact, (2) that is fairly traceable to the defendant's conduct, and (3) susceptible to redress by a decision in their favor."  *Lake v. Fontes*, 83 F.4th 1199, 1202-03 (9th Cir. 2023) (cleaned up).  Neither "abstract, theoretical concerns," nor an "interest shared generally with the public at large in the proper application of the Constitution and laws," will satisfy constitutional standing requirements.  *Id.* (citations omitted).

### A.  Plaintiffs Assert No Injury Sufficient to Sustain Standing.

Plaintiffs claim an interest in "supporting the enforcement of laws such as the NVRA that promote fair and orderly elections."  (DE 1 ¶¶ 22, 26, 28).  Due to their mistaken belief that the Secretary and all fifteen independently-elected county recorders do not comply with Arizona law, federal law, and the EPM, Plaintiffs allege that

---

[2] Plaintiffs' report is improper under Fed. R. Civ. P. 10(c).  Unlike judicially-noticeable information and exhibits, which may be considered by this Court at this stage, neither the report nor allegations which rely upon it are entitled to the presumption of validity.  *Interstate Nat. Gas Co. v. Southern Calif. Gas Co.*, 209 F.2d 380 384 (9th Cir. 1953) ("A motion to dismiss pursuant to Rule 12(b) . . . admits all well pleaded facts, but does not admit facts which the court will judicially notice as not being true nor facts which are revealed to be unfounded by documents included in the pleadings or introduced in support of the motion.").

1  "ineligible voters have an *opportunity* to vote in Arizona elections, *risking* the dilution of

2  Plaintiffs' legitimate vote."  (*Id.* ¶ 29) (emphasis added).  They further allege their

3  beliefs "undermine Plaintiffs' confidence in the integrity of Arizona elections, which

4  also burdens their right to vote."  (*Id.* ¶ 30).  They allege these assumptions about

5  Arizona's voter rolls result in spending "more time and resources monitoring Arizona's

6  elections" and "get-out-the-vote efforts for like-minded individuals . . . [who] lack

7  confidence in the accuracy and integrity of Arizona's elections." (*Id.* ¶ 32-33).  None of

8  these allegations are concrete or cognizable harms sufficient to confer standing.

9        First, Plaintiffs are not entitled to bring a federal lawsuit just to confirm that laws

10  are being followed to their liking.  The Constitution's standing requirement "reflects a

11  due regard for the autonomy of those most likely to be affected by a judicial decision,"

12  and "is not to be placed in the hands of 'concerned bystanders,' who will use it simply as

13  a 'vehicle for the vindication of value interests.'"  *Diamond v. Charles*, 476 U.S. 54, 62

14  (1986).  "The requirement that the plaintiff possess a personal stake helps ensure that

15  courts decide litigants' legal rights in specific cases, as Article III requires, and that

16  courts do not opine on legal issues in response to citizens who might 'roam the country

17  in search of governmental wrongdoing.'"  *Food and Drug Admin. v. Alliance for

18  Hippocratic Medicine*, 602 U.S. --, 2024 WL 2964140 at *5 (2024).  Indeed, this is one

19  of a number of cookie-cutter lawsuits in which citizens are roaming the country, making

20  unfounded allegations of governmental wrongdoing.  Plaintiffs' wish that the Secretary

21  comply with NVRA (which he is already doing) is insufficient to establish standing.

22        Plaintiffs' next allegation, that "ineligible voters have an opportunity to vote,"

23  which "risk[s] the dilution of Plaintiffs' legitimate vote" is both too speculative and not a

24  cognizable claim.  (DE 1 ¶ 29).  Plaintiffs' own Complaint admits that "[t]here is no

25  evidence that these counties experienced above-average voter participation compared to

26  the rest of the country or state."  (*Id.* ¶ 89).  They acknowledge that their claimed harm

27  does not exist.  Even if one assumes that Plaintiffs' feared harm does not *yet* exist—but

28

could theoretically occur in the future—such harm would only arise after a cascade of independent actions.  Such harm could result only after:  (1) an ineligible voter requests an early ballot or presents at a polling place; (2) casts a ballot; (3) that ineligible ballot is tabulated; and (4) sufficient other ineligible voters engage in the same series of steps in a number sufficient to "dilute" Plaintiffs' votes.  This is precisely the type of "'long chain of hypothetical contingencies that have never occurred in Arizona and 'must take place for any harm to occur'" that has been repeatedly rejected by federal courts.  *Lake*, 83 F.4th at 1204.  And even if these problems did not bar Plaintiffs' standing, federal courts do not recognize a generalized "vote dilution" harm outside of redistricting cases.  *See, e.g. Gill v. Whitford*, 585 U.S. 48, 68 (2018) (rejecting standing premised on an "interest 'in their collective representation in the legislature'") (internal citations omitted).

Finally, Plaintiffs' beliefs about the status of Arizona's voter rolls, and the actions they undertake as a result of those beliefs, do not make this a federal case.  Plaintiffs' asserted lack of confidence in Arizona's elections is not a state-created burden on the right to vote and does not provide standing.  *Food & Drug Admin.*, 2024 WL 2964140 at *14 (explaining that plaintiffs' "sincere legal, moral, ideological, and policy objections . . . alone do not establish a case or controversy in federal court.").  A concern about public confidence in the election is just that—public—not individualized.  *See Drake v. Obama*, 664 F.3d 774, 782 (9th Cir. 2011) (holding Plaintiff lacked standing because he "has no greater stake in this lawsuit than any other United States citizen.").  Likewise, any steps Plaintiffs choose to take are not state-created harms, but voluntary actions taken due to their own mistaken beliefs.  To the extent Plaintiffs conduct "get-out-the-vote efforts to convince like-minded individuals," that is precisely the kind of activity in which they voluntarily engage, not an activity undertaken to counteract alleged list maintenance deficiencies.[3]  *See Rodriguez v. City of San Jose*, 930 F.3d 1123,

---

[3] Moreover, Plaintiffs cannot assert the alleged harms to the organizations of which they are members, because they are not named in this suit.  *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *Mills v. United States*, 742 F.3d 400, 406-07 (9th Cir. 2014).

1134 (9th Cir. 2019) (holding standing requires both a frustration of an organization's mission and diversion of resources to combat the injurious behavior).  Plaintiffs have failed to assert a particularized, individual harm sufficient to confer standing.

**B.  Plaintiffs' Asserted Injury Is Not Attributable to the Secretary.**

Plaintiffs' alleged harm is a direct result of a misapprehension of the statistics upon which they rely; they can only produce "discrepancies" between the CVAP and registrants when they use *total* registered voters, rather than *active* registered voters. Thus, for example, Plaintiffs rely upon a CVAP of 5,322,581 people in Arizona in 2022. (DE 1 at 16, Table III.B.1).  Comparing Plaintiffs' CVAP with a *total* of 4,833,160 registrants results in the 90.8% on which Plaintiffs rely.  (*Id.*).  However, there were only 4,143,929 *active* registered voters in 2022, resulting in an active registration rate of 77.8% using Plaintiffs' CVAP.  EAVS data reported a CVAP of 5,216,518 for Arizona, producing an active registration rate of 79.4% of CVAP for the state.  Whether using Plaintiffs' CVAP, or the CVAP from EAVS, Arizona's active registrants as a percentage of CVAP (77.8% or 79.4%) is significantly lower than the United States' total active registration rate of CVAP of 85.4%.  Ex. 1 at 162, 168.  And EAVS specifically warns against Plaintiffs' conflation of statistics, especially the use of *total* registered voters. (DE 1, Ex. 1 at 140) ("However, data on registered and eligible voters as reported in the EAVS should be used with caution, as these totals can include registrants who are no longer eligible to vote in that state but who have not been removed from the registration rolls because the removal process laid out by the NVRA can take up to two election cycles to be completed.").  Indeed, Arizona reported a lower percentage of registered voters compared to CVAP than all but nine other states.  Ex. 1 at 162-66.

In short, the statistics Plaintiffs allege demonstrate Arizona's failure to comply with NVRA are directly traceable to inactive registrants.  These registrants will be removed (or not) according to law, but the Secretary is required to keep those voters on the rolls unless NVRA or another applicable law requires their removal.  *See* 52 U.S.C.

§ 20507(d).  Plaintiffs' asserted injury is attributable not to any inaction or malfeasance by the Secretary, but is a direct result of NVRA itself.

### C. The Requested Order Will Not Redress Plaintiffs' Grievances.

Plaintiffs' Complaint seeks a declaration and injunction requiring the Secretary to comply with NVRA, a law with which he already complies.  Indeed, Arizona's list maintenance procedures go *further* than what is required by NVRA.  Arizona already processes and cancels deceased registrants based on monthly data obtained from the Arizona Department of Health Services and other reliable sources, Ex. 2 at 37-38, routinely receives lists of felons and people who are adjudicated incompetent from Arizona courts and other courts, for cancellation, *id.* at 38-39, and removes ineligible voters who move based on returned election mail and USPS's NCOA service, *id.* at 45-48.  No injunction is required.

The Secretary complies with NVRA, and there is no credible allegation of harm traceable to the Secretary that could remedy Plaintiffs' claimed concerns.  For these reasons, Plaintiffs lack standing to bring this action pursuant to Article III and Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## II. There Is No Set of Facts that Would Entitle Plaintiffs to Relief.

Fed. R. Civ. P. 12(b)(6) requires dismissal of a complaint which fails to state a claim upon which relief can be granted.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).  "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

"Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the

1   pleader is entitled to relief." *Ashcroft*, 556 U.S. at 679.   Only well-plead factual

2   allegations are entitled to a presumption of veracity, and then the court must determine

3   whether these facts plausibly entitle the plaintiff to relief.  *Id.*  The general rule to accept

4   well-plead factual allegations as true does not apply to plainly incorrect allegations.

5   "The court need not, however, accept as true allegations that contradict matters properly

6   subject to judicial notice or by exhibit."  *Sprewell v. Golden State Warriors*, 266 F.3d

7   979, 988 (9th Cir. 2001).

8       In assessing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court may

9   take judicial notice of facts that cannot be reasonably disputed because they can be

10  determined "from sources whose accuracy cannot reasonably be questioned."  Fed. R.

11  Evid. 201(b); *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)

12  (instructing courts to "consider matters of which a court may take judicial notice" and

13  documents incorporated into the complaint by reference when deciding a motion to

14  dismiss under Rule 12(b)(6)).  Plaintiffs rely in their Complaint and attached report[4] on

15  U.S. Census Bureau data, Secretary of State registration data, and data from the U.S.

16  Election Assistance Commission ("EAC") for their claims.  This data is appropriate for

17  judicial notice, is incorporated by reference, and can be considered in this motion to

18  dismiss without converting it a motion for summary judgment.  *Khoja*, 899 F.3d at 999.

19  Plaintiffs' report, however, does not qualify for judicial notice pursuant to Fed. R. Evid.

20  201, and is not entitled to an assumption of validity at this stage.  *Interstate Nat. Gas Co.*

21  *v. Southern Calif. Gas Co.*, 209 F.2d at 384; *see also* Fed. R. Civ. P. 7, 8, and 10

22  (defining allowed pleadings and setting forther the appropriate scope of pleadings and

23  exhibits).

24      **A. Arizona Conducts NVRA-Compliant List Maintenance.**

25      Whatever "reasonable efforts" NVRA requires for list maintenance, Arizona

26  objectively exceeds NVRA's standards.   The fact that Arizona had 797,221 inactive

27

28  _____

[4] The Court should not consider the conclusions in Plaintiffs' report at this stage when
Defendant has not had an opportunity to provide his own expert analysis. *See supra* n. 2.

1    voters as of April 2024 demonstrates that Arizona engages in "reasonable efforts to

2    remove the names of ineligible voters from the official lists of eligible voters" when they

3    have moved out of the jurisdiction.   52 U.S.C. § 20507(a)(4)-(f).[5]   The State's list

4    maintenance efforts are demonstrated by the following four processes.

5           First, the state's robust list maintenance program is codified by statute and

6    described in detail in the EPM.   Ex. 2 at 36-54.   The officers involved in voter

7    registration and list maintenance—the Secretary and the fifteen Arizona county

8    recorders—are elected officials.   They each take an oath of office to uphold the U.S. and

9    Arizona constitutions.   A.R.S. § 38-231(E).   Given these facts, these dedicated officials

10   are entitled to a presumption of good faith, and this Court "must be wary of plaintiffs

11   who seek to transform federal courts into 'weapons of political warfare' that will deliver

12   victories that eluded them 'in the political arena.'"   *Alexander v. S. Car. State Conf. Of*

13   *the NAACP*, 144 S. Ct. 1221, 1236 (2024).   Even if this Court does not presume good

14   faith on the basis of the various officials responsible for list maintenance, Plaintiffs'

15   allegations would require that all these people refuse to follow the law and are willing to

16   risk criminal prosecution to do so.   This is not plausible.

17          Second, Arizona's list maintenance occurs at regular intervals as part of a

18   methodical program that goes above and beyond the list maintenance process required

19   by NVRA.   For example, Arizona uses NCOA information provided by USPS to start

20   the NVRA removal process, otherwise known as NVRA's "safe harbor" provision.   52

21   U.S.C. § 20507(c)(1) ("A State may meet the requirement of subsection (a)(4) [list

22   maintenance] by establishing a program under which change-of-address information

23   supplied by the Postal Service . . . is used to identify registrants whose addresses may

24   have changed . . .");   Ex. 2 at 45-48.   Additionally, Arizona's EPM requires list

25   maintenance to include a process to remove registrants who have moved based on

26

27          _____

28   [5] In order to cast a ballot, an inactive voter must appear at a polling place, provide voter
     identification as required by A.R.S. § 16-579, and affirm their residence within the
     jurisdiction.  A.R.S. §16-583(A).

information obtained from other government sources indicating a registrant has moved out of their county or out of the state.  *Id.* at 39-45.  This list maintenance is in addition to the regular removal of people who die, or are adjudicated ineligible due to felony convictions or court declarations of incompetence.  *Id.* at 36-39.  Plaintiffs' reliance on the letters reporting various removal programs is misplaced.  (DE 1 at ¶¶ 17, 71).  The quarterly letters are not a part of NVRA "list-maintenance duty" and are a creation of very recent statutory change still in active litigation.  (*Id.* at ¶ 71).  The A.R.S. § 16-165(M) letters which Plaintiffs cite are inapposite.  In short, Arizona's list maintenance programs are robust, exceeding the list maintenance requirements of NVRA.

Third, the reported data confirms that Arizona election officials comply with the statutory and regulatory requirements regarding list maintenance activities.  According to EAVS, Arizona sent 991,282 NVRA notices to Arizona registrants in 2022, a rate higher than any other state except Washington.  Ex. 1 at 182-83.  In 2022 alone, Arizona removed 432,498 registrants, including 175,284 registrants who did not return a NVRA notice.  *Id.* at 188.  This was a rate that was 45.8% higher than the national average of removals for people who fail to respond to NVRA notices.  *Id.* at 188-89.  Notably, Arizona removed a higher percentage than the national average of not only voters who failed to respond to NVRA notices, but also voters who requested to be removed (11.6% versus 4.5%), felons (3.5% versus 1.4%), and registrants who are adjudicated incompetent (0.2% versus 0.1%).  *Id.* at 190-91.  As a result, Arizona removed a higher percentage of voters from its rolls than the national average (8.9% versus 8.5%).  And 2022 was not an outlier, but consistent with Arizona's robust list maintenance program.  The 2020 EAVS[6] indicates Arizona removed 350,841 registrants (7.4% versus a national removal rate of 8.2%), and the 2018 EAVS[7] indicates Arizona removed 437,701

---

[6] Election Admin. & Voting Survey, Election Ass. Comm'n, 165-66 (2020) *available at* https://www.eac.gov/sites/default/files/document_library/files/2020_EAVS_Report_Final_508c.pdf.

[7] Election Admin. & Voting Survey, Election Ass. Comm'n, 82-83 (2018) *available at* https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf.

registrants, or 10.23% of registrants, compared to the national rate of 8.17% of registrants. Unlike the report included by Plaintiffs as an attachment to their Complaint, these data are amenable to judicial notice and may be considered by this Court when ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). This data clearly shows that Plaintiffs cannot state a plausible claim that Arizona does not conduct a "reasonable effort" to ensure accurate voter rolls.

Finally, Arizona's vigorous list maintenance program is evidenced by the data on registrants. Active registrations as a portion of CVAP are lower in Arizona than the nation as a whole. Ex. 1 at 162, 166. Indeed, the CVAP in EAVS is slightly lower than the CVAP used in Plaintiffs' Complaint and accompanying report, but active registered voters are the same. *Compare* (DE 1 ¶ 77) (reporting CVAP for 2022 as 5,322,581) *with* EAVS (providing CVAP from 2022 as 5,216,518). When the denominator shrinks, but the numerator remains constant, the percentage as a whole grows. Therefore, because the CVAP from EAVS is smaller than Plaintiffs' CVAP, the EAVS data is more favorable to Plaintiffs. Indeed, EAVS data provides Arizona has a rate of 79.4% of active voters as a percentage of CVAP, compared to 77.8% of active voters as a percentage of CVAP using Plaintiffs' data in 2022. This is far short of the national average of 85.4%. Ex. 2 at 166. In sum, there is no factual basis for Plaintiffs' claim that Arizona does not engage in "reasonable efforts" to remove ineligible voters from the voter rolls. Indeed, Arizona has a well-established, rigorous list maintenance program, as established by data stretching back multiple election cycles. Plaintiffs' Complaint cannot state a claim upon which relief may be granted, and should be dismissed.

**B. The Facts as Alleged Do Not Support a Plausible Claim for Relief.**

Ultimately, the entire basis for Plaintiffs' Complaint is that Arizona allegedly has an implausibly high number of registered voters. Plaintiffs insist that *all* registrants, rather than active registrants, should be compared to CVAP to determine if Arizona's voter rolls are non-compliant with NVRA. (DE 1, ¶ 80 n.6). However, as explained,

1   comparing total registrants rather than active registrants results in percentages that are
2   significantly higher than one might expect if people who move out of the jurisdiction
3   were automatically canceled.  Ex. 1 at 140 (cautioning not to use total registered voters
4   because "these totals can include registrants who are no longer eligible to vote in the
5   state but who have not been removed from the registration rolls because the removal
6   process laid out by the NVRA can take up to two election cycles to be completed.").
7   That is the result of the requirements of federal law and is not evidence of improper list
8   maintenance.  Because NVRA does not allow the automatic cancellation of voters who
9   do not respond to notices—but *requires* the state to maintain those registrants on inactive
10  status for two federal election cycles—there will be people on Arizona's inactive list
11  who cannot be removed, but would have to establish that they are eligible to vote if they
12  came to the polling place on election day.  *See* A.R.S. § 16-583(A).

13          Plaintiffs have failed to marshal facts that establish a plausible claim for relief.
14  But comparing Plaintiffs' reported CVAP to the active registered voters in the state
15  demonstrates that Arizona's ratio of registrants to CVAP is not inflated.   Comparing
16  Arizona's registrants to the United States as a whole—whether the more accurate active
17  registrants as a percentage of CVAP, which is 79.4% for Arizona and 85.4% for the
18  United States, or skewed to include all registrants, including those who cannot yet be
19  removed due to the requirements of NVRA, which is 92.6% for Arizona and 94.7% for
20  the United States—belies Plaintiffs' claims.  Ex. 1 at 162, 166.  As the Supreme Court
21  explained in *Brnovich v. Democratic Nat'l Comm.*, "statistical manipulation" can be
22  "highly misleading" and "mask" the issues.  141 S. Ct. 2321, 2345 (2012).

23          The fact that Plaintiffs have included a so-called expert report does not "nudge"
24  them over the line to establish a plausible claim.  *Twombly*, 550 U.S. at 570.  As an
25  initial matter, the report is not part of the pleading, and therefore is not entitled to a
26  presumption of veracity.  Fed, R. Civ. P. 7, 10.  As a practical matter, any plaintiff would
27  be able to survive a motion to dismiss by attaching a report to their complaint, which

28

1   would eviscerate the intentions of reducing costs and burdens on the parties and the

2   courts that animate Rule 12(b)(6).  *Id.* at 557-58.  But putting that aside, the facts as

3   alleged in Plaintiffs' Complaint and Plaintiffs' report are obviously implausible.  At the

4   outset, Plaintiffs' report states (in a footnote) that "[m]y analysis focuses on total

5   registered voters, not active registered voters, because inactive registered voters would

6   still be required to be a part of the Voting Eligible Population."  (DE 1-1 9 n.6).

7   However, inactive registrants are precisely the registrants who are most likely to have

8   moved out of the jurisdiction and thus *not be included* in the Census data.  *See, e.g.* Ex. 2

9   at 45-48 (explaining the lengthy, legally-required process of maintaining a voter who has

10   moved out of the jurisdiction on the voter registration rolls as an inactive voter).

11   It is *only* by using the data this way—with CVAP as a denominator, which will

12   *not* include people who have moved out of the jurisdiction, and total registered voters as

13   the numerator, which *must* include registrants who have moved out of the jurisdiction—

14   that Plaintiffs can construct "implausibly" high voter registration rates.  When inactive

15   voters, *i.e.*, those voters who were not in Arizona for the Census to count, are excluded,

16   Arizona's voter registration rate drops to 79.4% of active voters as a percentage of

17   CVAP, slightly below the 81.4% that Plaintiffs' report supports as reasonable for

18   Arizona based on Census reports.  (DE1-1 11, ¶ 22).

19   Plaintiffs' claims are simply not plausible under Plaintiffs' own standards.

20   Cherry-picking statistics to create a report that appears superficially reasonable does not

21   create a plausible claim for relief that withstands review under the federal rules of civil

22   procedure.  Plaintiffs' Complaint should be dismissed.

23   ## CONCLUSION

24   Plaintiffs' Complaint should be dismissed for lack of standing pursuant to Fed. R.

25   Civ. P. 12(b)(1), and failure to state a plausible claim for relief pursuant to Fed. R. Civ.

26   P. 12(b)(6).

27

28

Respectfully submitted this 25th day of June, 2024.

Kristin K. Mayes
Attorney General

*/s/ Kara Karlson*
Kara Karlson
Karen J. Hartman-Tellez
Senior Litigation Counsel
Kyle Cummings
Assistant Attorney General
*Attorney for Defendant Arizona Secretary of State Adrian Fontes*

# CERTIFICATE OF CONFERRAL

I certify that counsel for the Plaintiffs and Defendant Arizona Secretary of State met and conferred in good faith via video and teleconference, as required by L. R. Civ. P. 12.1(c) before this Motion was filed.  After discussing the arguments raised in the Motion, the conferees were unable to agree that the Plaintiffs' pleading was curable by amendment.

DATED this 25th day of June, 2024.

*/s/ Kara Karlson*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 25th day of June, 2024, I filed the forgoing document electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

_/s/Monica Quinonez_