Roy Herrera (#032901)
Daniel A. Arellano (#032304)
**HERRERA ARELLANO LLP**
1001 North Central Avenue, Suite 404
Phoenix, Arizona 85004
Telephone: 602.567.4820
roy@ha-firm.com
daniel@ha-firm.com

Alexis E. Danneman (#030478)
**PERKINS COIE LLP**
2525 East Camelback Road, Suite 500
Phoenix, Arizona 85016-4227
Telephone: 602.351.8000
ADanneman@perkinscoie.com
DocketPHX@perkinscoie.com

Jonathan P. Hawley (WA #56297)*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: 206.359.8000
JHawley@perkinscoie.com

*Attorneys for the Democratic National Committee
and Arizona Democratic Party*

*Pro hac vice

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| SCOT MUSSI; GINA SWOBODA, in her capacity as Chair of the Republican Party of Arizona; and STEVEN GAYNOR, <br><br> Plaintiffs, <br><br> v. <br><br> ADRIAN FONTES, in his official capacity as Arizona Secretary of State, <br><br> Defendant. | No. CV-24-1310-PHX-DWL <br><br> **AMICUS BRIEF OF THE DEMOCRATIC NATIONAL COMMITTEE AND ARIZONA DEMOCRATIC PARTY IN SUPPORT OF DISMISSAL** |

**TABLE OF CONTENTS**

Page

INTRODUCTION ....................................................................................................1

ARGUMENT ........................................................................................................3

I.      The Democratic National Committee and Arizona Democratic Party have a strong interest in the outcome of this litigation and the fair administration of Arizona's elections. ...................................................................................3

II.     Plaintiffs' claims are premised on misunderstandings of federal law and a flawed statistical methodology. ..................................................................4

        A.      Arizona makes a reasonable effort to remove the names of ineligible voters—and that is enough. ......................................................4

        B.      Plaintiffs' statistical analysis is flawed to the point of implausibility. ......6

III.    This lawsuit is yet another meritless challenge to the administration of Arizona's elections—and part of a nationwide campaign to cast doubt on the 2024 election. ..................................................................................10

CONCLUSION ...................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. C.R. Union v. Phila. City Comm'rs*,
    872 F.3d 175 (3d Cir. 2017) .................................................................................. 1

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ....................................................................................... 9, 10

*Bellitto v. Snipes*,
    935 F.3d 1192 (11th Cir. 2019) ..................................................................... 2, 7

*Bowyer v. Ducey*,
    506 F. Supp. 3d 699 (D. Ariz. 2020) .......................................................... 10, 11

*Lake v. Hobbs*,
    No. 2 CA-CV 2023-0144, 2024 WL 2949331
    (Ariz. Ct. App. June 11, 2024) ........................................................................ 11

*League of Women Voters of Ariz. v. Reagan*,
    No. CV-18-02620-PHX, 2018 WL 4467891 (D. Ariz. Sept. 18, 2018) ....................... 5

*Md. Election Integrity, LLC v. Md. State Bd. of Elections*,
    No. SAG-24-00672, 2024 WL 2053773 (D. Md. May 8, 2024), *appeal
    docketed*, No. 24-1449 (4th Cir. May 17, 2024) ........................................... 15

*PILF v. Benson*,
    No. 21-cv-929, 2024 WL 1128565 (W.D. Mich. Mar. 1, 2024), *appeal
    docketed*, No. 24-1255 (6th Cir. Mar. 27, 2024) ................................. 3, 5, 13

*PILF v. Boockvar*,
    495 F. Supp. 3d 354 (M.D. Pa. 2020) .............................................................. 5

*Trump for President v. Secretary of Pa.*,
    830 F. App'x 377 (3rd Cir. 2020) ................................................................... 11

STATUTES

52 U.S.C. §§ 20501–20511 ................................................................................ 1

52 U.S.C. § 20507(a)(4) .................................................................................. 2, 4

52 U.S.C. § 20507(c)(2) .................................................................................. 15

52 U.S.C. § 20507(d)(1)(B) ............................................................................... 9

52 U.S.C. § 20507(f) ............................................................................................ 9

52 U.S.C. §§ 20901–21145 ................................................................................. 5

52 U.S.C. § 21083(a)(4)(B) ................................................................................. 5

52 U.S.C. § 21083(a)(2)(A)(i) ............................................................................. 5

52 U.S.C. § 21085 ............................................................................................... 5

52 U.S.C. § 30101 ............................................................................................... 4

**OTHER AUTHORITIES**

139 Cong. Rec. 4,835 (1993) .............................................................................. 6

H.R. Rep. No. 107-329 (2001) ........................................................................... 5

S. Rep. No. 103-6 (1993)..................................................................................... 1

*Decennial Census*, U.S. Census Bureau, https://www.census.gov/programs-
surveys/acs/about/acs-and-census.html (last visited July 29, 2024)............................ 7

*Democracy*, Brookings Inst. (July 26, 2022),
https://www.brookings.edu/articles/misinformation-is-eroding-the-
publics-confidence-in-democracy .................................................................. 16

*Elections*, Campaign Legal Ctr., https://campaignlegal.org/results-lawsuits-
regarding-2020-elections (last visited July 29, 2024)................................... 11

*GOP Platform: Make America Great Again!*, Am. Presidency Project (July
8, 2024), https://www.presidency.ucsb.edu/documents/2024-republican-
party-platform ............................................................................................... 12

*His Image, New Memo Outlines What That Looks Like*, NPR (Mar. 15,
2024), https://www.npr.org/2024/03/15/1238765442/rnc-trump-
republicans-whatley-lara-election-integrity-voter-fraud-early-voting; ...................... 12

Isaac Arnsdorf, *Trump Allies at Heritage Declare 2024 Election
Illegitimate in Advance*, Wash. Post (July 11, 2024)................................... 12

Jim Rutenberg & Nick Corasaniti, *Unbowed by Jan. 6 Charges,
Republicans Pursue Plans to Contest a Trump Defeat*, N.Y. Times (July
13, 2024) ................................................................................................. 12, 13

Michael Wines, *One Rationale for Voter ID Debunked, G.O.P. Has Another*, N.Y. Times (Mar. 23, 2017) ......................................................... 17

Nick Corasaniti et al., *G.O.P. Intensifies Scrutiny of Voting: 'We're Keeping a Close Eye on You'*, N.Y. Times (Apr. 20, 2024)........................................ 12

Nick Mordowanec, *Trump Already Claiming Interference in 2024 Election*, Newsweek (May 17, 2023) .......................................................................... 12

Nicolas Berlinski et al., *The Effects of Unsubstantiated Claims of Voter Fraud on Confidence in Elections* ................................................................ 16

Patrick Marley et al., *With Push from Trump, Republicans Plan Blitz of Election-Related Lawsuits*, Wash. Post (Mar. 22, 2024) ............................. 12

*Response Rates*, U.S. Census Bureau, https://www.census.gov/acs/www/methodology/sample-size-and-data-quality/response-rates (last visited July 29, 2024)..................................... 7

*U.S. Election System*, MIT Election Data & Science Lab 1, 4 (Oct. 2023), https://electionlab.mit.edu/sites/default/files/2023-10/voter-trust.pdf....................... 17

*U.S. Presidential Election*, 22 Election L.J. 145, 147 (2023) ......................... 16

*U.S. and World Population Clock*, U.S. Census Bureau, https://www.census.gov/popclock (July 29, 2024)........................................ 7

*Understanding and Using American Community Survey Data*, U.S. Census Bureau 1 (Sept. 2020), https://www.census.gov/content/dam/Census/library/publications/2020/acs/acs_general_handbook_2020.pdf ................................................. 7

**INTRODUCTION**

Plaintiffs have revealed that their objective in this litigation is less about bringing serious claims regarding Arizona's compliance with federal law than about using the judicial system to erode public confidence in the 2024 elections. Most fundamentally, that the purpose of this lawsuit is political stagecraft rather than legal merit is revealed by the absence of a viable remedy for their claim. The National Voter Registration Act ("NVRA"), 52 U.S.C. §§ 20501–20511, expressly prohibits States from implementing systematic programs to cancel voter registrations within ninety days of a federal election, *id.* § 20507(c)(2)(A), reflecting Congress's intent to impose safeguards to avoid the "selective purging of the voter rolls," S. Rep. No. 103-6, at 3 (1993). Given this restriction, Plaintiffs could not have obtained relief before Arizona's July 30 primary election because the NVRA required the State to suspend any voter-removal program no later than May 1—more than a month before Plaintiffs filed their complaint. And, to secure relief during the one-week window between the July 30 primary and the ninety-day cutoff before the November 5 general election—August 7—Plaintiffs would have needed to seek expedited relief. They have not. Indeed, a Nevada district court dismissed a virtually identical litigation, brought by the Republican National Committee ("RNC") and the Trump Campaign, for essentially these reasons. *RNC v. Aguilar*, No. 2:24-cv-00518 (D. Nev. June 20, 2024), ECF No. 96.

This lawsuit is no exception. Congress designed the NVRA to promote registration and "protect[] registered voters from improper removal." *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 179 (3d Cir. 2017). By using the NVRA as an instrument to encourage the *de*registration of otherwise-eligible electors, Plaintiffs have revealed that their objective in this litigation is political theater rather than the vindication of federal law.

-1-

Setting aside Plaintiffs' questionable motives, their NVRA claim fails on the merits. While protecting the integrity and accuracy of voter rolls is indeed within the scope of the NVRA, so is ensuring that voters are not erroneously deregistered or otherwise denied their right to access the franchise; as the Senate Report accompanying the legislation explained, "one of the guiding principles" of the NVRA is "to ensure that once registered, a voter remains on the rolls so long as he or she is eligible to vote in that jurisdiction." S. Rep. No. 103-6, at 19. Balancing these objectives, the NVRA mandates that a State operate a "general program that makes *a reasonable effort*" to remove the names of ineligible voters who have moved or died. 52 U.S.C. § 20507(a)(4) (emphasis added). Arizona "objectively exceeds [this] standard[]," administering a "robust list maintenance program" to maintain the accuracy of the state's voter rolls. Ariz. Sec'y of State's Mot. to Dismiss ("MTD") 3–5, 12–15, ECF No. 20. Plaintiffs do not even allege, and certainly cannot demonstrate, how Arizona's list-maintenance program falls short of the "reasonable effort" that the NVRA requires.

Plaintiffs' data analysis is no more persuasive than their legal claim. In alleging that "the number of people on the official voter registration rolls in Arizona is 20 or more percentage points higher than the number actually eligible and registered in Arizona," Compl. ¶ 84, ECF No. 1, Plaintiffs rely on old population estimates compiled from survey data collected over a multiyear period. The registration data to which they compare those estimates are, by contrast, a snapshot taken at a specific moment in time. It is hardly a surprise that such an apples-to-oranges approach would yield facial inconsistencies—or that courts that have considered this methodology have soundly rejected it. *See, e.g.*, *Bellitto v. Snipes*, 935 F.3d 1192, 1207–08 (11th Cir. 2019).

Ultimately, this lawsuit is designed not to address any real (much less substantial) issue with Arizona's voter-registration lists but rather to advance a political agenda premised on distrust and suspicion as November approaches. When considered as part of

the Republican Party's broader nationwide strategy, Plaintiffs' objective becomes clear: creating confusion and uncertainty to undermine the results of the November election and prop up further post-election litigation. Indeed, former President Donald Trump is already asserting interference with the 2024 general election, months before a single vote has been cast or counted; influential conservatives have declared that there is "zero chance" of a free and fair election in November; and the RNC and its allies have preemptively filed lawsuits like this one around the country, challenging voter-registration maintenance programs based on the same flawed interpretation of the NVRA and obviously erroneous data analysis that Plaintiffs repeat here. Other courts have rejected these challenges. *See, e.g.*, *PILF v. Benson*, No. 21-cv-929, 2024 WL 1128565 (W.D. Mich. Mar. 1, 2024), *appeal docketed*, No. 24-1255 (6th Cir.); *RNC v. Aguilar*, No. 2:24-cv-00518 (D. Nev. June 20, 2024), ECF No. 96. This Court should do the same.

# ARGUMENT

**I.    The Democratic National Committee and Arizona Democratic Party have a strong interest in the outcome of this litigation and the fair administration of Arizona's elections.**

As the principal party committee of the Democratic Party, the Democratic National Committee ("DNC") has a strong interest in this litigation. The DNC supports the election of Democrats to all levels of political office, from the school board to the Oval Office, by mobilizing voters across the nation. To accomplish its mission of reducing barriers to voting, the DNC works to ensure that qualified voters are not prevented from registering, improperly removed from the voter rolls, or otherwise barred from accessing the franchise.

The DNC also brings a unique perspective to these proceedings based on its experience combatting the efforts of Republican-aligned groups and candidates to undermine public confidence in our elections. It participated in many of the sixty-plus lawsuits filed in 2020 where litigants sought to cast doubt on the electoral system, nullify the lawful votes of millions of Americans, and overturn the general-election results. That

experience allows the DNC to provide insight into the unspoken purpose of this lawsuit and Plaintiffs' attempt to cast a shadow over the 2024 election.

The Arizona Democratic Party ("ADP") is a state party committee as defined by 52 U.S.C. § 30101. ADP's purpose is to elect candidates of the Democratic Party to public office throughout Arizona. To accomplish this purpose, the ADP engages in vitally important activities, including supporting Democratic Party candidates, protecting the legal rights of voters, and ensuring that all eligible voters have the meaningful ability to cast ballots in Arizona. The ADP is the Democratic counterpart to the Republican Party of Arizona—the chair of which is one of the Plaintiffs in this lawsuit. The DNC and ADP thus have compelling reasons for seeking to assist the Court in interpreting and applying the NVRA.

## II. Plaintiffs' claims are premised on misunderstandings of federal law and a flawed statistical methodology.

Plaintiffs' improper use of the NVRA to mount an untimely challenge to Arizona's election administration suffers from two fatal flaws: Their complaint ignores the proper standard for judging a State's list-maintenance program under that law and further relies on fundamentally unsound statistical analysis.

### A. Arizona makes a reasonable effort to remove the names of ineligible voters—and that is enough.

Plaintiffs misapprehend the proper standard with which to assess a State's compliance with the NVRA. The statute requires each State to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" who have died or moved out of their voting jurisdiction. 52 U.S.C. § 20507(a)(4). The phrase "reasonable effort" is telling: In enacting the NVRA, Congress gave each State considerable flexibility to develop a general maintenance program that is reasonable given the circumstances of its electoral system. The accompanying Senate Report explained that the NVRA "would not require a specific mandatory procedure for verifying or confirming voter rolls" or

"mandate any specific time periods for when such list cleaning mechanisms must be used." S. Rep. No. 103-6, at 2, 20. Nor does the NVRA require certain results. *See Benson*, 2024 WL 1128565, at *11 ("[T]he NVRA requires only a 'reasonable effort,' not a perfect effort."). Instead, Congress intentionally left the details of a State's "general program" to its own discretion, recognizing that requiring more robust voter-purging processes would "unnecessarily place[] additional burdens on the registration system because persons who are legitimately registered must be processed all over again." S. Rep. No. 103-6, at 17–18. This flexibility reflects that the NVRA "counterpose[s] two general, sometimes conflicting, mandates: To expand and simplify voter registration processes so that more individuals register and participate in federal elections, while simultaneously ensuring that voter lists include only eligible voters." *League of Women Voters of Ariz. v. Reagan*, No. CV-18-02620-PHX, 2018 WL 4467891, at *1 (D. Ariz. Sept. 18, 2018) (cleaned up).[1]

Against the NVRA's flexible standard, Plaintiffs' complaint fails on its face. Even setting aside their methodological shortcomings, *see infra* at 6–10, Plaintiffs have identified *nothing* unreasonable about Arizona's list-maintenance program, whether specific procedural deficiencies or areas for improvement. *Cf. PILF v. Boockvar*, 495 F. Supp. 3d 354, 359 (M.D. Pa. 2020) (denying preliminary relief in NVRA case where plaintiff did "not allege that [challenged list-maintenance] program itself is deficient, nor d[id] it point to a specific breakdown that ma[de] the program 'unreasonable'"). This is

---

[1] Congress later reaffirmed that the NVRA ensures flexibility and errs on the side of preventing erroneous deregistration when it enacted the aptly named Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. §§ 20901–21145. HAVA reinforced the NVRA's mandate that States must "ensure that eligible voters are not removed in error from the official list of [registered] voters" and directed that registered voters may only "be removed from the computerized list" of voters only "in accordance with the provisions of the [NVRA]." *Id.* §§ 21083(a)(4)(B), (a)(2)(A)(i). And HAVA made clear that, like the NVRA, it "left to the discretion of the State" the "methods of complying with" federal election-administration requirements. *Id.* § 21085; *see also* H.R. Rep. No. 107-329, at 35 (2001) ("The goal of the minimum standards is to improve our election system without issuing dictates that would rob states of the ability to craft their own solutions.").

not surprising: As Defendant Adrian Fontes's motion to dismiss amply demonstrates, Arizona conducts a robust program that readily satisfies the NVRA's flexible standard. *See* MTD 3–5, 12–15.

Instead, all Plaintiffs can point to is purported bloat in Arizona's voter rolls. But, at the time of the NVRA's enactment, Congress was told that the statute's built-in safeguards (including the requirement that two federal election cycles pass before nonresponsive voters are removed from the voter rolls, *see supra* n.1) might increase the "risk[] of inflated voter rolls," 139 Cong. Rec. 4,835, 4,850 (1993) (letter from former Ohio Secretary of State Bob Taft)—meaning that there is nothing inherently unlawful or surprising about Arizona's voter rolls, even assuming the soundness of Plaintiffs' statistical analysis. Indeed, Congress concluded—with justification—that any concerns about fraud and registration maintenance would be adequately addressed by procedural safeguards accompanying automatic voter registration and the prospect of "[f]ederal criminal penalties." S. Rep. No. 103-6, at 11–13. Nothing alleged in Plaintiffs' complaint gives any reason to doubt the wisdom of Congress's judgment or the balance it struck in crafting the NVRA. Plaintiffs' fears of voter fraud stemming from alleged list-maintenance deficiencies are wholly unsubstantiated.

### B. Plaintiffs' statistical analysis is flawed to the point of implausibility.

Plaintiffs' claim of inflated voter rolls is premised on comparisons between composite population estimates and snapshot registration rates years later—a fundamentally flawed methodology that cannot give rise to any legitimate inference of impropriety.

Critically, Plaintiffs' figures for Arizona's citizen voting-age population ("CVAP")—which is to say, the number of eligible voters—come from the U.S. Census Bureau's American Community Survey ("ACS"). *See* Compl. ¶¶ 76–77. But the ACS merely provides an *estimate* of CVAP; unlike the decennial census, which "[c]ounts every

-6-

person living" in the territorial United States, the ACS is "[s]ent to a sample of addresses (about 3.5 million)," *The Importance of the American Community Survey and the Decennial Census*, U.S. Census Bureau, https://www.census.gov/programs-surveys/acs/about/acs-and-census.html (last visited July 29, 2024)—far short of the total U.S. population of more than 336 million, *see U.S. and World Population Clock*, U.S. Census Bureau, https://www.census.gov/popclock (July 29, 2024). Importantly, "ACS estimates reflect data that have been collected over a period of time rather than for a single point in time." *Understanding and Using American Community Survey Data*, U.S. Census Bureau 1 (Sept. 2020), https://www.census.gov/content/dam/Census/library/publications/2020/acs/acs_general_handbook_2020.pdf. And the 2022 ACS—one of the data sources on which Plaintiffs rely, *see* Compl. ¶¶ 76–77—was even less reliable than usual because it had a response rate of only 84.4% (the second lowest in over two decades), *see Response Rates*, U.S. Census Bureau, https://www.census.gov/acs/www/methodology/sample-size-and-data-quality/response-rates (last visited July 29, 2024).

By contrast, the number of registered voters reported by the State "purports to be *actual* registration numbers," not mere estimates. Compl. ¶ 79. Herein lies the problem: Plaintiffs cannot reliably compare "artificially low" population estimates derived from the ACS with the actual numbers of registered voters because this yields "artificially high" voter "registration rate[s]"—and therefore "misleading" results. *Bellitto*, 935 F.3d at 1208. Plaintiffs' theory of erroneous registrations (and thus unlawfully lax list maintenance) is founded on their back-of-the-envelope calculation that the voter-registration rate in Arizona exceeds 90 percent, *see* Compl. ¶¶ 81–89, but this figure is methodologically flawed and cannot carry the weight Plaintiffs place on it.

Moreover, the ACS estimates and actual voter-registration figures from the State are mismatched chronologically: The State's count of registered voters is a snapshot taken at a single point in time, representing the number of registered voters at the moment a

report is generated, whereas both "[s]ingle-year and multiyear estimates from the ACS are [] 'period' estimates derived from a sample collected over a period of time, as opposed to 'point-in-time' estimates such as those from past decennial censuses." *Am. Cmty. Survey Data*, *supra*, at 13. Matching a recent snapshot of the number of registered voters with an older CVAP estimate is far from the fair comparator that Plaintiffs suggest. Without accounting for the incongruities at the heart of their data, Plaintiffs cannot plausibly allege that the current number of registered voters in Arizona (or any of its constituent counties) is significantly higher than the number of eligible voters or that the state's voter-registration rates exceed what might be expected.[2]

Fundamental methodological errors also pervade Plaintiffs' analysis of deceased voters. *See* Compl. ¶¶ 11–12, 91–93. Their conclusion that "approximately 20,000 to 35,000 registered voters who died [] were not removed from Arizona's voter rolls," *id.* ¶ 91, is premised on the assumption that every one of the estimated 143,278 eligible Arizona voters who passed away during the relevant time period was registered to vote, *see id.* ¶ 12; *see also id.* Ex. 1 ¶¶ 59–69. This is an unreasonable presupposition, since even Plaintiffs' claimed "implausibly high" voter-registration estimates fall below 100 percent. *Id.* ¶¶ 7, 81. When, by contrast, Plaintiffs' preferred voter-registration rate of 69.9 percent is applied to the estimated number of decedents, *see id.* ¶ 7, the purported 20,000-to-35,000-voter surplus vanishes, as Plaintiffs acknowledge that "108,103 [deceased voters] *were* removed from the voter rolls," *id.* ¶ 12 (emphasis added).

No more compelling is Plaintiffs' analysis of Maricopa County's confirmation notices using data from the Election Administration and Voting Survey ("EAVS"). *See id.* ¶¶ 94–96. Plaintiffs claim that the 620,000 unaccounted-for notices, which "were sent to voters in Maricopa County to determine if they still lived at the location where they were

---

[2] Plaintiffs also rely on voter registration numbers that include inactive voters, as the Secretary details in his brief. *See* MTD at 10–11, 15–17.

registered to vote," represent "voters moving out of Arizona or voters who failed to respond to confirmation notices" who are, in turn, "the 500,000 unaccounted-for registered voters on Arizona's voter rolls." *Id.* ¶¶ 95–96. But Plaintiffs never elaborate or explain the basis for their conclusion that these unaccounted-for notices necessarily went to voters who moved or failed to respond. Instead, they offer only a "[b]are assertion[]" that this is the case, which is not enough under federal pleading standards. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). Indeed, their conclusion here is not merely insufficient, but implausible: Plaintiffs' own expert notes that, according to the EAVS data, "Maricopa County had 51,208 removals [] 'because the registrant moved outside the jurisdiction'" and "80,474 removals [] 'because the registrant did not respond to confirmation letters.'" Compl. Ex. 1, at 11 n.10. Given that the EAVS data expressly reported the numbers of voters who moved or did not respond to notices, logic dictates that the 620,000 unaccounted-for notices do *not* fall into either category, contrary to Plaintiffs' allegations.

Moreover, even if some or all of these 620,000 notices were sent to voters who moved or did not respond, that alone would not indicate that these voters are wrongfully on the voter rolls or that Arizona is delinquent in its obligation to remove them. The NVRA, for instance, expressly prohibits removing a registered voter from the rolls just because they change addresses "within the same registrar's jurisdiction," 52 U.S.C. § 20507(f)—meaning it might be the case that some voters have changed addresses but *cannot* (and should not) be removed from the voter rolls. The NVRA also prevents States from removing voters suspected of moving until at least two federal general elections have passed since the voters failed to respond to official notices. *Id.* § 20507(d)(1)(B). Immediately deregistering voters who fail to respond to notices would not only be unnecessary under the NVRA, but unlawful. In short, Maricopa County's unaccounted-for notices do not, without more, raise a plausible inference of noncompliance with the NVRA or any other nefarious circumstance.

*     *     *

Whatever Plaintiffs' issues with the administration of Arizona's elections (manufactured or otherwise), they cannot ignore that, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs' complaint falls short of this hornbook threshold. Because they fail to allege any actual unreasonableness in Arizona's list-maintenance procedures and employ a fundamentally flawed (and thus implausible) statistical methodology, they have not even so much as alleged "the mere possibility of misconduct," *id.* at 679, let alone stated a viable claim for relief. Under these circumstances, dismissal is not only appropriate, but required.[3]

## III. This lawsuit is yet another meritless challenge to the administration of Arizona's elections—and part of a nationwide campaign to cast doubt on the 2024 election.

Over the past four years, Republican-affiliated individuals and organizations have brought a series of meritless challenges to list-maintenance programs and other election processes. Plaintiffs' lawsuit is merely a continuation of these post-2020 efforts to sow public distrust in our elections—and the latest baseless challenge filed in Arizona.

Republican efforts to undermine public confidence in elections have been extensive and varied. After former President Trump lost the 2020 election, he and his allies filed more than sixty lawsuits challenging the results. *See, e.g.*, *Results of Lawsuits Regarding*

---

[3] As a final legal infirmity in their complaint, Plaintiffs ask the Court to "requir[e] the Secretary to fully comply with any existing procedures that Arizona has in place to ensure ineligible voters are identified and removed from the rolls," Compl. at 19—relief that is barred by the Eleventh Amendment, which prohibits federal courts from "instruct[ing] state officials on how to conform their conduct to state law," even when such claims are "masked under federal law," *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 716 (D. Ariz. 2020) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)).

*the 2020 Elections*, Campaign Legal Ctr., https://campaignlegal.org/results-lawsuits-regarding-2020-elections (last visited July 29, 2024). None of those cases succeeded in overturning the vote, and all were roundly rejected by judges across the ideological spectrum, who recognized that the "breathtaking relief" of "tossing out millions of []ballots would be drastic and unprecedented, disenfranchising a huge swath of the electorate and upsetting all down-ballot races too." *Trump for President v. Secretary of Pa.*, 830 F. App'x 377, 382, 388 (3rd Cir. 2020). Republican efforts in 2020 included post-election challenges filed in Arizona, including one that alleged that the election was "riddled with fraud, illegality and statistical impossibility" and that was rejected because the claims were "largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections." *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 706, 721 (D. Ariz. 2020).

Even though the 2020 post-election challenges were no more successful in Arizona than in the rest of the country, Republican candidates tried their hands again in 2022, mounting a striking (and ongoing) series of lawsuits alleging that the state's election processes were flawed and seeking to overturn the results of various races—months and even *years* after their Democratic opponents were sworn into office. *See, e.g.*, *Lake v. Hobbs*, No. 2 CA-CV 2023-0144, 2024 WL 2949331, at *11 (Ariz. Ct. App. June 11, 2024) (describing allegations that, among other things, county election officials failed to properly conduct signature vilification, resulting in "illegal ballots"). Courts have repeatedly rejected these 2022 challenges as well. *See id.*

Plaintiffs' lawsuit echoes the same themes from these past cases. Undeterred by their repeated courtroom losses in 2020 and 2022, Republican-affiliated groups and individuals continue to assert baseless allegations of voter fraud, claims that do nothing to protect the integrity of elections and instead only undermine voters' confidence in election outcomes. Former President Trump was already asserting interference with the 2024 general election more than a year ago, *see* Nick Mordowanec, *Trump Already Claiming*

*Interference in 2024 Election*, Newsweek (May 17, 2023), https://www.newsweek.com/trump-already-claiming-interference-2024-election-1800976, and the "right-wing Heritage Foundation" recently proclaimed the illegitimacy of the 2024 election, with its executive director asserting, "As things stand right now, there's a zero percent chance of a free and fair election," Isaac Arnsdorf, *Trump Allies at Heritage Declare 2024 Election Illegitimate in Advance*, Wash. Post (July 11, 2024), https://www.washingtonpost.com/politics/2024/07/11/heritage-foundation-election-war-game. Meanwhile, the RNC has ranked "election integrity" as a key priority for its 2024 campaign, *see 2024 GOP Platform: Make America Great Again!*, Am. Presidency Project (July 8, 2024), https://www.presidency.ucsb.edu/documents/2024-republican-party-platform—and has been open about its plans to use litigation to advance its goals in the runup to this year's general election. These efforts have been widely covered in the media,[4] including a recent report in *The New York Times*, which noted that "Democrats, civil rights lawyers and even some Republicans say that the threat is clear: Even if the cases fail, Mr. Trump's allies are building excuses to dispute the results, while trying to empower thousands of local election officials to disrupt the process." Jim Rutenberg & Nick Corasaniti, *Unbowed by Jan. 6 Charges, Republicans Pursue Plans to Contest a Trump Defeat*, N.Y. Times (July 13, 2024), https://www.nytimes.com/2024/07/13/us/politics/republican-election-campaign-2024.html. The *Times* report quoted prominent Republican election lawyer Ben Ginsberg as warning, "The fundamental principle of the system—the

---

[4] *See, e.g.*, Ximena Bustillo, *As Trump Continues to Remake RNC in His Image, New Memo Outlines What That Looks Like*, NPR (Mar. 15, 2024), https://www.npr.org/2024/03/15/1238765442/rnc-trump-republicans-whatley-lara-election-integrity-voter-fraud-early-voting; Nick Corasaniti et al., *G.O.P. Intensifies Scrutiny of Voting: 'We're Keeping a Close Eye on You'*, N.Y. Times (Apr. 20, 2024), https://www.nytimes.com/2024/04/20/us/politics/trump-rnc-voting-election.html; Patrick Marley et al., *With Push from Trump, Republicans Plan Blitz of Election-Related Lawsuits*, Wash. Post (Mar. 22, 2024), https://www.washingtonpost.com/politics/2024/03/22/republicans-election-lawsuits-rnc.

rule of law, the finality of the results, the ability to challenge an election but then accept the results if the challenges fail—is being stood on its head." *Id.*

By creating and perpetuating the false narrative that America's elections are replete with fraud, and by vowing to put an end to it, the Republican Party has positioned itself as the solution to a fictional problem of its own creation. Based on the former president's recent statements, the Republican strategy—of which this lawsuit is a part—is a clear attempt to lay the groundwork for post-election litigation claiming that the 2024 election was marred by fraud.

Republicans' claims of fraud and electoral malfeasance are as unfounded today as they were four years ago. Indeed, federal courts have recently rejected strikingly similar (and equally baseless) challenges to list-maintenance practices in other states. For example, a federal court in Michigan rejected a claim brought by the conservative Public Interest Legal Foundation ("PILF") that that state's program to remove deceased voters encouraged fraud or otherwise conflicted with the NVRA. *See Benson*, 2024 WL 1128565, at *12 ("After conducting more than nine months of discovery into the many facets of Michigan's program for the removal of deceased registrants, PILF has identified no genuine issue for trial regarding its claim that the program is not reasonable."). That case, like Plaintiffs' claim here, was "based on [the] matching" of unwarrantedly compared lists (there, matching "potentially deceased voters" on the voter rolls with publicly available data like the Social Security Death Index). *Id.* at *9–11 (cleaned up). The Michigan court recognized the substantial threat to voters posed by such lawsuits, noting that "purging voters from the rolls requires voters to re-register and hinders participation in elections." *Id.* at *1 (quoting *Am. C.R. Union*, 872 F.3d at 178). Less than two weeks after PILF's lawsuit was dismissed, the RNC filed yet another case in the same court alleging, like Plaintiffs here, that Michigan must be violating the NVRA because its voter-registration

rates are too high. *See generally* Complaint, *RNC v. Benson*, No. 1:24-cv-00262 (W.D.
Mich. Mar. 13, 2024), ECF No. 1.[5]

Five days after filing its Michigan suit, the RNC struck again, raising nearly
identical claims in Nevada. *See generally* Complaint for Declaratory & Injunctive Relief,
*RNC v. Aguilar*, No. 2:24-cv-00518 (D. Nev. Mar. 18, 2024), ECF No. 1. As in its
Michigan suit, and like Plaintiffs' lawsuit here, the RNC alleged that Nevada is "failing
to make a reasonable effort to conduct appropriate list maintenance as required by the
NVRA" because "[a]t least five counties in Nevada have inordinately high voter
registration rates." *Id.* ¶¶ 3, 6. After a federal court dismissed the complaint without
prejudice for lack of standing, the RNC filed an amended complaint; while the new
complaint provides additional injury-related allegations, the merits of the lawsuit are
unchanged. *See generally* First Amended Complaint for Declaratory & Injunctive Relief,
*RNC v. Aguilar*, No. 2:24-cv-00518 (D. Nev. July 2, 2024), ECF No. 98.

This case and its analogues in Michigan and Nevada are merely the latest efforts in
the ongoing conservative attempt to use litigation to aggressively purge voter rolls. PILF
in particular has been unceasing in its baseless (and uniformly unsuccessful) attempts to
purge voters from the rolls.[6] Another conservative organization, Judicial Watch, has filed

---

[5] A motion to dismiss the RNC's complaint is fully briefed and pending before the
court.

[6] *See* Complaint for Declaratory Judgment & Injunctive Relief, *PILF v. Knapp*, No.
3:24-cv-01276 (D.S.C. Mar. 14, 2024), ECF No. 1 (case ongoing); Complaint for
Declaratory Judgment & Injunctive Relief, *PILF v. Bos. Elections Dep't*, No. 1:24-cv-
10521 (D. Mass. Feb. 29, 2024), ECF No. 1 (voluntary dismissal); Complaint for
Declaratory & Injunctive Relief, *PILF v. Dupuis*, No. 4:24-cv-00679 (N.D. Cal. Feb. 5,
2024), ECF No. 1 (case ongoing); Plaintiff's Complaint for Declaratory & Injunctive
Relief, *PILF v. Nago*, No. 1:23-cv-00389 (D. Haw. Sept. 21, 2023), ECF No. 1 (case
ongoing); Complaint for Declaratory & Injunctive Relief, *PILF v. Griswold*, No. 1:21-cv-
03384 (D. Colo. Dec. 16, 2021), ECF No. 1 (case ongoing); Complaint for Declaratory
Judgment & Injunctive Relief, *PILF v. Evans*, No. 1:21-cv-03180 (D.D.C. Dec. 6, 2021),
ECF No. 1 (stipulated dismissal); Complaint for Declaratory & Injunctive Relief, *PILF v.
Winfrey*, No. 2:19-cv-13638 (E.D. Mich. Dec. 10, 2019), ECF No. 1 (stipulated dismissal).

lawsuits in Illinois and California, as has a similar group in Maryland—all, like Plaintiffs here, alleging NVRA violations premised on fundamental misunderstandings of the underlying law and statistics. *See* Complaint for Declaratory & Injunctive Relief ¶ 24, *Jud. Watch, Inc. v. Weber*, No. 2:24-cv-03750 (C.D. Cal. May 6, 2024), ECF No. 1 (alleging presumptive violation of NVRA because, "[i]n Plaintiffs' experience," the number of removals based on changed residency was "absurdly small" compared to census data); Complaint ¶ 31, *Jud. Watch, Inc. v. Ill. State Bd. of Elections*, No. 1:24-cv-01867 (N.D. Ill. Mar. 5, 2024), ECF No. 1 (same); Complaint for Declaratory & Injunctive Relief ¶¶ 22–28, *Md. Election Integrity LLC v. Md. State Bd. of Elections*, No. 1:24-cv-00672 (D. Md. Mar. 6, 2024), ECF No. 1 (alleging that "[m]eticulous analysis of the official Maryland State Voter Registration Database reveals a minimum of 79,392 current apparent registration violations").[7]

Plaintiffs' claim here fits into this pattern of unsubstantiated election-related lawsuits. They allege that Arizona's election processes are flawed and raise concerns about fraud. *See, e.g.*, Compl. ¶ 36 ("Retaining voter rolls bloated with ineligible voters harms the electoral process, heightens the risk of electoral fraud, and undermines public confidence in elections."). But Plaintiffs, including the chair of the Republican Party of Arizona, waited until June of a presidential election year to file their complaint. Given this delay, they *cannot* obtain any systematic relief before the 2024 elections: Federal law forbids cancelling voter registrations based on a potential change of residence within ninety days of a federal election, *see* 52 U.S.C. § 20507(c)(2), and Arizona has upcoming elections on July 30 and August 7. And to secure relief for the November general election—during the narrow window between the July 30 election and August 7, the

---

[7] The Maryland case was dismissed on standing grounds. *See Md. Election Integrity, LLC v. Md. State Bd. of Elections*, No. SAG-24-00672, 2024 WL 2053773, at *4 (D. Md. May 8, 2024), *appeal docketed*, No. 24-1449 (4th Cir. May 17, 2024).

ninety-day cutoff before November 5—Plaintiffs would have needed to seek expedited relief. They have not. Accordingly, this litigation cannot deliver the relief Plaintiffs seek before the November general election; its only practical effect is to reduce confidence in the integrity of that election, sowing doubt that can later be reaped in potential post-election litigation of the sort Arizona witnessed in 2020 and 2022.

In the end, the greatest threat to confidence in the security of our elections is not fraud or voter-roll maintenance practices, but unfounded attacks on election integrity. The recent "explosion of misinformation . . . disrupt[s] the democratic process" because it "confuses and overwhelms voters." Gabriel R. Sanchez & Keesha Middlemass, *Misinformation Is Eroding the Public's Confidence in Democracy*, Brookings Inst. (July 26, 2022), https://www.brookings.edu/articles/misinformation-is-eroding-the-publics-confidence-in-democracy. Political-science literature confirms the danger these baseless accusations pose to the public's perception of election results. One recent peer-reviewed study found that "unsubstantiated claims of voter fraud undermine the public's confidence in elections, particularly when the claims are politically congenial, and that these effects cannot easily be ameliorated by fact-checks or counter-messaging." Nicolas Berlinski et al., *The Effects of Unsubstantiated Claims of Voter Fraud on Confidence in Elections*, 10 J. Experimental Pol. Sci. 34, 36 (2023). Another confirmed that "[p]erceived problems in election administration, especially if these problems are highly advertised, exaggerated, or, outright false, negatively affect voter confidence." Mara Suttmann-Lea & Thessalia Merivaki, *The Impact of Voter Education on Voter Confidence: Evidence from the 2020 U.S. Presidential Election*, 22 Election L.J. 145, 147 (2023). And though one might expect that strengthening election security would reduce distrust in elections, "public opinion is only weakly responsive to changes in policy or outcomes," making rhetorical changes by well-known public figures "crucial." Olivier Bergeron-Boutin et al., *Communicating with*

*Voters to Build Trust in the U.S. Election System*, MIT Election Data & Science Lab 1, 4 (Oct. 2023), https://electionlab.mit.edu/sites/default/files/2023-10/voter-trust.pdf.

In other words, the spreading of misinformation about election integrity "has lasting implications on voters' trust in election outcomes." Sanchez & Middlemass, *supra*. Commentators have similarly agreed that unfounded attacks have a deleterious effect on the public's overall confidence in elections. For example, although proponents of restrictive registration and voting laws "have traditionally argued that such laws are needed to police rampant voter fraud—a claim most experts call unfounded—some are now saying the perception of fraud, real or otherwise, is an equally serious problem, if not worse." Michael Wines, *One Rationale for Voter ID Debunked, G.O.P. Has Another*, N.Y. Times (Mar. 23, 2017), https://www.nytimes.com/2017/03/23/us/election-fraud-voter-ids.html. Far from assuaging voters' concerns about election integrity, baseless litigation like this serves only to intensify those fears, damaging democracy—and, as recent experience has demonstrated, the rule of law—in the process.

## CONCLUSION

What is ultimately at stake here is not, as Plaintiffs would have this Court believe, the integrity of Arizona's forthcoming presidential election, but rather the public's confidence in that election. Following the lead of courts confronting similarly baseless and pernicious cases across the country, this Court should dismiss Plaintiffs' lawsuit.

Dated: July 30, 2024

**PERKINS COIE LLP**

By: */s/ Alexis E. Danneman*
    Alexis E. Danneman
    2525 East Camelback Road, Suite 500
    Phoenix, Arizona 85016-4227

    Jonathan P. Hawley*
    1201 Third Avenue, Suite 4900
    Seattle, Washington 98101-3099

    Roy Herrera
    Daniel A. Arellano
    **HERRERA ARELLANO LLP**
    1001 North Central Avenue, Suite 404
    Phoenix, Arizona 85004

    *Attorneys for the Democratic National*
    *Committee and Arizona Democratic Party*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2024, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

*/s/ Indy Fitzgerald*