**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Scot Mussi, et al., <br>     Plaintiffs, <br> v. <br> Adrian Fontes, <br>     Defendant. | No. CV-24-01310-PHX-DWL <br><br> **ORDER** |

In this action, Scot Mussi, Gina Swoboda, and Steven Gaynor (collectively, "Plaintiffs") allege that Adrian Fontes, in his official capacity as the Arizona Secretary of State ("the Secretary"), violated the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C § 20501 *et seq.*, by failing to make a reasonable effort to remove the names of ineligible voters from Arizona's lists of eligible voters.

Now pending before the Court is the Secretary's motion to dismiss. (Doc. 20.) For the reasons that follow, the motion is granted.

## BACKGROUND

I. <u>Factual Allegations</u>

The following facts, presumed true, are derived from Plaintiffs' operative pleading, the complaint. (Doc. 1.)

    A. **The Parties**

"Plaintiff Scot Mussi is a duly registered Arizona voter who lives in Maricopa County. Mussi regularly votes in Arizona's primary and general elections, and is currently

President of the Arizona Free Enterprise Club. Mussi has spent nearly 20 years working on conservative issues and causes in Arizona, and he plans to vote in Arizona's upcoming federal and state elections." (*Id.* ¶ 21.)

"Plaintiff Gina Swoboda is Chair of the Republican Party of Arizona" ("AZ GOP"). (*Id.* ¶ 23). "[She] works in Arizona to advance conservative policies and to help elect Republican candidates. AZ GOP relies upon accurate voter registration rolls to engage in electoral activity, contact voters, get out the vote, monitor the integrity of elections, protect the efficacy of AZ GOP adherents' votes, and decide how to allocate limited resources." (*Id.* ¶ 25).

"Plaintiff Steven Gaynor is a duly registered Arizona voter who lives in Maricopa County. Gaynor regularly votes in Arizona's primary and general elections. He plans to vote in Arizona's upcoming federal and state elections." (*Id.* ¶ 27).

Defendant Adrian Fontes is Arizona's Secretary of State "and is responsible for the statewide list maintenance required by the NVRA." (*Id.* ¶¶ 1, 34.)

B. **The Challenged Conduct**

"Section 8 of the [NVRA], 52 U.S.C. § 20507, requires states to 'conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . (A) the death of the registrant; or (B) a change in the residence of the registrant' to maintain accurate and updated voter-registration records in a uniform manner across the state." (*Id.* ¶ 1, cleaned up.) According to Plaintiffs, "Arizona has failed to comply with this requirement because Arizona voter registration data and statistics indicate the lack of an NVRA-compliant list maintenance program in the state." (*Id.* ¶ 2.) Specifically, Plaintiffs allege that "the Secretary—when providing information regarding [Arizona's] list maintenance programs to the state legislature—has responded that its program 'is in development,' meaning that the general maintenance program required of states by the NVRA does not currently exist in Arizona." (*Id.* ¶ 3.) As a result of this alleged failure, counties across Arizona have voter registration rates that are "implausibly high." (*Id.* ¶ 7.) Plaintiffs allege that, by their calculation,

Arizona has between 500,000 and 1.27 million registered voters on its voter rolls who are either deceased or no longer live in Arizona and who "should not be currently registered." (*Id.* ¶¶ 8-10.) Plaintiffs also allege that "752,387 voter registration confirmation notices were sent to voters listed on the registration rolls in Maricopa County to determine if they still lived at the location where they were registered to vote. And while the data shows that 131,682 voters were removed for various reasons from the notice batch, there are no reported voter responses or removals by the Secretary accounting for the status of the remaining 620,000 notice letters." (*Id.* ¶ 13.) According to Plaintiffs, this means "that the 500,000 unaccounted-for registered voters remaining on Arizona's voter rolls is primarily attributable to voters moving out of Arizona or voters who failed to respond to confirmation notices—both of which are established methods of maintaining clean and updated voter rolls." (*Id.* ¶ 16.) "Based on this and other evidence, the Secretary is failing to make a reasonable effort to conduct appropriate list maintenance, despite the NVRA's requirement that he maintain updated and accurate voter rolls." (*Id.* ¶ 18.)

II. Procedural Background

On June 3, 2024, Plaintiffs commenced this action. (Doc. 1.)

On June 25, 2024, the Secretary moved to dismiss. (Doc. 20.)

On July 25, 2024, Plaintiffs filed a response. (Doc. 29.)

On August 8, 2024, the Secretary filed a reply. (Doc. 34.)[1]

On November 21, 2024, the Court issued a tentative ruling. (Doc. 41.)

On December 3, 2024, the Court heard oral argument. (Doc. 42.)

**DISCUSSION**

The Secretary moves to dismiss both under Rule 12(b)(1), for lack of standing, and under Rule 12(b)(6), for failure to state a claim. Because standing implicates the Court's subject-matter jurisdiction, the analysis begins there. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 430-31 (2007) ("[A] federal court generally may not rule on

---

[1] Several amici have filed briefs in support of the Secretary's motion to dismiss. (Docs. 28, 36, 38.)

- 3 -

the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction)."); *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) ("Because standing and mootness both pertain to a federal court's subject-matter jurisdiction under Article III, they are properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), not Rule 12(b)(6).").

I. <u>Legal Standard</u>

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560-61 (cleaned up). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up).

II. <u>Injury-In-Fact</u>

A. **The Parties' Arguments**

The Secretary argues that Plaintiffs lack standing. (Doc. 20 at 7-11.) As for the first element of standing (injury-in-fact), the Secretary contends it is not satisfied because "Plaintiffs are not entitled to bring a federal lawsuit just to confirm that laws are being followed to their liking." (*Id.* at 8.) The Secretary also contends that the risk of vote dilution alleged in the complaint "is both too speculative and not a cognizable claim" because "[s]uch harm could result only after: (1) an ineligible voter requests an early ballot or presents at a polling place; (2) casts a ballot; (3) that ineligible ballot is tabulated; and

(4) sufficient other ineligible voters engage in the same series of steps in a number sufficient to 'dilute' Plaintiffs' votes. This is precisely the type of 'long chain of hypothetical contingencies that have never occurred in Arizona and must take place for any harm to occur' that has been repeatedly rejected by federal courts." (*Id.* at 8-9.) The Secretary also argues that "even if these problems did not bar Plaintiffs' standing, federal courts do not recognize a generalized 'vote dilution' harm outside of redistricting cases." (*Id.* at 9.) Finally, the Secretary argues that "Plaintiffs' asserted lack of confidence in Arizona's elections is not a state-created burden on the right to vote and does not provide standing" and that "any steps Plaintiffs choose to take are not state-created harms, but voluntary actions taken due to their own mistaken beliefs." (*Id.*)

Plaintiffs respond by citing several cases that, in their view, support the proposition that "[i]n NVRA cases, a government's alleged 'noncompliance with the NVRA' that 'undermines the individual plaintiffs' confidence in the integrity of the electoral process and discourages their participation' is a sufficient injury for Article III standing purposes." (Doc. 29 at 4.) According to Plaintiffs, "[t]his type of alleged injury is neither speculative, nor hypothetical because the lack of confidence is a *present* condition, not something that might happen in the future." (*Id.*) Plaintiffs thus argue that they "are injured because 'Arizona's inaccurate rolls undermine Plaintiffs' confidence in the integrity of Arizona elections, which also burdens their right to vote.'" (*Id.* at 5.) Plaintiffs also contend they have "adequately alleged injury in an additional three ways." (*Id.*) "*First*, Plaintiffs have been, are currently, and will continue to be injured by voter dilution of Plaintiffs' legitimate votes because 'the Secretary does not maintain accurate voter rolls, [so] ineligible voters have an opportunity to vote in Arizona elections.' *Second*, Plaintiffs are required to 'spend more time and resources monitoring Arizona's elections for fraud and abuse, mobilizing voters to counteract it, educating the public about election-integrity issues, and persuading elected officials to improve list maintenance' due to the Secretary's failure to maintain accurate voter rolls. *Third*, inaccurate voter rolls compel Plaintiffs to 'spend more of their time and resources on get-out-the-vote efforts for like-minded individuals—eligible voters

who, because the Secretary does not maintain accurate voter rolls, lack confidence in the accuracy and integrity of Arizona's elections.'" (*Id.*) Plaintiffs also contend that Swoboda, "in her capacity as Chair of Arizona GOP, is injured by inaccurate voter rolls because it frustrates the AZ GOP's mission and diverts its resources." (*Id.* at 6.)

In reply, the Secretary reiterates his position that Plaintiffs fail to satisfy Article III's standing requirements. (Doc. 34 at 3-4.) In response to Plaintiffs' contention that they have identified four discrete injuries, the Secretary argues that "[d]espite the fashion in which Plaintiffs have posed them, these are not four distinct harms; rather, all are derivations of a single concern, that votes Plaintiffs view as legitimate (and in favor of their preferred candidates) may be outnumbered by votes from voters that Plaintiffs view as illegitimate (and against their preferred candidates). This is not federally-cognizable harm." (*Id.* at 3.) Next, the Secretary argues that Plaintiffs' "attenuated chain of ifs and maybes is hypothetical, and not concrete or particularized to the Plaintiffs." (*Id.* at 4.). Next, the Secretary argues that Plaintiffs' cited cases "1) do nothing to show that *these Plaintiffs* have standing in *this case*; and 2) are all easily distinguishable from the case at bar in any event." (*Id.*) The Secretary further argues that "[t]his Court is not bound by any of these decisions, and given the legal distinctions between those cases and the case at bar, this Court should decline to follow them." (*Id.* at 5.) The Secretary concludes that if Plaintiffs' allegations were deemed sufficient, "there is no limit to the type of claim that such self-assessed 'concern' could transform into a constitutional controversy." (*Id.* at 6.)

B. **Analysis**

This is not the first lawsuit in which a court has been asked to entertain a claim of inadequate voter-roll maintenance in violation of the NVRA. Some courts have rejected such lawsuits for lack of standing. *Republican Nat. Comm'n v. Benson*, 2024 WL 4539309, *7-12 (W.D. Mich. 2024); *Republican Nat. Comm'n v. Aguilar*, 2024 WL 4529358, *3-8 (D. Nev. 2024); *Child v. Delaware Cnty.*, 2024 WL 4643966, *4 (E.D. Pa. 2024); *Judicial Watch, Inc. v. Illinois Family Action, Breakthrough Ideas*, 2024 WL 4721512, *5-7 (N.D. Ill. 2024). *See also Drouillard v. Roberts*, 2024 WL 4667163, *4 (N.D. Cal. 2024)

(denying TRO request premised in part of NVRA voter-roll maintenance claim due to lack of standing). Other courts have concluded that an individual plaintiff may establish an injury-in-fact in this context by alleging vote dilution and/or a lack of confidence in the integrity of the election process. *Green v. Bell*, 2023 WL 2572210, \*4 (W.D.N.C. 2023) (accepting both theories); *Judicial Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091, 1103-04 (D. Colo. 2021) (rejecting vote-dilution theory but accepting confidence theory). Still other courts have concluded that an organizational plaintiff may establish an injury-in-fact in this context by alleging that the challenged conduct causes increased within-mission organizational expenditures, otherwise frustrates the organization's purpose, and/or undermines its members' confidence in the integrity of the election process. *Public Interest Legal Foundation v. Benson*, 2022 WL 21295936, \*6 (W.D. Mich. 2022) (accepting expenditures theory); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 787-93 (W.D. Tex. 2015) (rejecting vote-dilution and confidence theories but accepting expenditures theory); *Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919, 924-25 (S.D. Ind. 2012) (accepting confidence theory as to one organization and frustration-of-purpose theory as to other organization). Acknowledging that the issue presents a debatable call, the Court concludes that Plaintiffs lack standing here because they have not alleged a concrete and particularized injury that is actual and imminent.

It is helpful to begin with first principles. As the Supreme Court recently emphasized, the purpose of the injury-in-fact requirement is to "screen[] out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action. For example, a citizen does not have standing to challenge a government regulation simply because the plaintiff believes that the government is acting illegally. A citizen may not sue based only on an asserted right to have the Government act in accordance with law. Nor may citizens sue merely because their legal objection is accompanied by a strong moral, ideological, or policy objection to a government action." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 381 (2024) (cleaned up). Where "[t]he only injury plaintiffs allege is that the law . . . has not been followed," "[t]his injury

is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance." *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam). *See also FEC v. Akins*, 524 U.S. 11, 24 (1998) ("[An alleged] injury to the interest in seeing that the law is obeyed . . . deprives the case of the concrete specificity that characterized those controversies which were the traditional concern of the courts at Westminster, and which today prevents a plaintiff from obtaining what would, in effect, amount to an advisory opinion.") (cleaned up).

For these reasons, even assuming the Secretary has violated the NVRA's voter-roll maintenance requirement, it doesn't necessarily follow that Plaintiffs have Article III standing to pursue a lawsuit based on that violation. Although the NVRA creates a private right of action for any person "aggrieved" by a statutory violation, 52 U.S.C. § 20510(b)(2), Plaintiffs still must allege that the challenged conduct has caused them to suffer a concrete and particularized injury that is actual and imminent, not conjectural or hypothetical. *See, e.g., TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) ("[T]his Court has rejected the proposition that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."); *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997) ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."). *See also Ass'n of Community Organizations for Reform Now v. Fowler*, 178 F.3d 350, 365 (5th Cir. 1999) (although "Congress intended the NVRA's private-right-of-action provision to eliminate prudential limitations on standing," a plaintiff asserting a claim under the NVRA must still "satisfy the standing requirements arising under Article III").

Notwithstanding these principles, Plaintiffs asserted during oral argument that Article III standing necessarily exists whenever a plaintiff alleges that a violation of the NVRA has diminished that plaintiff's confidence in the integrity of the electoral process. This is so, in Plaintiffs' view, because the express purposes of the NVRA include "protect[ing] the integrity of the electoral process" and "ensur[ing] that accurate and

current voter registration rolls are maintained," *see* 52 U.S.C. § 20501(b)(3)-(4), and because Congress created a private right of action under the NVRA. During oral argument, Plaintiffs asserted that these statutory features mean any alleged violation of the NVRA that causes decreased voter confidence is a concrete injury-in-fact for Article III purposes: "[T]he NVRA mandates a certain type of action be taken . . . in maintaining voter rolls. A private right of action is then created if that process is not followed where the type of harm that was intended to be avoided, meaning a lack of confidence, a lack of integrity in the electoral process, can then compel the Secretary to engage in those duties to cure those harms." Citing *Spokeo*, Plaintiffs added: "Once Congress identifies a harm by enacting a statute with a cause of action to redress that harm, we consider whether the statutory harm shares a 'close relationship with a harm that has traditionally provided a basis for a lawsuit in English or American courts.' If it does, then the plaintiffs' alleged intangible harm satisfies standing's concreteness requirements."

These arguments are unavailing. To be sure, in *Spokeo*, the Supreme Court held that Congress's judgment may be "instructive and important" when evaluating whether particular "intangible injuries can nevertheless be concrete." 578 U.S. at 340-41. *See also TransUnion,* 594 U.S. at 425-26 ("In determining whether a harm is sufficiently concrete to qualify as an injury in fact, the Court in *Spokeo* said that Congress's views may be 'instructive.' Courts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation."). Thus, Congress's enactment of the NVRA may bolster the concreteness of certain injuries that flow from statutory noncompliance. But Plaintiffs overlook that concreteness is only part of the standing inquiry. Indeed, in *Spokeo*, the Supreme Court exhorted lower courts to "fully appreciate the distinction between concreteness and particularization" when conducting a "standing analysis" and noted that "[w]e have made it clear time and time again that an injury in fact must be both concrete *and* particularized." *Id.* at 340, 342. As explained below, none of Plaintiffs' proffered harms satisfies all of the requirements for an

injury-in-fact under Article III.

One of Plaintiffs' theories of harm is that they "are currently, and will continue to be injured by voter dilution." (Doc. 29 at 5.) The Court has little trouble concluding that Plaintiffs' allegations on this issue are insufficient to establish standing. Even assuming the Secretary has failed to perform the sort of voter-list maintenance required by the NVRA, that lack of maintenance would not inexorably result in Plaintiffs' votes being diluted. Instead, as the Secretary notes, such dilution "could result only after: (1) an ineligible voter requests an early ballot or presents at a polling place; (2) casts a ballot; (3) that ineligible ballot is tabulated; and (4) sufficient other ineligible voters engage in the same series of steps in a number sufficient to 'dilute' Plaintiffs' votes." (Doc. 20 at 9.) The complaint conspicuously fails to allege that any of these steps have actually occurred in Arizona—instead, it simply speculates that the alleged lack of voter-list maintenance means "ineligible voters have an *opportunity* to vote in Arizona elections, *risking* the dilution of Plaintiffs' legitimate votes." (Doc. 1 ¶ 29, emphases added.) Additionally, during oral argument, Plaintiffs' counsel disavowed any contention that these hypothetical ineligible votes are being cast in a manner that disproportionately harms Plaintiffs' partisan electoral interests: "We're not making that allegation."

Under Ninth Circuit law, when a claim of "electoral manipulation" is based on a "long chain of hypothetical contingencies," a "district court correctly dismisse[s] the operative complaint for lack of Article III standing." *Lake v. Fontes*, 83 F.4th 1199, 1204 (9th Cir. 2024). Such is the case here in relation to Plaintiffs' vote-dilution theory. The problem is not a lack of concreteness but an overreliance on speculative contingencies. For this reason, many courts—including courts that have found standing based on other theories—have concluded that a plaintiff asserting a voter-list maintenance claim under the NVRA cannot establish standing under a vote-dilution theory due to the speculative nature of that harm. *Aguilar*, 2024 WL 4529358 at *4 ("Plaintiffs' vote dilution claim is too speculative. . . . At most, the amended complaint merely insinuates that voter fraud could happen, not that it is certainly impending or that there is a substantial risk that it would

happen due to inaccurate voter rolls.") (cleaned up); *Griswold*, 554 F. Supp. 3d at 1103 ("This alleged injury—that noncompliance with the law could dilute the individual plaintiffs' votes—is also hypothetical. . . . The possibility that the individual plaintiffs' votes—and every other voter's vote in equal measure—*could* be diminished because a fraudulent vote *could* be cast at some election in the future is insufficient to allege a concrete and particularized injury."); *Martinez-Rivera*, 166 F. Supp. 3d at 789 (finding no clear error in the magistrate judge's determination that "the risk of vote dilution [is] speculative"). *See generally Lujan*, 504 U.S. at 560 (an injury-in-fact must be "actual or imminent, not conjectural or hypothetical").

In addition to being impermissibly speculative, Plaintiffs' claim of vote dilution amounts to the sort of generalized grievance that lacks the particularization necessary to qualify an injury-in-fact for Article III standing purposes. As the Ninth Circuit recently explained: "[W]hether evaluated in the context of Article III or on the merits, the relevant principle is the same: the mere fact that some invalid ballots have been inadvertently counted, without more, does not suffice to show a distinct harm to any group of voters over any other." *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1089 n.13 (9th Cir. 2024). *See also Strong Communities Foundation of Arizona Inc. v. Richer*, 2024 WL 4475248, *8 (D. Ariz. 2024) ("Plaintiffs argue Cahill has suffered an injury because greater numbers of potentially-ineligible registrants dilute her vote. . . . [But] even if Cahill's vote was 'diluted' in the colloquial sense plaintiffs allege, that type of 'dilution' does not give Cahill particularized injury in fact because it is also suffered by every other voter. Cahill's voter dilution theory is therefore insufficient to establish her standing."). Many courts have reached the same conclusion in the NVRA voter-list maintenance context. *Aguilar*, 2024 WL 4529358 at *4 ("Johnston's fear of vote dilution can be raised by every and any voter in the State of Nevada. Any reduction in individual voting power due to independent acts of voter fraud are felt equally by all voters in Nevada and do not present an individual and personal injury of the kind required for Article III standing.") (cleaned up); *Child*, 2024 WL 4643966 at *4 ("Petitioners allege that both they and the public will be harmed by the

distribution and possible collection of unqualified voter ballots. This is exactly the type of generalized grievance that courts throughout this country have consistently dismissed for lack of standing."); *Drouillard*, 2024 WL 4667163 at *4 ("Plaintiffs' assertion of injury here—that their 'constitutional right to vote is impaired by the dilution of their vote resulting from counting votes of ineligible voters'—is plainly inadequate. . . . Because Plaintiffs have no particularized injury and sue only to have the Government act in accordance with law, they lack standing.") (cleaned up); *Griswold*, 554 F. Supp. 3d at 1103 ("The alleged [vote dilution] injury is a generalized grievance because it is shared equally by all voters. That is, the potential diminution in the value of each vote is not specific to the individual plaintiffs since they would not be specifically disadvantaged by fraudulent votes any more than other voters would be, even though fraud impacts the final tally of votes."); *Martinez-Rivera*, 166 F. Supp. 3d at 789 (finding no clear error in the magistrate judge's determination that "the risk of vote dilution [is] . . . more akin to a generalized grievance about the government than an injury in fact").

During oral argument, Plaintiffs advanced several reasons why their vote-dilution theory should not be categorized as a generalized grievance, but none of those arguments has merit. First, Plaintiffs argued that "[t]he fact that an injury may be suffered by a large number of people does not itself make the injury . . . generalized. The victim's injuries from a mass tort, for example, are widely spread." The problem with this argument is that a vote-dilution injury is, at least in this context, not an injury akin to a mass tort that affects a large (but still finite and limited) pool of people. Instead, it is an injury felt equally by *every* voter. *See, e.g., Election Integrity Project*, 113 F.4th at 1089 n.13; *Wood v. Raffensperger*, 981 F.3d 1307, 1314-15 (11th Cir. 2020) ("Wood argues that he has . . . standing . . . [because] the inclusion of unlawfully processed absentee ballots diluted the weight of his vote. To be sure, vote dilution can be a basis for standing. But it requires a point of comparison. For example, in the racial gerrymandering and malapportionment contexts, vote dilution occurs when voters are harmed compared to irrationally favored voters from other districts. By contrast, no single voter is specifically disadvantaged if a

vote is counted improperly, even if the error might have a mathematical impact on the final tally and thus on the proportional effect of every vote. Vote dilution in this context is a paradigmatic generalized grievance that cannot support standing.") (cleaned up). Plaintiffs also asserted during oral argument that the above-cited cases were wrongly decided[2] and urged the Court to instead follow the guidance of a law review article arguing that courts are too quick to dismiss election-related cases for lack of standing. Steven J. Mulroy, *Baby & Bathwater: Standing in Election Cases After 2020*, 126 Dick. L. Rev. 9 (2021). The Court must reject this invitation because it is bound to faithfully apply Ninth Circuit law, including the many recent Ninth Circuit decisions cited in this order that have rejected election-related lawsuits for lack of standing. *Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir. 1981) ("District courts are bound by the law of their own circuit."); *Stafne v. Burnside*, 2024 WL 2318169, *1 (9th Cir. 2024) ("Although Stafne argues otherwise based on a law review article, we must follow binding Supreme Court precedent."). Finally, Plaintiffs asserted during oral argument that disallowing election-related lawsuits whenever the harm is widespread would create perverse incentives for election officials and make it practically impossible to vindicate the purposes underlying the NVRA. But such arguments overlook that "Article III standing is not merely a troublesome hurdle to be overcome if possible so as to reach the merits of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787. . . . Standing doctrine helps safeguard the Judiciary's proper— and properly limited—role in our constitutional system." *United States v. Texas*, 599 U.S. 670, 675-76 (2023) (cleaned up). At any rate, the Court does not foreclose the possibility that a different set of plaintiffs, raising a different set of factual allegations, might be able to establish standing in the NVRA voter-list maintenance context. The narrow conclusion being reached here is that Plaintiffs' specific allegations and theories of harm are insufficient to meet their burden.

---

[2] In response to the Court's question, "[I]t seems to me that you disagree with [*Wood*] as a concept and you think that that's inconsistent with . . . Supreme Court cases," Plaintiffs' counsel stated: "I do, Your Honor."

Plaintiffs' next theory of harm is that "noncompliance with the NVRA that undermines the individual plaintiffs' confidence in the integrity of the electoral process and discourages their participation is a sufficient injury for Article III standing purposes." (Doc. 29 at 4.) According to Plaintiffs, this lack of confidence stems from a fear of vote dilution: "[B]ased on Arizona's inaccurate voter rolls, Plaintiffs' votes risk being diluted, and their confidence in elections is undermined." (*Id.* at 5, quoting Doc. 1 ¶ 31.)

Courts disagree about whether this "confidence" theory suffices to establish standing in the NVRA voter-list maintenance context. Some have rejected it. *Benson*, 2024 WL 4539309 at *9 ("[T]he 'fear' upon which the individual Plaintiffs rely is an insufficient basis for properly invoking federal-court jurisdiction."); *Aguilar*, 2024 WL 4529358 at *5-6 ("Johnston's undermined confidence in the integrity of Nevada's elections is not an injury that is distinct from that of any other registered voter . . . . Undermined confidence in the integrity of Nevada elections is [also] too speculative."); *Illinois Family Action*, 2024 WL 4721512 at *5 ("Davis and Judicial Watch assert only a generalized grievance of decreased confidence in the voting system. . . . The Court agrees with the majority view that generalized concerns over vote dilution do not give rise to standing."); *Martinez-Rivera*, 166 F. Supp. 3d at 789 (finding no clear error in the magistrate judge's determination that "undermined voter confidence . . . [is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact").[3] Others have accepted it. *Green*, 2023 WL 2572210 at *4 ("[Plaintiffs] also claim that North Carolina's 'inaccurate rolls' undermine their confidence in the state's elections, which further 'burdens their right to vote.' These alleged harms qualify as injuries in fact . . . .") (citations omitted); *Griswold*, 554 F. Supp. 3d at 1103-04 ("The Secretary insists that these purported injuries are also generalized and hypothetical, yet there is no indication that undermined confidence and discouraged participation are common to all members of the public. Nor

---

[3] Courts have also rejected this theory in cases arising under other voting-rights statutes. *Mancini v. Delaware County, PA*, 2024 WL 4680034, *3 (E.D. Pa. 2024) (dismissing, for lack of standing, a lawsuit brought under the Help America Vote Act of 2002 and holding that "a lack of confidence in the integrity of Delaware County's elections . . . is far too speculative to support Article III standing").

are these fears speculative or hypothetical.") (cleaned up); *King*, 993 F. Supp. 2d at 924 ("Judicial Watch alleges that the confidence of its members who are registered to vote in Indiana in the integrity of the electoral process has been undermined by the Defendants' failure to comply with the list maintenance requirements of the NVRA. If the state has a legitimate interest in preventing that harm from occurring, surely a voter who alleges that such harm has befallen him or her has standing to redress the cause of that harm.").

Acknowledging the split in authority on this issue, the Court concludes that Plaintiffs' "confidence" theory is insufficient to establish Article III standing. In *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), a group of "attorneys and human rights, labor, legal, and media organizations whose work allegedly requires them to engage in sensitive and sometimes privileged telephone and e-mail communications with colleagues, clients, sources, and other individuals located abroad" sought to bring a constitutional challenge to a provision of the Foreign Intelligence Surveillance Act of 1978 that "allows the Attorney General and the Director of National Intelligence to acquire foreign intelligence information by jointly authorizing the surveillance of individuals who are not 'United States persons' and are reasonably believed to be located outside the United States." *Id.* at 401, 406. In an attempt to establish standing, the plaintiffs alleged two injuries—*first*, that their communications would be illegally intercepted in the future; and *second*, that they had already sustained "present injuries . . . stemming from a reasonable fear of" such unlawful interceptions. *Id.* at 407. The Supreme Court concluded that the plaintiffs lacked standing under the first theory because it was premised on a "highly attenuated chain of possibilities" and thus did "not satisfy the requirement that threatened injury must be certainly impending." *Id.* at 410-11. Based on this determination, the Supreme Court concluded that the plaintiffs' second, fear-based theory "fares no better." *Id.* at 415. The Court explained:

> The Second Circuit's analysis improperly allowed respondents to establish standing by asserting that they suffer present costs and burdens that are based on a fear of surveillance, so long as that fear is not "fanciful, paranoid, or otherwise unreasonable." This improperly waters down the fundamental

requirements of Article III. Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending. In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending. If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear. . . . Thus, allowing respondents to bring this action based on costs they incurred in response to a speculative threat would be tantamount to accepting a repackaged version of respondents' first failed theory of standing.

*Id.* at 416 (citations omitted).

In the Court's view, the parallels between this case and *Clapper* are obvious. Plaintiffs effectively ask the Court to find that their fear of vote dilution—which, they allege, erodes their confidence in the electoral process and discourages their participation—is an injury that is independent from the actual vote dilution they separately identify as one of their injuries. But because, as discussed in earlier portions of this order, Plaintiffs' claim of vote dilution is too generalized, too speculative, and premised on too many hypothetical contingencies to qualify as an injury-in-fact, *Clapper* precludes Plaintiffs from repackaging their fear of vote dilution (and attendant lack of confidence in the electoral process) as an independent injury: "[Plaintiffs] cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending. If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by [incurring harm] based on a nonparanoid fear." *Id.* *See also Thielman v. Griffin-Valade*, 2023 WL 8594389, *1 (9th Cir. 2023) ("Plaintiffs allege that they are injured by 'a lack of confidence in the integrity of the election system.' But that alleged injury represents nothing more than the kind of speculation that stretches the concept of imminence beyond its purpose. . . . Plaintiffs allege only that they suffer a 'crisis of confidence' in Oregon's voting systems, which is the same 'speculative' grievance that we found insufficient to confer standing in *Lake*. Plaintiffs' conjectural allegations of potential injuries are insufficient to plead a

plausible real and immediate threat of election manipulation, as the district court correctly concluded in dismissing their claims.") (cleaned up).

Nor is there any merit to Plaintiffs' contention, raised during oral argument, that the statutory features of the NVRA compel a finding that a voter's claimed lack of confidence in the integrity of the electoral system is a sufficient injury to establish Article III standing. Although Congress stated that two of its purposes in enacting the NVRA were to "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained," *see* 52 U.S.C. § 20501(b)(3)-(4), the Court cannot see how such general observations could be interpreted as evincing an intent to enshrine, in each voter, an enforceable and concrete (if intangible) right to subjective confidence that all of the provisions of the NVRA are being followed. In the Court's view, the recognition of such a right would be impossible to reconcile with the bedrock standing principle that "[a] citizen may not sue based only on an asserted right to have the Government act in accordance with law." *Alliance for Hippocratic Medicine*, 602 U.S. at 381. And accepting Plaintiffs' confidence theory would be particularly problematic here because, as discussed above, Plaintiffs expressly premise their lack of confidence on a fear of vote dilution. Fear of an injury that is itself too speculative and generalized to create standing cannot be an independently sufficient source of standing. *Clapper*, 568 U.S. at 416.

This leaves Plaintiffs' final two theories of harm, which are essentially that the Secretary's alleged inaction has caused Plaintiffs (and the AZ GOP) to spend "time and resources" on various educational, voter mobilization, and monitoring efforts, resulting in a "diversion of resources" that qualifies as an injury-in-fact under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). (Doc. 29 at 5-6.) These theories are unavailing. As an initial matter, and as the Secretary notes in his reply, Plaintiffs' attempt "to assert standing under a diversion of organizational resources theory" is difficult to reconcile with the fact that "there are no organizational plaintiffs named as parties." (Doc. 34 at 7.) During oral argument, Plaintiffs were tellingly unable to identify a single case endorsing this approach.

At any rate, the Ninth Circuit's recent decision in *Arizona Alliance for Retired*

*Americans v. Mayes*, 117 F.4th 1165 (9th Cir. 2024)—which was issued after the motion-to-dismiss briefing was completed—forecloses Plaintiffs' reliance on such theories. In *Arizona Alliance*, the Ninth Circuit clarified that "our circuit's confusing line of organizational standing cases that have broadly construed [*Havens Realty*] as allowing an organization to assert standing if it diverts resources in response to a governmental policy that frustrates its mission" are no longer good law. *Id.* at 1169-70. Following *Arizona Alliance*, "neither the frustration of a mission nor the diversion of resources confers [an organization with] standing under Article III." *Id.* at 1170. Instead, an organization must "show that a challenged governmental action directly injures the organization's pre-existing core activities and does so *apart* from the plaintiffs' response to that governmental action." *Id.* Thus, an organization cannot establish an injury-in-fact by "expending money to gather information and advocate against the defendant's actions," by making "vague claims that a policy hampers [its] mission," by "spending money voluntarily" on "public advocacy" or "public education" functions "in response to a governmental policy," or by "divert[ing] resources in response to a governmental policy that frustrates its mission." *Id.* at 1170, 1177, 1178. These principles undermine Plaintiffs' final theories of harm.[4]

Because Plaintiffs have failed to allege a cognizable injury-in-fact, it is unnecessary to address the remaining elements of standing. And because Plaintiffs lack standing, it would be inappropriate to address the Secretary's alternative merits-based dismissal arguments under Rule 12(b)(6). *Moore v. Maricopa Cnty. Sheriff's Office*, 657 F.3d 890, 895 (9th Cir. 2011) ("[T]he Supreme Court has specifically instructed that a district court must first determine whether it has jurisdiction before it can decide whether a complaint states a claim."). The complaint is dismissed without prejudice due to a lack of standing. *Fleck and Associates, Inc. v. City of Phoenix*, 471 F.3d 1100, 1106-07 (9th Cir. 2006)

---

[4] As noted, some district courts have found organizational standing in NVRA voter-list maintenance cases based on diversion-of-resources or frustration-of-purpose theories. *Benson*, 2022 WL 21295936 at *6; *Martinez-Rivera*, 166 F. Supp. 3d at 787-93; *King*, 993 F. Supp. 2d at 924-25. However, those cases were decided before the 2024 decisions by the Supreme Court in *Alliance for Hippocratic Medicine* and by the Ninth Circuit in *Arizona Alliance*.

(dismissals for lack of subject-matter jurisdiction are always without prejudice).

III. Leave To Amend

The Secretary argues in his reply that leave to amend should be denied in the event of dismissal. (Doc. 34 at 8.) Plaintiffs are silent on this issue in their response.

The Ninth Circuit has stated that, at least in certain circumstances, "a district court should grant leave to amend even if no request to amend the pleading was made." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (citation omitted). The Ninth Circuit has also stated that "[R]ule 15's policy of favoring amendments to pleadings should be applied with 'extreme liberality.'" *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (citation omitted). *See also Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). Accordingly, although the Court is skeptical that Plaintiffs will be able to plead any new facts sufficient to cure the standing-related deficiencies identified in this order, the Court will give Plaintiffs an opportunity to attempt to do so.

**IT IS ORDERED** that:

1. The Secretary's motion to dismiss (Doc. 20) is **granted**. The complaint is dismissed without prejudice.

2. Plaintiffs may, within 14 days of the issuance of this order, file a First Amended Complaint ("FAC"). The FAC may include only changes from the complaint that are intended to remedy the deficiencies identified in this order. If Plaintiffs choose to file a FAC, they must also file, as an exhibit, a redlined version that indicates how the FAC differs from the complaint.

3. If Plaintiffs do not file a FAC within 14 days of the issuance of this order, the Clerk shall enter judgment accordingly and terminate this action.

Dated this 5th day of December, 2024.

_____
Dominic W. Lanza
United States District Judge